**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NATIONAL RAILROAD PASSENGER
CORPORATION—AMTRAK,

                Petitioner,

      v.

METRO-NORTH COMMUTER RAILROAD
COMPANY,

                Respondent.

Civil Action No. 26-cv-3339

**MEMORANDUM IN SUPPORT OF AMTRAK'S MOTION FOR**
**<u>PRELIMINARY INJUNCTIVE RELIEF</u>**

Elizabeth Edmondson
**JENNER & BLOCK LLP**
1155 Avenue of the Americas
New York, NY 10036-2711
(212) 891-1606
eedmondson@jenner.com

Jessica Ring Amunson*
**JENNER & BLOCK LLP**
1099 New York Ave NW, Suite 900
Washington, DC 20001-4412
(202) 639-6023
jamunson@jenner.com

* *pro hac vice* application forthcoming


*Counsel for Amtrak*

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................................1

II. FACTUAL BACKGROUND ...............................................................................................3

    1.   The Agreements Require Metro-North to Facilitate Both Revenue and Non-Revenue Service.............................................................................................................4

    2.   Metro-North Is Responsible for Calculating Amtrak's Monthly Payment for Revenue and Non-Revenue Service.................................................................................5

    3.   Metro-North Assumes the Risk of Damage to Its Infrastructure in Exchange for a Monthly Risk Fee .................................................................................................5

    4.   Disputes Must Be Resolved in Good Faith or Submitted to Arbitration ......................6

III. JURISDICTION ...............................................................................................................13

IV. ARGUMENT....................................................................................................................13

    A.  Absent a Preliminary Injunction, Amtrak Will Suffer Irreparable Harm and the Arbitration of this Dispute Contemplated in the Agreements Will Be Rendered Pointless .....................................................................................................................14

    B.  There Is At Least a Sufficiently Serious Question Going to the Merits to Warrant a Preliminary Injunction in Aid of Arbitration ..................................................................17

        1.   There Is a Sufficiently Serious Question as to Metro-North's Breach of the Parties' Agreements ...............................................................................................17

        2.   In the Alternative, There Is a Sufficiently Serious Question as to Metro-North's Breach of the Implied Covenant of Good Faith and Fair Dealing..................20

    C.  The Balance of Hardships Weighs Decidedly in Favor of Amtrak .................................21

    D.  The Public Interest Would Not Be Disserved by an Injunction in Aid of Arbitration.......................................................................................................................22

    E.  No Bond Is Required in Connection with this Preliminary Injunction.............................22

CONCLUSION.........................................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
   784 F.3d 887 (2d Cir. 2015) ............................................................................... *passim*

*Bldg. Serv. 32BJ Health Fund v. S & A Bldg. Servs., LLC*,
   No. 12-cv-3714, 2013 WL 1701012 (S.D.N.Y. Apr. 17, 2013) ............................................23

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   910 F.2d 1049 (2d Cir. 1990) ...............................................................1, 13, 17, 22

*Brenntag Int'l Chems., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999) ...................................................................................14

*Brown Bros. Elec. Contractors v. Beam Constr. Corp.*,
   41 N.Y.2d 397 (1977) ...............................................................................................18

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010) ................................................................................13, 22

*Dalton v. Educational Testing Service*,
   87 N.Y.2d 384 (1995) ...............................................................................................20

*Doctor's Assocs., Inc. v. Stuart*,
   85 F.3d 975 (2d Cir. 1996) ...................................................................................22, 23

*Elite Licensing, Inc. v. Thomas Plastics, Inc.*,
   250 F. Supp. 2d 372 (S.D.N.Y. 2003) ...................................................................23

*Fed. Ins. Co. v. Americas Ins. Co.*,
   691 N.Y.S.2d 508 (App. Div. 1st Dep't 1999) .......................................................18

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,
   922 F. Supp. 2d 435 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 210 (2d Cir. 2014) ............................21

*Gulf Ins. Co. v. Transatlantic Reinsurance Co.*,
   886 N.Y.S.2d 133 (App Div. 1st Dep't 2009) .......................................................18

*Jobim v. Songs of Universal, Inc.*,
   732 F. Supp. 2d 407 (S.D.N.Y. 2010) ...................................................................19

*LaForest v. Former Clean Air Holding Co.*,
   376 F.3d 48 (2d Cir. 2004) .....................................................................................23

*Martin v. Nat'l R.R. Corp.*,
   No. 18-CV-9688, 2019 WL 11794000 (S.D.N.Y. Oct. 31, 2019) .........................13

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993)..............................................................................................13, 17

*Old Colony Tr. Co. v. City of Omaha*,
    230 U.S. 100 (1913)..................................................................................................................18

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*,
    754 F.2d 91 (2d Cir. 1985)...................................................................................................14, 16

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*,
    769 F.3d 807 (2d Cir. 2014)....................................................................................................21

*Telenor Mobile Commc'ns AS v. Storm LLC*,
    584 F.3d 396 (2d Cir. 2009).....................................................................................................22

*Thales Avionics, Inc. v. L3 Techs., Inc.*,
    719 F. Supp. 3d 337 (S.D.N.Y. 2024).......................................................................................13

*Thomas v. Nat'l R.R. Passenger Corp.*,
    No. 22-CV-10225, 2025 WL 2771594 (S.D.N.Y. Sept. 29, 2025)...........................................17

*Tradescape.com v. Shivaram*,
    77 F. Supp. 2d 408 (S.D.N.Y. 1999).........................................................................................21

*Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*,
    No. 20-cv-5015, 2021 WL 3668092 (S.D.N.Y. Aug. 17, 2021)................................................20

*Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*,
    415 N.Y.S.2d 229 (App Div. 1st Dep't 1979), *aff'd*, 53 N.Y.2d 643 (1981) ..........................18

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) .......................................................................14

*Yang v. Kellner*,
    458 F. Supp. 3d 199 (S.D.N.Y.), *aff'd sub nom. Yang v. Kosinski*, 805 F.
    App'x 63 (2d Cir. 2020), *and aff'd sub nom. Yang v. Kosinski*, 960 F.3d 119
    (2d Cir. 2020)...........................................................................................................................21

**Statutes**

28 U.S.C. § 1349................................................................................................................................13

49 U.S.C. § 103..................................................................................................................................11

49 U.S.C. § 24101................................................................................................................................7

49 U.S.C. § 24101(a) ..........................................................................................................................3

49 U.S.C. § 24101(b) ..........................................................................................................................2

49 U.S.C. § 24308 ........................................................................................................3

§ 212 of the Passenger Rail Investment and Improvement Act of 2008 ........................................4

**Other Authorities**

49 C.F.R. § 213.301 ....................................................................................................7

49 C.F.R. § 213.307 ....................................................................................................7

49 C.F.R. § 213.333 ................................................................................................7, 14

Fed. R. Civ. P. 65(c) ..................................................................................................22

## I.  **INTRODUCTION**

Last month, Respondent Metro-North Commuter Railroad Company ("Metro-North") about-faced on more than thirty years of contractual performance with Petitioner National Railroad Passenger Corporation ("Amtrak") and began denying Amtrak permission to operate non-revenue train service on two rail lines that are critical to Amtrak's operations—Metro-North's New Haven and Hudson Lines—apparently as leverage for Metro-North's negotiating position in an unrelated dispute.  Non-revenue movements are an essential pillar of any train company's operations, including Amtrak's.  They are necessary to perform federally mandated testing of the tracks on which Amtrak operates, perform commissioning runs of new trains that will replace trains aging out of service, and relocate passenger equipment to areas where it is needed to ensure Amtrak service can run on time.

Under the parties' agreements, the underlying dispute is subject to mandatory arbitration. But in the meantime, a preliminary injunction "preserv[ing] the status quo pending arbitration" is necessary to avoid irreparable harm to Amtrak's business and to ensure that the arbitration the parties bargained for does not "become a 'hollow formality'" by the time "the arbitrators are able to render a decision in the dispute." *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053-1054 (2d Cir. 1990).  The process for commencing arbitration under the agreements can take thirty days or more, and Amtrak's business will be irreparably harmed if the status quo is not preserved before the arbitration panel can rule on the dispute.  Metro-North's denials of Amtrak's non-revenue service are already causing disruptions to Amtrak's business. Amtrak's inability to reposition its equipment along Metro-North's lines has forced Amtrak to cancel and delay passenger train service.  And Amtrak's inability to run track geometry cars over Metro-North's lines as planned to perform federally mandated safety inspections has forced Amtrak to devise a workaround to attach those cars to passenger trains to ensure the tests can

occur, causing those trains to run at slower speeds and delaying Amtrak's passengers.  Amtrak will have to slow all revenue trains down if Metro-North continues to deny Amtrak the access to its rail lines that Congress mandated, the terms of which are set by the parties' agreements.

These disruptions are a serious threat to Amtrak's business.  As both parties know, and as their agreements recognize, a train company's reputation depends on its ability to run its trains as scheduled, efficiently, and on time.   Passengers will start seeking alternative means of transportation if Amtrak cannot reliably provide them with on-time service.

The balance of hardships also weighs overwhelmingly in favor of an injunction here.  Any hardship to Metro-North of an injunction preserving Amtrak's contractual right to run non-revenue trains would be negligible.  Until last month, Metro-North permitted Amtrak's non-revenue service on the Hudson and New Haven Lines for the entire life of the parties' agreements—more than thirty years—without questioning Amtrak's right to such service.  The irreparable reputational and operational harms Amtrak faces in the absence of an injunction far outweigh any hardship to Metro-North of preserving the status quo.

The public interest, moreover, *requires* an injunction preserving the status quo.  Amtrak is the national railroad company of the United States.  It was created by Congress with the express mission of "provid[ing] efficient and effective intercity passenger rail mobility" to the American public.  49 U.S.C. § 24101(b).  Tens of thousands of passengers rely on Amtrak's ability to reliably run intercity passenger service in the Northeast Corridor.  The public interest is plainly served by an injunction enforcing Amtrak's contractual right to run the non-revenue trains it needs to provide these services to its passengers.

2

## II.   FACTUAL BACKGROUND

### A.   The Parties

Amtrak is a quasi-public corporation tasked by Congress with "provid[ing] modern, cost-efficient, and energy-efficient intercity rail passenger transportation throughout the United States." 49 U.S.C. § 24101(a).  Amtrak generally does not own the rail lines it uses for passenger service. Jagodzinski Decl. ¶ 3.   Instead, Amtrak depends on host railroads to dispatch its trains in accordance with contractual agreements and governing law.  *Id.*

Amtrak's train services along the Northeast Corridor, which runs from Boston, Massachusetts, to Washington, D.C., are by far its most popular and heavily used.  *Id*. ¶ 5.  Along portions of this corridor, Amtrak's trains run over tracks controlled by Metro-North.  *Id.* Specifically, Amtrak uses Metro-North's New Haven Line tracks from New Rochelle, New York, to New Haven, Connecticut.  *Id.*  Amtrak also uses Metro-North's Hudson Line tracks, which run between New York City and Poughkeepsie.  *Id*. ¶ 4.

### B.   The Hudson and New Haven Agreements

Congress has provided that rail carriers must provide access to Amtrak.  Under 49 U.S.C. § 24308, Amtrak may make an agreement with a rail carrier to set the terms of its statutory access rights.  More than thirty years ago, Amtrak and Metro-North entered into two such agreements to set the terms of Amtrak's use of Metro-North's Hudson and New Haven Lines.  They executed an agreement for the terms of Amtrak's use of the Hudson Line in 1990, *id*., Ex. A (the "Hudson Agreement"), and for the terms of Amtrak's use of the New Haven Line in 1991, *id*. ¶ 5, Ex. B (the "New Haven Agreement," and together with the Hudson Agreement, the "Agreements").

1.    The Agreements Require Metro-North to Facilitate Both Revenue and Non-Revenue Service

The Agreements govern two basic categories of Amtrak train service across Metro-North's lines:  revenue service and non-revenue service.  Revenue service (i.e., Amtrak passenger trains) is governed by Article V of the Hudson Agreement, Ex. A §§ 5.1, 5.2, and Sections 7, 8, and 9 of the October 1, 2015 Amendment to the New Haven Agreement, which in turn incorporate Sections 5.1–5.4, 5.6, 6.1, and 6.2 of the Northeast Corridor and Intercity Rail Cost Allocation Policy (the "Policy") issued by the Northeast Corridor Infrastructure and Operations Advisory Commission (the "Commission"),[1] Ex. B. at 3.  Both Agreements provide that Amtrak will pay Metro-North on a per-mile basis for revenue train runs on its tracks.  *See* Ex. A § 5.1(A) (incorporating Appendix IV), Appendix IV, Item 3 (setting per mile rate for passenger cars on Hudson Line); Ex. B at 3 (incorporating Policy), Policy § 5.3, Table 3 (providing for per-mile charges for operations costs).

Separate provisions in the Agreements govern non-revenue service.  Section 3.2(A) in both Agreements provides that Amtrak "shall have the right from time to time to request and . . . [Metro-North] hereby agrees to provide modified or additional services in connection with the operation of Amtrak trains on" the Hudson and New Haven Lines.  Ex. A § 3.2(A); Ex. B § 3.2(A).  As long as Amtrak submits the request sufficiently in advance, Metro-North is required to facilitate the run, subject only to its physical, financial, and operational constraints.  *Id.*  Section 3.2(A) provides, in relevant part, that:

> Such modified or additional services **shall be provided by [Metro-North]** upon the filing by [Amtrak] of a request on a date sufficiently in advance of the date upon which any such request is to be implemented . . . .  The services requested in any such request shall be subject to the physical and financial capabilities of [Metro-North] and shall give due regard to Railroad's speed, weight and similar operating

---

[1] Congress established the Commission in Section 212 of the Passenger Rail Investment and Improvement Act of 2008.

restrictions and rules and safety standards and to the avoidance of unreasonable interference with the adequacy, safety, and efficiency of its other railroad operations.

Ex. A § 3.2(A); Ex. B § 3.2(A) (emphasis added).

Metro-North's operational constraints, moreover, must be weighed against the critical importance of non-revenue service to Amtrak's business.  Section 3.2(A) further provides:

In applying the foregoing, recognition shall be given to the importance of fast and convenient schedules and passenger comfort and convenience to the success of NRPC's Intercity Rail Passenger Service.

Ex. A § 3.2(A); Ex. B § 3.2(A).

> 2. <u>Metro-North Is Responsible for Calculating Amtrak's Monthly Payment for Revenue and Non-Revenue Service</u>

Metro-North is the party responsible under the Agreements for calculating the payment due from Amtrak each month and submitting a corresponding invoice.  Ex. A § 5.2(A) (providing that every month, Metro-North "shall submit a Statement of Charges to [Amtrak] calculated for such month in accordance with the provisions in Section 5.1"); Ex. B at 4 (providing that every month, Metro-North "shall submit an invoice to Amtrak for all sums due for that month under the Agreement and this Amendment").  Amtrak, in turn, is required to pay Metro-North's invoices within fifteen days.  Ex. A § 5.2(A); Ex. B at 4.

> 3. <u>Metro-North Assumes the Risk of Damage to Its Infrastructure in Exchange for a Monthly Risk Fee</u>

Both Agreements require the parties to assume liability for damage to their own equipment, passengers, and employees caused in the operation of Metro-North's tracks, signals, and infrastructure and of Amtrak's trains.  Ex. A § 7.2; Ex. B at 5, § 7.2.  As compensation for Metro-North assuming the risk of damage to its tracks, signals, and infrastructure by Amtrak trains, Amtrak pays Metro-North a monthly risk fee calculated at a fixed rate "per passenger train mile." Ex. A § 7.2(e); Ex. B at 5, § 7.2(e).

5

4.    <u>Disputes Must Be Resolved in Good Faith or Submitted to Arbitration</u>

The Agreements require the parties to "make a good faith effort to resolve any dispute, claim, or controversy between them relating to the interpretation, application, or implementation" of the Agreements. Ex. A, Article VI; Ex. B, Article VI. If a dispute "cannot be resolved by agreement" between the parties, they must then submit the dispute "to binding arbitration" in accordance with various agreed-upon procedures. Ex. A, Article VI; Ex. B, Article VI. To construct an arbitration panel, the parties undergo a process that can take thirty days or more. First, the party initiating the arbitration notifies the other in writing of its desire to arbitrate and designates the first arbitrator. Ex. A, Article VI(a); Ex. B, Article VI(a). Then, within fifteen days, the opposing party responds in writing by designating a second arbitrator. Ex. A, Article VI(b); Ex. B, Article VI(b). Finally, within another fifteen days, the two designated arbitrators appoint a third arbitrator to serve as chairman. If they fail to do so, the party initiating the arbitration may request the Chief Judge of the United States District Court where it resides to appoint a third arbitrator. Ex. A, Article VI(c); Ex. B, Article VI(c). Once the arbitration panel has been formed, the arbitrators "shall promptly hear and decide the issues submitted to them" and render a written decision and award. Ex. A, Article VI(d-e); Ex. B, Article VI(d-e).

**C.    The Parties' Course of Performance for the Last Three Decades**

For more than thirty years following the execution of the Agreements, Metro-North rarely denied Amtrak's requests for non-revenue service. Jagodzinski Decl. ¶ 14. Amtrak's practice is to submit requests for non-revenue service well in advance of when they are needed, and in almost all cases, Metro-North quickly approved Amtrak's requests. *Id.* On the rare occasions that Metro-North denied Amtrak's request for non-revenue service, Metro-North explained the operational constraints behind its denial and discussed alternative scheduling for such service. *Id.*

6

At issue are three categories of non-revenue service Amtrak routinely undertakes as part of its essential operations. *First,* Amtrak undertakes initial "commissioning runs" to test the performance of new trains before they begin passenger service. *Id.* ¶ 7. Introducing new trains to Amtrak's fleet is a critical part of Amtrak's business. *Id.* ¶¶ 8, 33. Amtrak is required by statute to "provide modern, cost-efficient, and energy-efficient" train transportation to its passengers. 49 U.S.C. § 24101. As trains age, efficiency requires not only that they be retired from Amtrak's fleet, but that they be replaced by more modern trains so that passenger schedules are not affected. Jagodzinski Decl. ¶¶ 8, 34. Amtrak is currently working to replace and expand its fleet of previous-generation Acela trains with more modern and efficient NextGen Acela trains. *Id.* ¶ 34.

*Second,* Amtrak regularly operates "track geometry cars" to test the adequacy of the tracks on its rail lines. *Id.* ¶ 11. These runs are accomplished using these dedicated track geometry cars that are specially designed to test the tracks. *Id.* Federal regulations require Amtrak to operate track geometry cars every two weeks to maintain its current train speeds of 160 miles per hour. *Id.* ¶ 38; *see generally* 49 C.F.R. § 213.333. Amtrak's trains are required to run slower on lines where a track geometry car has not been operated within two weeks. Jagodzinski Decl. ¶¶ 38-39. Trains can run no faster than 125 miles per hour if fifteen days pass between track geometry car runs. *Id.* ¶ 38; *see* 49 C.F.R. §§ 213.307, 213.333. Trains can run no faster than 110 miles per hour if 45 days pass between track geometry car runs. Jagodzinski Decl. ¶ 39; *see* 49 C.F.R. §§ 213.307, 213.333. Eventually, trains can run no faster than 90 miles per hour without track geometry car runs. Jagodzinski Decl. ¶ 39; *see* 49 C.F.R. §§ 213.301, 213.333.

*Third,* Amtrak must make non-revenue train movements to relocate equipment before and after it is serviced at maintenance facilities along Amtrak's routes. Equipment repositioning is an essential part of Amtrak's ability to service passengers. Jagodzinski Decl. ¶¶ 12-13. Delays of

the relocation and servicing of Amtrak's passenger equipment, such as locomotives, can force Amtrak to cancel or delay scheduled passenger service. *Id.* ¶ 42. Metro-North's denials of Amtrak's relocation movements have already caused Amtrak to cancel or delay passenger service. *Id.* ¶ 44.

### D.    The Pantograph Incident

While testing the performance of Amtrak's NextGen Acela trainsets on Metro-North's New Haven Line in August 2021, a pantograph[2] on top of a NextGen Acela train was damaged at a bridge on the line in Westport, Connecticut. *Id.* ¶ 15. Amtrak immediately notified Metro-North. *Id.* ¶ 16. Similar incidents with pantographs at the same bridge occurred on a few occasions. *Id.* The parties jointly developed an interim mechanical procedure to manually lower the pantographs when approaching that bridge. *Id.* ¶ 17. By the fall of 2025, Amtrak and Metro-North had begun implementing this procedure. *Id.* Amtrak had also begun designing a new pantograph that would avoid this issue altogether. *Id.* ¶ 18. The parties agreed to test the new pantograph on the New Haven Line once the new pantograph became available. *Id.*

On January 20, 2026, before Amtrak had completed the design and implementation of the redesigned pantograph, the pantograph on a NextGen Acela train on a revenue service run became damaged at the bridge. *Id.* ¶ 19. The damaged pantograph, in turn, damaged the track's overhead wire system, or catenary. *Id.* At that time, Joe Lagana, Metro-North's Senior Vice President of Operations, called Christopher Jagodzinski, Amtrak's Vice President, Commissioning & Corridor Optimization, about the damage to Metro-North's wiring. *Id.* ¶ 20. In subsequent conversations, Mr. Lagana demanded that Amtrak reimburse Metro-North for the damage caused. *Id.* Mr.

---

[2] A pantograph is a roof-mounted apparatus that collects power for the train from an overhead line.

Jagodzinski later informed Mr. Lagana of his understanding that the damage was covered by the monthly risk fee that Amtrak pays Metro-North under the Agreements. *Id.*

By February 2026, Amtrak had completed the design and lab testing of the new pantograph prototype for its NextGen Acela trains. *Id.* ¶ 21. On March 11, 2026, the parties conferred and Metro-North agreed to operate a pantograph test train on Metro-North's tracks. *Id.* But when Amtrak formally submitted a request to Metro-North to test the upgraded pantograph on March 18, 2026, Metro-North denied the request. *Id.* Mr. Lagana stated, in response to the request, that there needed to be "an agreement put in place" before Metro-North would allow Amtrak to test the pantograph on Metro-North's tracks. *Id.*

### E.  Metro-North Begins Denying Amtrak's Requests for Non-Revenue Service

Since March 18, 2026, Metro-North, in a departure from the first thirty years of performance under the Agreements, began ignoring, denying, or delaying almost every one of Amtrak's non-revenue service requests, regardless of whether the run involved testing pantographs on the New Haven Line. *Id.* ¶¶ 22-25. Metro-North's blanket denials have not abated as of the date of this petition. *See id.* ¶ 32. Metro-North's explanations for such denials have been vague and perfunctory. As set forth below:

- Metro-North denied Amtrak's request to operate a track geometry test train on March 18 and 19 on the New Haven Line. *Id.* ¶ 23.

- Metro-North also denied Amtrak's request to test a newly converted cab car[3] on March 19 on the Hudson Line. *Id.* ¶ 24.

- Metro-North denied a second request by Amtrak to operate a track geometry test train on the New Haven Line on March 23. *Id.* ¶ 25.

- Metro-North orally notified Amtrak that its request to run a commissioning test of a NextGen Acela train on March 24 on the New Haven Line would be denied. Amtrak then cancelled the planned commissioning test. *Id.* ¶ 26.

---

[3] Cab cars are train cars with a control station from which a train can be operated.

9

- Metro-North denied Amtrak's request to reposition passenger equipment along the New Haven line on March 28.  *Id*. ¶ 27.

- Metro-North denied Amtrak's request to relocate a NextGen Acela trainset on the Hudson Line on March 31.  *Id.* ¶ 28.  Amtrak offered to reschedule the move to April 1, and Metro-North again denied the request.  *Id.*  Metro-North eventually permitted the relocation of the NextGen Acela trainset after a three-day delay.  *Id*.

- Metro-North ignored Amtrak's request to move a track geometry test train on the New Haven Line on April 15, 2026.  *Id.* ¶ 30.  After Amtrak resubmitted the request, Metro-North denied it the day before it was scheduled to occur.  *Id*.

- Metro-North also ignored Amtrak's subsequent request to schedule a track geometry test train on the New Haven Line on April 21-22, 2026.  *Id.* ¶ 31.  After Amtrak followed up, Metro-North once again denied the move without providing any basis for the denial.  *Id*.

On one occasion, Metro-North has stated that it cannot allow non-revenue movements without an "agreement."  *Id.* ¶¶ 21, 28.  Otherwise, Metro-North has simply declined to approve the request, or cited, without elaboration, "potential conflicts with ongoing infrastructure improvements."  *Id.* ¶¶ 30, 32.  In the past, Metro-North had generally explained the specific operational constraints justifying a denial of Amtrak's non-revenue service, and those constraints were obvious, unquestionable, and rare.  *See supra* Part II.C.

### F.    Amtrak's Stopgap Fixes to Mitigate Disruptions Will Not Suffice

In the face of Metro-North's denials, Amtrak has devised stopgap measures to minimize the impact on its revenue service, fulfill its commitments to its passengers, and maintain safe operations.  While these workarounds have allowed Amtrak to mitigate the consequences of Metro-North's denials, they come at a substantial cost to Amtrak's operations, slowing trains, delaying schedules, and limiting testing.  Moreover, they will become increasingly untenable as denials continue.

***NextGen Acela Commissioning Runs:***  For its new NextGen Acela trains, Amtrak shortened its standard commissioning run to avoid Metro-North's New Haven Line.  Jagodzinski Decl. ¶ 35.  This truncated run, however, prevents Amtrak from performing the full set of dynamic voltage tests required before the trains enter revenue service, which puts NextGen Acela reliability at risk when operating in New England during revenue service.  *Id.*  Poor mechanical reliability during revenue service negatively impacts Amtrak's schedule, passenger experience, and, most importantly, Amtrak's reputation as a reliable intercity rail provider.  *Id.*

In addition, the Hudson Line is the only route approved by the Federal Railroad Administration ("FRA")[4] for Amtrak to use to transport new NextGen Acela trainsets from their manufacturing plant in Hornell, New York, to Amtrak's facilities.  *See id.* ¶ 36.  Metro-North has already denied requests to make these moves, delaying train delivery and by extension the commissioning pipeline.  *See* Jagodzinski Decl. ¶ 36.  These delays have strained Amtrak's relationship with the manufacturer, as Amtrak risks failing to meet agreed-upon schedules for train departures from the plant.  *Id.* ¶ 37.  In fact, the manufacturer has already sought damages from Amtrak.  *Id.*  These delays also impact Amtrak's business plan to replace its aging Acela fleet with the NextGen Acela trainsets, which cannot go into revenue service until they are commissioned.  *Id.*

***Geometry Cars:***  To maintain track safety and preserve train speeds without a standalone geometry car run, Amtrak has attached a geometry car to the rear of a regularly scheduled passenger train.  *Id.* ¶¶ 40-41.  This allows Amtrak to move the track geometry car as needed over the New Haven Line to Amtrak's track to perform the federally mandated inspection of Amtrak's

---

[4] The FRA is an agency created by Congress to regulate and administer, among other things, railroad safety and the development of high-speed rail.  *See* 49 U.S.C. § 103.

track, but at a significant operational cost. *Id.* The geometry car can operate at a maximum of only 110 mph, forcing the attached passenger train to run well below its normal speed. *Id.* ¶ 41. To minimize the impact on passenger service, Amtrak has been attaching the geometry car to late-night passenger trains, which requires inspection crews to work outside normal hours and results in substantial additional overtime expenses. *Id.*

If Amtrak is unable to complete geometry car runs every two weeks as required by federal regulations, the consequences would escalate rapidly. Progressively severe speed reductions would follow, from 160 mph to 125 mph after fifteen days, to 110 mph after 45 days, and eventually, to 90 mph, at which point systematic cancellations of Amtrak's revenue train service would be unavoidable. *Id.* ¶¶ 38-39.

***Equipment Repositioning:*** Equipment repositioning allows Amtrak to move equipment across Metro-North's lines for regular maintenance, inspection, and reconfiguration needed to fulfill its daily passenger service schedule. *Id.* ¶ 12. Metro-North denied multiple repositioning requests, and while it ultimately permitted some locomotives to move several days late, the initial denials caused Amtrak to cancel and delay revenue trains in the interim. *Id.* ¶ 43. Each additional denial forces Amtrak to reduce its level of service, and the harm compounds over time as maintenance backlogs grow and scheduling disruptions cascade across the network. *Id.* ¶ 44. The resulting cancellations and service delays directly undermine Amtrak's reputation for reliable intercity passenger service. *Id.* ¶ 45.

These stopgap measures are not sustainable. If Metro-North's denials continue through the course of arbitration, Amtrak faces progressively severe speed restrictions, mounting service cancellations, an inability to place new trains into revenue service, and growing maintenance constraints on its existing fleet. *Id.* ¶¶ 33, 35, 38, 39, 44. The cumulative effect would be a

significant and sustained degradation of Amtrak's intercity passenger service in the Northeast Corridor, which tens of thousands of passengers rely on each week. *Id.* ¶ 5. Amtrak has built its reputation on the consistency and reliability of this service. *Id.* ¶ 45. Reputational harm of this kind is not readily undone and can take years to restore. Prolonged uncertainty over whether and when Amtrak can conduct routine non-revenue operations on Metro-North's lines would make it impossible to maintain that standard. *Id*.

## III.  JURISDICTION

The Court has federal-question jurisdiction over this case because Amtrak was "incorporated by or under an Act of Congress" and "the United States is the owner of more than one-half of its capital stock." 28 U.S.C. § 1349; *see Martin v. Nat'l R.R. Corp.*, No. 18-CV-9688, 2019 WL 11794000, at *1 (S.D.N.Y. Oct. 31, 2019). And because the parties here "have agreed to arbitrate [their] dispute," this court "has jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894–95 (2d Cir. 2015).

## IV.  ARGUMENT

A preliminary injunction is necessary to avoid irreparable reputational and operational harm to Amtrak's business while the arbitration procedures that govern the parties' dispute play out. Preliminary injunctions "to preserve the status quo pending arbitration," unlike other preliminary injunctions, must account for "the court's obligation under the FAA to enforce a valid agreement to arbitrate." *Blumenthal*, 910 F.2d at 1054. Preserving the status quo prevents "the arbitration remedy for which [the parties] bargained" from becoming "a hollow formality" by the time it is awarded. *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993); *accord, e.g.*, *Thales Avionics, Inc. v. L3 Techs., Inc.*, 719 F. Supp. 3d 337, 345 (S.D.N.Y. 2024). A party is entitled to a preliminary injunction in aid of arbitration if it demonstrates: "(a)

13

irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  Each of these elements is present here.

> **A.      Absent a Preliminary Injunction, Amtrak Will Suffer Irreparable Harm and the Arbitration of this Dispute Contemplated in the Agreements Will Be Rendered Pointless**

Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).  A finding of irreparable harm is appropriate where "monetary damages[] are inadequate to compensate for the injury." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (quotation omitted).  Harm to a business's reputation is a well-recognized example of irreparable harm in the Second Circuit because reputational harm is "not calculable nor precisely compensable." *Benihana, Inc.*, 784 F.3d at 896; *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985) ("Reputation is not calculable nor precisely compensable.").

This test is easily met here.  Metro-North's blanket refusals to permit non-revenue train services are forcing Amtrak to degrade its operations across the Northeast Corridor, which is a foundational route, accounting for approximately 50% of all Amtrak passenger trips.  Jagodzinski Decl. ¶ 5.  The harm to Amtrak is concrete, growing, and of a kind that no damages award can undo.

One immediate threat concerns Amtrak's federally mandated track geometry inspections.  Under 49 C.F.R. § 213.333, Amtrak must operate track geometry cars on its tracks every two weeks to maintain its current operating speeds.  Jagodzinski Decl. ¶¶ 11, 38.  Metro-North has

14

denied Amtrak's repeated requests to conduct these runs. *E.g.*, *id.* ¶ 40. If Amtrak cannot operate geometry cars, federal regulations will require Amtrak to slow all Acela trains from 160 miles per hour to 125 miles per hour after fifteen days, then to 110 miles per hour after 45 days, and ultimately to 90 miles per hour—barely more than half their normal operating speed—at which point systematic cancellations will become unavoidable. *Id.* ¶¶ 38–39. Thus far, Amtrak has avoided these mandatory slowdowns by attaching a geometry car to the rear of a regularly scheduled revenue train, but this stopgap is itself harmful because the geometry car can operate at only 110 miles per hour, slowing that revenue train and delaying its passengers. *Id.* ¶¶ 40–41.

Metro-North's denials are simultaneously crippling Amtrak's efforts to modernize its fleet. Once manufactured in Hornell, each of the remaining NextGen Acela trainsets needs to be commissioned before it can enter revenue service. *Id.* ¶¶ 10–11. Metro-North has already denied a commissioning run, forcing Amtrak to shorten its testing route to avoid Metro-North territory. *Id.* ¶¶ 33, 35. The truncated run prevented Amtrak from performing the full set of dynamic voltage tests. *Id.* ¶ 35. Without those tests, NextGen Acela trainsets entering revenue service face a serious reliability risk when operating in New England during revenue service, which, in turn, negatively impacts Amtrak's schedule, passenger experience, and, most importantly, Amtrak's reputation as a reliable intercity rail provider. *Id.* Additionally, the NextGen Acela trainsets must be transported from their manufacturing plant in Hornell, New York, over Metro-North's Hudson Line, and Metro-North has denied several of those movement requests as well, delaying the commissioning pipeline and jeopardizing Amtrak's contractual obligations to the manufacturer. *Id.* ¶¶ 36–37. As older trainsets must be retired due to technical and operational requirements, each day of delay in commissioning their replacements is a day Amtrak is at risk of being unable to maintain its current service levels. *See id.* ¶ 34.

Metro-North's denials have also extended to routine equipment repositioning, which Amtrak needs to maintain, inspect, and reconfigure its equipment for daily passenger service. *Id.* ¶ 42. These denials have already forced Amtrak to cancel and delay revenue trains. *Id.* ¶ 44. The damage will compound with each additional denial, progressively eroding the scheduling reliability that tens of thousands of Amtrak's passengers depend on. *Id.*

None of these harms can be adequately remedied by money damages. Passengers who experience repeated slowdowns, cancellations, and mid-run shutdowns do not simply demand refunds; they lose confidence in Amtrak as a reliable mode of transportation and shift to alternatives. *See id.* ¶ 45. That lost confidence cannot be recaptured through a damages award after arbitration. *See Benihana, Inc.*, 784 F.3d at 896; *Power Test*, 754 F.2d at 95. The Agreements themselves recognize this: Section 3.2 of each Agreement specifically directs Metro-North to weigh its operational constraints against "the importance of fast and convenient schedules and passenger comfort and convenience to the success of [Amtrak's] Intercity Rail Passenger Service." Ex. A § 3.2; Ex. B § 3.2. The harm Metro-North is inflicting on Amtrak strikes at the very interest the Agreements were designed to protect.

Moreover, absent an injunction, the arbitration the parties bargained for will be rendered meaningless. In recognition of the critical role that consistent, uninterrupted rail service plays in both parties' businesses, both Agreements require the parties to "make a good faith effort to resolve" any disputes, and if such efforts fail, to submit the disputes "to binding arbitration" in accordance with an agreed-upon procedure. Ex. A Article VI(a); Ex. B Article VI(a). In addition, Metro-North is required to "provide the services requested by [Amtrak]" during the pendency of any dispute. Ex. A § 5.1. Metro-North is flouting both obligations. Its blanket denials are not only not good-faith attempts to resolve the underlying dispute, but also threaten to fundamentally

16

undermine the arbitration that both parties agreed would govern such disputes. Under the Agreements, simply constructing the arbitration panel can take thirty days or more. *See supra* Part II.B.5. During that time, Amtrak could face mandatory speed reductions on its most-traveled corridor, would be unable to commission or transport any waiting NextGen Acela trainsets, and would continue to suffer cancellations from denied equipment repositioning. If the arbitration proceeds on its expected timeline, Amtrak's trains could be down to 90 miles per hour before the panel holds a single hearing. Jagodzinski Decl. ¶ 42. A preliminary injunction is necessary to ensure that the arbitration remedy for which the parties bargained does not become "a hollow formality." *Blumenthal*, 910 F.2d at 1053.

**B.      There Is At Least a Sufficiently Serious Question Going to the Merits to Warrant a Preliminary Injunction in Aid of Arbitration**

Where, as here, the parties have agreed to arbitrate their dispute and the court's jurisdiction extends only to preserving the status quo pending arbitration, courts have recognized that they should leave resolution of the merits to the arbitrator and therefore generally ask only whether there is a sufficiently serious question going to the merits. *See Nemer*, 992 F.2d at 434–35 ("[A] request for a status quo injunction pending arbitration does not require examination of the merits of the underlying disputes."). Here, there is at the very least a serious question as to whether Metro-North is breaching either the Agreements themselves or the implied covenants within them.

1.      There Is a Sufficiently Serious Question as to Metro-North's Breach of the Parties' Agreements

The elements of a breach-of-contract action are "(1) the existence of a contract between the plaintiff and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by the defendant's breach." *Thomas v. Nat'l R.R. Passenger Corp.*, No. 22-CV-10225, 2025 WL

17

2771594, at *2 (S.D.N.Y. Sept. 29, 2025) (quotations omitted).[5]  There is at least a sufficiently serious question as to each of these elements.

*The Agreements are Valid and Enforceable:*  There is no dispute that the Agreements are valid and enforceable.  The Agreements have governed Amtrak and Metro-North's relationship on the Hudson and New Haven Lines since 1990 and 1991, respectively.  Ex. A at 1; Ex. B at 1.

*Amtrak Has Performed under the Agreements:*  Amtrak has fully performed under the Agreements.  Amtrak is entitled to run non-revenue trains so long as its requests for the runs are timely, Ex. A § 3.2(A); Ex. B § 3.2(A), subject only to Metro-North's physical, financial, and operational capacities, Ex. A §§ 3.1(A), 3.3(A); Ex. B §§ 3.1(A), 3.3(A).  Amtrak does not run non-revenue trains without submitting a timely request and obtaining approval from Metro-North.  *See* Jagodzinski Decl. ¶¶ 12-15.  Even when Metro-North began denying Amtrak's requests—in plain violation of the Agreements—Amtrak refrained from making the runs, *see id*. ¶¶ 21-32, despite the significant operational, financial, and reputational costs of doing so, *see id*. ¶¶ 35, 37, 38, 41, 44.

In New York, "the parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.'"  *Fed. Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508, 512 (App. Div. 1st Dep't 1999) (quoting *Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*, 415 N.Y.S.2d 229, 230 (App Div. 1st Dep't 1979), *aff'd*, 53 N.Y.2d 643 (1981)).  "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."  *Gulf Ins. Co. v. Transatlantic*

---

[5] As the court explained in *Thomas v. National Railroad Passenger Corporation*, New York law applies to this dispute because the tracks at issue are located primarily in New York and Metro-North is headquartered in New York.  2025 WL 2771594, at *3–*4.

18

*Reinsurance Co.*, 886 N.Y.S.2d 133, 143 (App Div. 1st Dep't 2009) (quoting *Old Colony Tr. Co. v. City of Omaha*, 230 U.S. 100, 118 (1913)); *accord, e.g.*, *Brown Bros. Elec. Contractors v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977) (explaining that, in determining the scope of a contract's terms, "it is necessary to look . . . to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds"). Here, Metro-North allowed Amtrak's non-revenue service throughout the life of the Agreements. *See Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 417 (S.D.N.Y. 2010) (finding, as a matter of law, that course of performance over nine-year period favored one party's calculation of receipts under ambiguous contract term).

*Metro-North Is in Breach of the Agreements:* There is at least a serious question as to whether Metro-North's blanket denials of Amtrak's non-revenue train movements violate the Agreements. As discussed, Metro-North has an affirmative obligation under both Agreements to facilitate Amtrak's non-revenue train service if Amtrak submits a timely request, subject only to Metro-North's physical, financial, and operational constraints. Ex. A § 3.2(A); Ex. B § 3.2(A). The Agreements provide that "[i]n applying the [constraints], recognition shall be given to the importance of fast and convenient schedules and passenger comfort and convenience to the success of" Amtrak's business. Ex. A § 3.2(A); Ex. B § 3.2(A). Before last month, Metro-North had rarely denied a non-revenue run in over thirty years of operation. Jagodzinski Decl. ¶ 14. When Metro-North did deny a non-revenue run, it generally provided an explanation for the denial and the physical or operational constraints were apparent. *Id*.

Metro-North is not entitled to issue blanket denials of all of Amtrak's non-revenue service—causing major disruptions to Amtrak's core business operations—over an unrelated dispute. Metro-North has never previously systematically delayed or denied Amtrak's non-revenue runs. Metro-North only began denying Amtrak's non-revenue requests after Amtrak

19

declined to reimburse Metro-North for damage caused to its property during regular revenue service, *see id.* ¶¶ 15–22, in accordance with the terms of the liability sharing provisions in the Agreements, Ex. A § 7.2(e); Ex. B § 7.2(e).  Metro-North's blanket denials of Amtrak's test runs and locomotive relocations violate both Agreements.

***Metro-North's Breaches Have Harmed Amtrak:***  As more fully explained in Part IV.A, *supra*, Metro-North's denials of Amtrak's non-revenue runs have caused and are continuing to cause disruptions to Amtrak's business.  Metro-North's denials have prevented Amtrak from making necessary equipment-repositioning movements across its tracks.  *Id.* ¶¶ 42-43.  Metro-North's denials have also forced Amtrak to adopt stopgap measures to continue to test its NextGen Acela trains.  *Id.* ¶ 35.  Metro-North's denials have forced Amtrak to cancel, delay, and slow down passenger trains—an untenable position for any train operation, including Amtrak, to maintain. *Id.* ¶ 41.  As the Agreements themselves recognize, "fast and convenient schedules" are critical to Amtrak's reputation and business success.  Ex. A § 3.2(A); Ex. B § 3.2(A).  Metro-North's breaches are causing significant harm to Amtrak, and if they are allowed to continue, they will irreparably damage Amtrak's business.

### 2. In the Alternative, There Is a Sufficiently Serious Question as to Metro-North's Breach of the Implied Covenant of Good Faith and Fair Dealing

In the alternative, there is a sufficiently serious question as to Metro-North's breach of the implied covenant of good faith and fair dealing by denying Amtrak's non-revenue service.

Under New York law, where a "contract contemplates the exercise of discretion," the implied covenant includes promises "not to act arbitrarily or irrationally in exercising that discretion," *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (1995), and not to "act [in] bad faith," *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 20-cv-5015, 2021 WL 3668092, at *5 (S.D.N.Y. Aug. 17, 2021).  There is a sufficiently serious question that Metro-

North has violated both promises. Metro-North has some discretion under the Agreements to deny non-revenue service depending on its physical and operational capacity. Ex. A § 3.2(A); Ex. B § 3.2(A). However, Metro-North's blanket denials of Amtrak's requests for non-revenue runs are not only arbitrary, they are, in Amtrak's view, a bad-faith attempt to gain leverage in unrelated negotiations between the parties. If Metro-North's actions do not constitute a breach of contract, they do constitute a breach of the implied covenant. *See Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 818 (2d Cir. 2014) (reversing dismissal of implied-covenant claim because record supported contention that defendant exercised discretionary contractual right arbitrarily and in bad faith).

### C.    The Balance of Hardships Weighs Decidedly in Favor of Amtrak

"[T]he balance of hardships asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 210 (2d Cir. 2014) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)). The court "must consider the effect on each party of the granting or withholding of the requested relief." *Yang v. Kellner*, 458 F. Supp. 3d 199, 216 (S.D.N.Y.), *aff'd sub nom. Yang v. Kosinski*, 805 F. App'x 63 (2d Cir. 2020), *and aff'd sub nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).

Amtrak will suffer far more in the absence of an injunction than Metro-North if an injunction is granted. Amtrak, as discussed, stands to suffer enormous operational and reputational harm if Metro-North is allowed to continue its arbitrary denials of Amtrak's non-revenue service. Jagodzinski Decl. ¶ 45. Metro-North, by contrast, would merely be returned to the status quo ante as the arbitration procedures in the Agreements play out. Metro-North suffers no real hardship from permitting Amtrak's non-revenue service on its tracks as it has done for more than three decades. And any monetary harm it claims to have suffered would be remedied in arbitration. *See*

21

*Benihana, Inc.*, 784 F.3d at 896 (affirming finding that balance of hardships weighed in favor of injunction where movant stood to suffer "harm to its brand" and nonmovant was not harmed by preserving the status quo).  Because the "balance of hardships tips decidedly in [Amtrak's] favor," a preliminary injunction preserving the status quo pending the arbitration of the parties' dispute is warranted here.  *Citigroup*, 598 F.3d at 35 (emphases and alterations omitted).

### D.    The Public Interest Would Not Be Disserved by an Injunction in Aid of Arbitration

The public is plainly served by Amtrak's ability to properly test its trains and run them at the expected speeds.  Tens of thousands of passengers rely on Amtrak's Northeast Corridor service each year, and an injunction that restores Amtrak's ability to conduct federally mandated safety inspections in the normal course, commission new trains, and maintain its scheduled services (at least until an arbitration panel has an opportunity to rule on the merits of the underlying contract dispute between the parties) serves the traveling public directly.  Jagodzinski Decl. ¶¶ 5, 13. Moreover, courts in this Circuit recognize that "the public interest . . . is served by the enforcement of the parties' lawful agreement," especially where, as here, the agreement is one to arbitrate the parties' disputes.  *Benihana, Inc.*, 784 F.3d at 897; *see also Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 410 (2d Cir. 2009) (recognizing "the well-established federal public policy in favor of arbitration"); *Blumenthal*, 910 F.2d at 1053 ("[A] district court must ensure that the parties get what they bargained for—a meaningful arbitration of the dispute.").

### E.    No Bond Is Required in Connection with this Preliminary Injunction

Under Fed. R. Civ. P. 65(c) ("Rule 65(c)"), a successful applicant for a preliminary injunction is required to post a bond "in such sum as the court deems proper."  "The injunction bond is designed to cover any damages that might result if it were later determined that the applicant was not entitled to an injunction."  *Blumenthal*, 910 F.2d at 1055 (quotations and

22

alterations omitted).  This court is "vested with wide discretion" in determining "the amount of any bond to be given" under Rule 65(c), "and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm."  *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (quotations omitted).  "The party against whom a preliminary injunction is sought"—in this case, Metro-North—"has the burden of establishing the amount of a bond necessary to secure against the wrongful issuance of the injunction."  *Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372, 391 (S.D.N.Y. 2003); *accord Doctor's Assocs.*, 85 F.3d at 985.

No bond is appropriate here because the preliminary injunction Amtrak seeks would merely require Metro-North to resume complying with its obligation under the Agreements to permit Amtrak's non-revenue runs unless it has a legitimate operational reason that it cannot do so.  Complying with Metro-North's contractual "obligation[s] cannot constitute 'harm' to [Metro-North], much less the sort of harm that would require the protective measure of a bond."  *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 61 (2d Cir. 2004) (affirming district court's decision to forego bond requirement because injunction merely required compliance with contractual agreement).  Metro-North permitted all of Amtrak's requested non-revenue runs with very little exception for more than three decades until it began arbitrarily denying the runs last month.  Jagodzinski Decl. ¶ 13.  There is no evidence that Metro-North would suffer any actual harm if a bond is not posted while the parties arbitrate their dispute.  *See Bldg. Serv. 32BJ Health Fund v. S & A Bldg. Servs., LLC*, No. 12-cv-3714, 2013 WL 1701012, at *2 (S.D.N.Y. Apr. 17, 2013) (forgoing bond because "[t]he terms of any injunction would require only that [defendant] comply with its existing obligations under the [parties' agreements]").

## CONCLUSION

For the reasons described above, Amtrak respectfully requests that this Court (i) enter the

Proposed Order to Show Cause setting the proposed briefing schedule and hearing date; and (ii)

after the scheduled hearing, grant Amtrak's Petition.

Dated: April 22, 2026                                  Respectfully submitted,

                                                       /s/ Elizabeth A. Edmondson
                                                       Elizabeth A. Edmondson

                                                       Jenner & Block LLP
                                                       1155 Avenue of the Americas
                                                       New York, NY 10036-2711
                                                       (212) 891-1606
                                                       eedmondson@jenner.com

                                                       Jessica Ring Amunson*
                                                       Jenner & Block LLP
                                                       1099 New York Ave NW, Suite 900
                                                       Washington, DC 20001-4412
                                                       (202) 639-6023
                                                       jamunson@jenner.com

                                                       * *pro hac vice* application forthcoming

                                                       *Counsel for Petitioner Amtrak*

24

## <u>CERTIFICATION OF COMPLIANCE WITH WORD COUNT LIMIT</u>

I hereby certify pursuant to Rule 7.1(c) of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York that the total number of words in this brief, exclusive of the caption, table of contents, table of authorities, and signature block, is 7,238. In making this certification, I have relied on the word count of the word-processing system used to prepare the document.

Dated: April 22, 2026                 _/s/ Elizabeth A. Edmondson_
       New York, New York             Elizabeth A. Edmondson
                                        JENNER & BLOCK LLP
                                          1155 Avenue of the Americas
                                          New York, NY 10036
                                          (212) 891-1606
                                          eedmondson@jenner.com

                                          *Counsel for Petitioner Amtrak*