**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NATIONAL RAILROAD PASSENGER
CORPORATION—AMTRAK

                          *Petitioner*,

- v. -

METRO-NORTH COMMUTER RAILROAD
COMPANY,

                          *Responden*t.

Case No. 26-cv-3339 (JSR)

**METRO-NORTH'S OPPOSITION TO AMTRAK'S**
**PETITION FOR A PRELIMINARY INJUNCTION**
**IN AID OF ARBITRATION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT .............................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 4

        A.      Amtrak and Metro-North Have for Decades Been Parties to Written Agreements Governing Metro-North's Services to Amtrak's Intercity Passenger Services on the New Haven and Hudson Lines .................................... 4

        B.      Amtrak and Metro-North Have No Agreement Governing Non-Passenger Trains, Which Have Long Been the Subject of *Ad Hoc* Requests by Amtrak ......................................................................................................................... 6

        C.      The Use of Amtrak's NextGen Acela on Metro-North's Lines Caused Significant, Uncompensated Damage to Metro-North Infrastructure ..................... 7

        D.      The Parties Engaged in Negotiations Regarding a Potential Agreement to Govern Non-Passenger Services ................................................................................ 8

ARGUMENT ........................................................................................................................... 10

I.       Amtrak Is Seeking an Injunction That Is Impermissibly Vague and Unworkable ........... 10

II.      Amtrak Cannot Seek Mandatory Relief Pending Arbitration ............................................ 11

III.     Even If a Mandatory Injunction Were Permissible, Amtrak Has Failed to Make the Requisite Showing That It Is Entitled to Such Extraordinary Relief ........................... 13

        A.      Amtrak Has Come Nowhere Close to Showing Irreparable Harm Pending Arbitration ............................................................................................................ 14

        B.      Amtrak Cannot Show a Substantial Likelihood That Metro-North Violated Any Agreement ....................................................................................................... 18

        C.      Amtrak Cannot Show a Substantial Likelihood That Metro-North Violated the Implied Covenant of Good Faith and Fair Dealing ......................................... 21

IV.     Amtrak Fails to Meet the Distinct Requirements for a Prohibitory Injunction ................ 22

        A.      Amtrak Cannot Show That the Balance of Hardships Tips Decidedly in Its Favor .................................................................................................................... 22

        B.      Amtrak Cannot Show That It Has Raised a Serious Question ............................. 24

V.      A Bond Is Required in Light of Amtrak's Demand for Uncompensated Non-Passenger Services .......................................................................................................... 25

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Exp. Fin. Advisors Inc.* v. *Thorley*,
147 F.3d 229 (2d Cir. 1998)........................................................................................13

*Benihana, Inc.* v. *Benihana of Tokyo, LLC*,
784 F.3d 887 (2d Cir. 2015)........................................................................................12

*Bernardino* v. *Barnes & Noble Booksellers, Inc.*,
2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017), *report and recommendation
adopted*, 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017)......................................11, 12

*Blumenthal* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
910 F.2d 1049 (2d Cir. 1990)................................................................................12, 25

*Building Service 32BJ Health Fund* v. *S&A Building Services, LLC.*,
2013 WL 1701012 (S.D.N.Y. Apr. 17, 2013).............................................................25

*Citibank, N.A.* v. *Citytrust*,
756 F.2d 273 (2d Cir. 1985)........................................................................................14

*Citigroup Glob. Markets, Inc.* v. *VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)....................................................................................22, 23

*Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*,
650 F. Supp. 2d 314 (S.D.N.Y. 2009), *aff'd*, 976 F.3d 239 (2d Cir. 2020)..............21

*Convergen Energy WI, LLC* v. *L'Anse Warden Elec. Co., LLC*,
2020 WL 5894079 (S.D.N.Y. Oct. 5, 2020)........................................................15, 16

*Crichlow* v. *Fischer*,
2015 WL 678725 (S.D.N.Y. Feb. 17, 2015)...............................................................22

*Daileader* v. *Certain Underwriters at Lloyds London Syndicate 1861*,
96 F.4th 351 (2d Cir. 2024) ........................................................................................12

*Deutsche Bank Nat'l Tr. Co.* v. *Quicken Loans Inc.*,
810 F.3d 861 (2d Cir. 2015).........................................................................................21

*Erving* v. *Virginia Squires Basketball Club*,
468 F.2d 1064 (2d Cir.1972)........................................................................................12

*Faiveley Transp. Malmo AB* v. *Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009)..................................................................................14, 16

*Fonar Corp.* v. *Deccaid Servs., Inc.*,
   983 F.2d 427 (2d Cir. 1993).................................................................10, 11

*General Mills, Inc.* v. *Champion Petfoods USA*,
   Inc., 2020 WL 915824 (S.D.N.Y. Feb. 26, 2020)..................................13

*Gov't Emps. Ins. Co.* v. *Patel*,
   166 F.4th 280 (2d Cir. 2026) .............................................................14, 23

*Hopkins Hawley LLC* v. *Cuomo*,
   2021 WL 8200607 (S.D.N.Y. Jan. 8, 2021) ...........................................15

*Indep. Ord. of Foresters* v. *Donald, Lufkin & Jenrette, Inc.*,
   157 F.3d 933 (2d Cir. 1998)....................................................................21

*Jane Doe et al.* v. *Carelon Behav. Health, Inc.*,
   2026 WL 880639 (S.D.N.Y. Mar. 31, 2026) ...........................................21

*LaForest* v. *Former Clean Air Holding Co.*,
   376 F.3d 48 (2d Cir. 2004).......................................................................25

*Loc. 32B-32J, Serv. Emps. Int'l Union* v. *Port Auth. of N.Y. & N.J.*,
   944 F. Supp. 208 (S.D.N.Y. 1996) .....................................................12, 13

*Lockheed Martin Corp.* v. *Retail Holdings, N.V.*,
   639 F.3d 63 (2d Cir. 2011)........................................................................19

*Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*,
   454 F.3d 108 (2d Cir. 2006)......................................................................12

*Metro. Transportation Auth.* v. *Duffy*,
   784 F. Supp. 3d 624 (S.D.N.Y. 2025).......................................................14

*Molloy* v. *Metro. Transp. Auth.*,
   94 F.3d 808 (2d Cir. 1996).......................................................................16

*N. Am. Soccer League, LLC* v. *United States Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018).................................................................13, 14

*N.Y.C.L. Union* v. *N.Y.C. Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012)......................................................................18

*Nicosia* v. *Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016)......................................................................13

*Petrello* v. *White*,
   533 F.3d 110 (2d Cir. 2008)......................................................................10

iv

*Shake* v. *Wilmington Tr., Nat'l Ass'n.*,
  2020 WL 5261223 (S.D.N.Y. Sept. 3, 2020)................................................24

*Smith* v. *City of New York*,
  754 F. Supp. 3d 581 (S.D.N.Y. 2024)........................................................17

*State Farm Mut. Ins. Co.* v. *Tri-Borough N.Y. Med. Practice, P.C.*,
  120 F.4th 59 (2d Cir. 2024) ...............................................................14, 24

*Sterling Drug, Inc.* v. *Bayer AG*,
  14 F.3d 733 (2d Cir. 1994)......................................................................11

*Sun Chem. Bank v. Dainippon Ink & Chems., Inc.*,
  635 F. Supp. 1417 (S.D.N.Y. 1986).........................................................16

*Surrey Propco LLC* v. *Denihan Ownership Co., LLC*,
  2023 WL 4553551 (2d Cir. July 17, 2023)................................................20

*Tough Traveler, Ltd.* v. *Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995).......................................................................14

*Two Hands IP LLC* v. *Two Hands Am., Inc.*,
  563 F. Supp. 3d 290 (S.D.N.Y. 2021).......................................................18

*Winter* v. *Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)......................................................................................23

## Statutes

49 U.S.C § 24305(a)(1)..................................................................................4

49 U.S.C. § 24308(a)(1)................................................................................4

## Other Authorities

Fed. R. Civ. P. 65 .......................................................................2, 10, 11, 25

## PRELIMINARY STATEMENT

Metro-North Commuter Railroad Company ("Metro-North") and National Railroad Passenger Corporation ("Amtrak") both are governmental or quasi-governmental entities that operate railroads providing passenger service to millions of Americans.  They share important objectives, including the safe and timely delivery of passengers to their destinations.  They also are parties to decades-old written agreements governing the compensation Amtrak must provide to Metro-North relating to Amtrak's operation of passenger trains on the New Haven Line and the Hudson Line.  Significantly, those agreements by their terms and as confirmed by the parties' longstanding course of dealing, address *only* passenger services.  They do *not* concern non-passenger services.  Instead, as to those services, Amtrak historically has asked Metro-North for permission to use Metro-North tracks, and Metro-North has considered and responded to those requests on an individualized, *ad hoc* basis.

Amtrak has now brought this lawsuit alleging that Metro-North has breached the *passenger* service agreements between the parties by denying Amtrak permission to use Metro-North lines for *non-passenger* services—even though, as noted, those agreements do not address such services.  Amtrak seeks from this Court a preliminary injunction against Metro-North in order to—at least in Amtrak's telling—"maintain the status quo" pending arbitration.  But, in substance, Amtrak requests a **mandatory** injunction that would require Metro-North to provide non-passenger services to Amtrak for an undefined period, while Amtrak has not even commenced the arbitration provided for under the passenger agreements.  Moreover, Amtrak's proposed injunction lacks any commitment to financial compensation to Metro-North or protections or indemnities in the event of damage to Metro-North's infrastructure or service delays.  Amtrak's lawsuit is puzzling in light of the negotiations that the parties were engaged in regarding an agreement to cover non-passenger services.

By way of brief background, Amtrak filed this lawsuit following its introduction of the NextGen Acela in mid-2025, and a series of five known incidents on Metro-North's New Haven Line where a portion of that train's pantograph—a mechanism enabling electric trains to secure power from overhead lines—detached from the trains, thus requiring Metro-North to deploy specialized crews. In two of those instances, the detached portion of the pantograph damaged Metro-North electrical lines, which required repairs and, in one case, caused substantial delays to Metro-North's passengers. When Amtrak asked Metro-North for authorization to conduct a test of its redesigned pantograph on Metro-North's territory in March 2026, Metro-North understandably requested compensation, including for its specialized crews that would be onsite for that test. As noted, although Amtrak and Metro-North have longstanding agreements governing *passenger* service, these agreements did not cover the use of Metro-North's rails for non-passenger service, such as test trains. While Metro-North attempted to reach agreement on issues surrounding pantograph testing and other non-passenger services, Amtrak has declined to agree to any overarching framework in which it would provide compensation. Instead, Amtrak abandoned those negotiations and sought preliminary injunctive relief, in aid of an arbitration it has not yet filed.

Metro-North remains open to discussions with Amtrak to put in place a fair agreement to cover Amtrak's non-passenger train services, including appropriate compensation and liability protections for Metro-North. In the meantime, Amtrak's request for an injunction should be denied for the following reasons:

*First*, the proposed injunction violates Rule 65 of the Federal Rules of Civil Procedure because it lacks specificity and omits critical details as to its scope. Amtrak's proposed injunction requires that Metro-North provide non-passenger services to Amtrak, but contains no reference to

any compensation or indemnification that Amtrak will provide in return. That leaves Metro-North with significant uncertainty as to whether it may permissibly deny non-passenger services where Amtrak declines to provide sufficient compensation or indemnification.

**Second**, while the proposed relief is framed as a *prohibitory* injunction, the reality is that this is a paradigmatic example of a *mandatory* injunction. A preliminary injunction in aid of arbitration may only be prohibitory in form and designed to preserve the status quo pending the arbitration proceeding. Accordingly, Amtrak's requested mandatory injunction cannot be issued.

**Third**, the movant's requested relief fails to satisfy the mandatory injunction standard. Crucially, there is no showing of irreparable harm—always the cornerstone of an injunction—because Amtrak delayed seeking a judicial remedy and disregarded ongoing negotiations that could have provided the very relief Amtrak now seeks. In addition, the supposed irreparable "harms" that Amtrak has described are conclusory and are belied by the effective workarounds that Amtrak has implemented. Furthermore, Amtrak has made no showing of a likelihood of success on the merits—or even presented a serious question on that subject—because the relevant agreements plainly relate *only* to passenger services. There is simply no contract governing the non-passenger services about which Amtrak is complaining.

**Finally**, even under the standard governing prohibitory injunctions, Amtrak fails to meet its burden of showing that the balance of hardships tips decidedly in its favor. To the contrary, Amtrak's actions have imposed and could continue to impose significant safety and operational burdens on Metro-North, and its requested relief would usurp Metro-North's management of the Hudson and New Haven lines and its ability to efficiently manage commuter traffic for millions of passengers.

**FACTUAL BACKGROUND**

A.    **Amtrak and Metro-North Have for Decades Been Parties to Written Agreements Governing Metro-North's Services to Amtrak's Intercity Passenger Services on the New Haven and Hudson Lines**

Metro-North, a public benefit corporation of the State of New York and subsidiary of the Metropolitan Transportation Authority (the "MTA"), operates one of the busiest commuter railroads in North America, with a ridership of 70.3 million in 2025.[1]  It operates commuter rail service over three rail lines east of the Hudson River—the Hudson, New Haven and Harlem Lines. (Roth Decl. ¶ 4).  Metro-North also contracts with a variety of train operators that use these lines— both freight and intercity—and is responsible for ensuring the safe and timely transport of various trains across lines that have limited capacity.  (Roth Decl. ¶ 5).

Amtrak was created by the Rail Passenger Service Act of 1970 to provide "intercity and commuter rail passenger transportation."  49 U.S.C § 24305(a)(1).  By statute, Amtrak "may make an agreement with a rail carrier or regional transportation authority to use facilities of, and have services provided by, the carrier or authority under terms on which the parties agree."  49 U.S.C. § 24308(a)(1).

As relevant here, Amtrak and Metro-North have entered into agreements relating to passenger trains on the Hudson Line (the "Hudson Line Passenger Agreement") and the New Haven Line (the "New Haven Line Passenger Agreement") (together, the "Passenger Agreements").[2]  (Roth Decl., Exs. A, C).  The Passenger Agreements provide that "Amtrak operates intercity passenger trains" over the Hudson and New Haven Lines.  (Passenger

---

[1]    *See* Declaration of Hannah Roth ("Roth Decl.") ¶ 3, filed concurrently herewith.

[2]    The New Haven Line Passenger Agreement was entered into on November 1, 1991 and also includes the Connecticut Department of Transportation as a party. (Roth Decl., Ex. C).  The Hudson Line Passenger Agreement was entered into on January 1, 1990. (*Id.*, Ex. A).

Agreements at 1). The Passenger Agreements state that Metro-North will provide services "for or in connection with the operation of Amtrak's trains over the" Hudson and New Haven Lines. (*Id.* § 3.1). The Passenger Agreements also state that these services "will contribute to the success of [Amtrak's] Intercity Rail Passenger Service." (*Id.* § 3.3(C)). Under the Passenger Agreements, Amtrak's passenger trains are to operate based on "Scheduled Times" that are agreed to by Amtrak and Metro-North. (*Id.*, App. V § E).

The Passenger Agreements also provide that Amtrak shall have the right to request "Modification of The Services" including "modified or additional services in connection with the operation of Amtrak trains" on the Hudson and New Haven Lines. (*Id.* § 3.2). The Passenger Agreements further provide that Metro-North shall accommodate such requests subject to the "physical and financial capabilities of [Metro-North]" with appropriate "recognition . . . given to the importance of fast and convenient schedules and passenger comfort and convenience to the success of [Amtrak's] Intercity Passenger Service." (*Id.*). Those constraints include Metro-North's "speed, weight and similar operating restrictions and rules and safety standards and . . . the avoidance of unreasonable interference with the adequacy, safety, and efficiency of its other railroad operations." (*Id.*). Any modified or additional services are subject to payments by Amtrak.[3] (*Id.* § 5.1). The Passenger Agreements make no reference to Metro-North providing non-passenger-related services to Amtrak.

---

[3]  In 2018, the parties executed an amendment to the New Haven Line Passenger Agreement that included updated payment terms pursuant to the recently approved Northeast Corridor Commuter and Intercity Rail Cost Allocation Policy. (Roth Decl. ¶ 11; Dkt. No. 8-2, Jagodzinski Decl., Ex. B). That amendment did not alter the provisions governing modified or additional services and stated "except as specifically modified by this Amendment, all other terms and conditions of the Agreement remain in effect." (Jagodzinski Decl., Ex. B at 2).

Under the terms of these Passenger Agreements, Metro-North has developed established processes with Amtrak for the approval of "modified or additional services" to Amtrak's Intercity Passenger Service. (*Id.* § 3.2). Metro-North's Service Design Department – Train Scheduling team coordinates directly with Amtrak to accommodate requests to modify its schedule or add additional passenger service. (Roth Decl. ¶ 13). For example, after the COVID-19 pandemic, Amtrak requested to increase the number of passenger trains on the New Haven Line to restore service to near pre-pandemic levels. (*Id.*). Metro-North also accommodates Amtrak's requests to run additional passenger service on high-volume travel days, such as around Thanksgiving or Christmas. (*Id.*).

**B.      Amtrak and Metro-North Have No Agreement Governing Non-Passenger Trains, Which Have Long Been the Subject of *Ad Hoc* Requests by Amtrak**

Metro-North and Amtrak have never had any formal agreements regarding the use of Metro-North lines by Amtrak's non-passenger trains (*i.e.*, trains without paying passengers onboard). While changes and modifications for passenger service are governed by the Passenger Agreements, non-passenger *ad hoc* requests have been handled informally between Metro-North's rail traffic control team and Amtrak's team. (Roth Decl. ¶ 15). Metro-North's approval of such requests has by no means been automatic; to the contrary, each request is independently reviewed. (*Id.*).

Critically, non-passenger services are not subject to the same billing arrangements as passenger services, and Amtrak does not assert that it ever provided compensation in connection with those services. (Roth Decl. ¶ 16).

6

C.    The Use of Amtrak's NextGen Acela on Metro-North's Lines Caused Significant, Uncompensated Damage to Metro-North Infrastructure

Deficiencies in the informal relationship governing Amtrak's non-passenger requests were brought into sharp focus by Amtrak's introduction of the NextGen Acela in mid-2025. As has been widely reported, the NextGen Acela has faced a number of manufacturing-related defects.[4]

One significant issue with the NextGen Acela related to its pantograph, a device fixed to the roof of the train car that draws electrical power from live wires overhead (the "catenary"). On July 15, 2025, during a NextGen Acela test run on the New Haven Line, a portion of the train's pantograph detached and became entangled in the catenary operated by Metro-North. (Roth Decl. ¶ 20). This forced the train to stop at the platform in New Haven station and required Metro-North to dispatch a repair crew to inspect the system and perform repairs. (*Id*.). This was not an isolated incident. There were additional incidents in which a portion of the NextGen Acela's pantograph detached on the New Haven Line, including during passenger service on August 11, 2025, September 9, 2025, and October 7, 2025. (Roth Decl. ¶ 21). After each incident, Metro-North had to dispatch a maintenance crew to ensure that the line was operating safely. (*Id*.). On January 20, 2026, the NextGen Acela's pantograph once again detached on the New Haven Line during passenger service, resulting in damage to the catenary. (Roth Decl. ¶ 22). This incident resulted in Metro-North providing its own train to Amtrak's passengers, the deployment of a Metro-North maintenance crew, as well as substantial delays for thousands of Metro-North customers. (*Id*.).

As Metro-North explained to Amtrak in a January 27, 2026 letter, these incidents "undermine service reliability and erode the safety and confidence of [Metro-North's] customers

---

[4]    *See* Declaration of Gregory F. Laufer ("Laufer Decl."), Exs. A, B, filed concurrently herewith.

and employees" and, accordingly, Metro-North requested that Amtrak ensure that there is a "meaningful and lasting fix to prevent further damage." (Roth Decl. ¶¶ 24–25).

Amtrak worked with its manufacturer to redesign the horns on the NextGen Acela pantographs and on March 14, 2026, Amtrak submitted a request for a test run of the redesigned NextGen Acela pantograph on the New Haven Line. (Roth Decl. ¶ 26). On March 16, 2026, Metro-North responded that there needed to be "an agreement put in place before [Metro-North] can proceed with this test train." (Roth Decl. ¶ 27). In response, Amtrak took the unprecedented position that non-passenger services like pantograph testing fell within the scope of the existing agreements and that a new agreement was thus unnecessary. (Roth Decl. ¶ 28). In an effort to resolve the dispute, on March 18, 2026, Metro-North transmitted a proposed agreement that would cover the renewed tests of the NextGen Acela pantograph, including payment and other protections for Metro-North to put its own workers in place to monitor the test runs and respond quickly if there were any technical issues. (Roth Decl. ¶ 29). Counsel for Amtrak and Metro-North continued discussions on the proposed draft, with Amtrak sending revisions on March 27, 2026 and Metro-North responding on April 3, 2026. (Roth Decl. ¶¶ 31–32).

### D.    The Parties Engaged in Negotiations Regarding a Potential Agreement to Govern Non-Passenger Services

During the same period, the parties also began negotiations over terms to cover other non-passenger services involving both the recently launched NextGen Acela trains and other equipment in Amtrak's fleet. (Roth Decl. ¶ 33). Metro-North conveyed to Amtrak leadership multiple times, including in meetings on April 1, 2026 and April 15, 2026, that such non-passenger requests would need to be part of a formalized relationship going forward, and that Metro-North would require compensation for these non-passenger train movements. (Roth Decl. ¶¶ 35, 37). Indeed, on April 2, 2026, Metro-North approved a request from Amtrak for the movement of a non-passenger train

on the Hudson Line, after reaching agreement with Amtrak that it would provide compensation. (Roth Decl. ¶ 34). On April 15, 2026, the parties held a meeting to progress the discussions over pantograph testing and other non-passenger services. (Roth Decl. ¶ 37). At that meeting, Metro-North reiterated that it was seeking a written agreement covering all non-passenger moves that would provide compensation and the parties agreed that their legal teams would convene additional meetings to iron out an agreement. (*Id*.)

Negotiations over the pantograph testing dragged on as Amtrak repeatedly asked for additional information about the fees Metro-North proposed for Amtrak to conduct testing on Metro-North's territory. On April 13, 2026, Amtrak asked for "more detailed information regarding MNR's costs" and Metro-North provided further information on April 17, 2026, including a proposed access fee of $2,213.06. (Roth Decl. ¶¶ 36–37). Metro-North also provided an updated version of the draft agreement on April 17. (Roth Decl. ¶ 39). On April 21, 2026, Amtrak asked for a "detailed calculation" of the proposed $2,213.06 access fee and Metro-North responded that same day with details on the basis for the calculation. (Roth Decl. ¶ 40). After Amtrak requested a call with Metro-North's revenue management team to understand the calculations, the parties held a meeting on April 24, 2026—after Amtrak instituted this suit— during which Metro-North agreed to consider Amtrak's own calculations for comparison purposes. (Roth Decl. ¶ 40). However, Amtrak never followed up with its own calculations—despite multiple requests by Metro-North—and has not otherwise responded to Metro-North's April 17 proposal or provided its own proposed revisions. (Roth Decl. ¶¶ 41–42).

While the negotiations about the terms surrounding NextGen Acela pantograph testing and other non-passenger services were pending, Amtrak filed this petition for preliminary injunction on April 22, 2026, claiming that Metro-North's actions were "*crippling* [Amtrak's] efforts to

replace train cars that are aging out of service and modernize its fleet" through the deployment of the NextGen Acela.  (Dkt. No. 1, Petition ¶ 17) (emphasis added).  Amtrak alleged that other requests that were made in March and April 2026—while the negotiations over appropriate fees for such non-passenger requests were ongoing—were being "denied," "ignored," or merely "delayed."  (Dkt. No. 7, Memorandum at 9–10).  That is belied by the extensive discussions that were taking place between Amtrak and Metro-North during this period and the fact that on April 2, 2026, Metro-North *approved* a request from Amtrak for the movement of a non-passenger train, after Amtrak agreed that it would provide compensation.  (*See* Roth Decl. ¶¶ 23–41).

As noted, even after Amtrak filed its suit, Metro-North has attempted to continue good-faith business negotiations.  (*See* Roth Decl. ¶ 44).

## ARGUMENT

### I.  Amtrak Is Seeking an Injunction That Is Impermissibly Vague and Unworkable

Pursuant to Federal Rule of Civil Procedure 65, an order granting injunctive relief must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d).  A Court may not grant an injunction where the enjoined party is unable to "ascertain from the four corners of the [injunction] precisely what acts are forbidden," *Fonar Corp.* v. *Deccaid Servs., Inc.*, 983 F.2d 427, 430 (2d Cir. 1993) (citation omitted).  In *Petrello*, for example, the Second Circuit reversed an injunction ordering a landowner to sell his farm according to the terms of a contract-of-sale, including a set closing date.  *See Petrello* v. *White*, 533 F.3d 110, 112 (2d Cir. 2008).  The Second Circuit held that such an injunction failed to provide the "reasonable detail" required by Rule 65 because, there were relevant terms not defined by the proposed injunction, leaving the landowner unable to "ascertain" how to comply and placing him at risk of contempt.  *Id.* at 115–16.

Amtrak's proposed injunction similarly fails Rule 65's specificity requirement. Amtrak seeks an injunction "enjoining Respondent from denying, refusing, or failing to timely approve Amtrak's requests for non-revenue train movements on Metro-North's New Haven Line and Hudson Line," providing exceptions only where "Metro-North's physical and financial capabilities; speed, weight or similar operating restrictions; or rules and safety standards require Metro-North to schedule the non-revenue train movement at a later date or time." (Pet. at 10). But that formulation contains no reference to any compensation or indemnification that Amtrak will provide to Metro-North for the non-passenger services. Instead, it leaves Metro-North to "guess— on pain of contempt" whether it may permissibly deny non-passenger services where Amtrak declines to provide sufficient compensation or indemnification. *Sterling Drug, Inc.* v. *Bayer AG*, 14 F.3d 733, 748 (2d Cir. 1994). That is plainly inconsistent with Second Circuit precedent. This is not an issue that Amtrak can claim will be worked out later—the defendant must be able to "ascertain from the four corners of the [injunction] precisely what acts are forbidden," *Fonar Corp.*, 983 F.2d at 430.

And to the extent that Amtrak asserts that it is requesting an injunction for *uncompensated* non-passenger services, that is manifestly unfair and would be inconsistent with the terms of the Passenger Agreements that Amtrak seeks to invoke.

## II.    Amtrak Cannot Seek Mandatory Relief Pending Arbitration

While Amtrak repeatedly—and inaccurately—characterizes its request as one for a prohibitory injunction, the fact of the matter is that Amtrak's actual demand is one for a *mandatory* injunction. (*See* Mem. at 17).

Accordingly, because "this case is subject to arbitration, mandatory injunctive relief is not available." *Bernardino* v. *Barnes & Noble Booksellers, Inc.*, 2017 WL 3727230, at *10 (S.D.N.Y. Aug. 11, 2017), *report and recommendation adopted*, 2017 WL 3726050 (S.D.N.Y. Aug. 28,

2017); *see also Benihana, Inc.* v. *Benihana of Tokyo, LLC*, 784 F.3d 887, 894–95 (2d Cir. 2015) (reversing mandatory preliminary relief because the lower court "should have confined itself to preserving the status quo pending arbitration.").

A preliminary injunction in aid of arbitration is appropriate when "the *only way* to preserve the status quo during the pendency of the arbitration proceeding is by the granting of injunctive relief." *Erving* v. *Virginia Squires Basketball Club*, 468 F.2d 1064, 1067 (2d Cir.1972) (emphasis added). Thus, in *Blumenthal* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990), the Second Circuit affirmed an injunction in aid of arbitration to prohibit the use of a movant's confidential records, customer lists, and other trade secrets by former employees, holding that the absence of the injunction would have had irreparable damage to the movant and made the arbitration a "hollow formality."

Here, by contrast, Amtrak seeks an unprecedented mandatory injunction that would compel Metro-North to make its territory accessible to Amtrak for an indefinite period and in a manner that departs from the status quo. "At [its] most basic," a mandatory injunction "requires the non-movant to take some action." *Daileader* v. *Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024); *see also Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) (an injunction that "orders an affirmative act or mandates a specified course of conduct" is mandatory in nature). For years, Amtrak and Metro-North have had an informal relationship under which the parties coordinated non-passenger services pursuant to a discretionary and *ad hoc* process. (*See* Roth Decl. ¶¶ 15–16). Now, Amtrak seeks to compel Metro-North to affirmatively "approve" and service non-passenger train movements on lines operated by Metro-North, when that was never an obligation that Metro-North had. (Pet. at 10). That is a request for mandatory relief. *See Loc. 32B-32J, Serv. Emps. Int'l Union* v. *Port Auth. of*

12

*N.Y. & N.J.*, 944 F. Supp. 208, 214 (S.D.N.Y. 1996) (injunction deemed mandatory where plaintiffs sought "greater access" to Port Authority property than permitted).

The Second Circuit has long held that an injunction altering the status quo in this way is a mandatory injunction. In *North American Soccer League,* the North American Soccer League ("NASL") moved for a preliminary injunction, demanding that the United States Soccer Federation ("USSF")—the body responsible for division designations in the U.S. and Cananda—grant it a Division II designation pending resolution of its lawsuit. *See N. Am. Soccer League, LLC* v. *United States Soccer Fed'n, Inc.*, 883 F.3d 32, 35–36 (2d Cir. 2018). Like Amtrak here, NASL argued that it was merely seeking prohibitory relief because USSF had granted NASL's requests for Division II designation for nearly a decade. *See id.* at 37–38. In rejecting that argument, the Second Circuit held that NASL's injunction was mandatory—not prohibitory—because it sought to alter the "near-decade-long relationship of annual sanctioning between the parties" and that it was irrelevant that NASL had regularly been granted Division II status in the past. *Id*. Amtrak's requested relief is mandatory for the same reason and is thus unavailable pending arbitration.[5]

### III. Even If a Mandatory Injunction Were Permissible, Amtrak Has Failed to Make the Requisite Showing That It Is Entitled to Such Extraordinary Relief

While the mandatory injunction Amtrak seeks is not appropriate in aid of arbitration, in any event, Amtrak fails to satisfy the mandatory injunction standard. A party seeking mandatory injunctive relief must show both (i) "irreparable harm" and (ii) "a clear or substantial likelihood

---

[5]  Dicta in *General Mills, Inc*. v. *Champion Petfoods USA*, Inc. 2020 WL 915824, at *7 (S.D.N.Y. Feb. 26, 2020) that mandatory relief can be available pending arbitration in certain circumstances is distinguishable. *General Mills* discusses hypothetical remedial injunctions that bear no resemblance to Amtrak's demand for ongoing, forward looking approvals. In any event, the cases *General Mills* relies upon are inapposite. *See Nicosia* v. *Amazon.com, Inc*., 834 F.3d 220, 238 (2d Cir. 2016) (affirming the *denial* of a preliminary injunction); *Am. Exp. Fin. Advisors Inc*. v. *Thorley*, 147 F.3d 229, 231 (2d Cir. 1998) (declining to consider the merits of a preliminary injunction).

of success on the merits." *See N. Am. Soccer League*, 883 F.3d at 37 (citation omitted). Amtrak fails to do so here.

### A.    Amtrak Has Come Nowhere Close to Showing Irreparable Harm Pending Arbitration

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB* v. *Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Gov't Emps. Ins. Co.* v. *Patel*, 166 F.4th 280, 291 (2d Cir. 2026) (quoting *State Farm Mut. Ins. Co.* v. *Tri-Borough N.Y. Med. Practice, P.C.*, 120 F.4th 59, 80 (2d Cir. 2024)). Accordingly, Amtrak is "entitled to an injunction only if [it] can demonstrate that, in the interval between this date and the date in the near future upon which the Court is expected to render a final decision, [it] will suffer an injury that cannot be repaired." *Metro. Transportation Auth.* v. *Duffy*, 784 F. Supp. 3d 624, 90 (S.D.N.Y. 2025). Amtrak's submission falls far short of these standards.

***First***, Amtrak's significant delay in initiating arbitration "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A.* v. *Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (citation omitted). Any "presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." *Tough Traveler, Ltd*. v. *Outbound Prods*., 60 F.3d 964, 968 (2d Cir. 1995). That is exactly the case here. By no later than March 18, 2026, Amtrak understood that Metro-North did not consider non-passenger services to be covered by the Passenger Agreements and would not provide those services without adequate compensation. (*See* Roth Decl. ¶¶ 26–30; Pet. ¶ 14). Yet, Amtrak waited *five* weeks to file this action and more than

*seven* weeks have passed without Amtrak initiating the contractually required arbitration.  Nor did Amtrak seek a Temporary Restraining Order.  This unexplained, weeks-long delay alone warrants denial of preliminary relief.  *See Hopkins Hawley LLC* v. *Cuomo,* 2021 WL 8200607, at *1 (S.D.N.Y. Jan. 8, 2021) (finding that a three-week delay between the announcement of a policy and plaintiffs filing for emergency relief constituted "lack of immediacy.").  At a minimum, Amtrak's evident lack of urgency strongly undermines any claim of irreparable injury.

Despite having waited more than seven weeks without commencing the arbitration, Amtrak now claims that immediate injunctive relief is necessary to prevent the arbitration from becoming "meaningless" or a "hollow formality," pointing to the roughly four weeks required to constitute an arbitral tribunal. (Mem. at 16–17).  But Amtrak itself has waited much longer than the length of time it now claims is intolerable.  "[T]o the extent that Plaintiff asserts that the length of the arbitration itself and the time it will take the arbitrators to make a decision on the preliminary relief will cause it irreparable harm, the Court notes that the problem is, to a large degree, of Plaintiff's own manufacture."  *Convergen Energy WI, LLC* v. *L'Anse Warden Elec. Co., LLC*, 2020 WL 5894079, at *7 (S.D.N.Y. Oct. 5, 2020).  Furthermore, the Court should not credit Amtrak's arguments that the arbitration procedure is too slow when it is one to which Amtrak expressly agreed.

***Second***, any alleged harm Amtrak faces is self-inflicted, which likewise undercuts any claim of irreparable injury.  "[A] movant cannot manufacture its own exigency and 'if the harm complained of is self-inflicted, it does not qualify as irreparable.'"  *Convergen Energy WI, LLC*, 2020 WL 5894079, at *5 (2020) (citation and alteration omitted).  That is precisely the case here, where Amtrak, as noted, delayed for weeks before bringing this action and initiating arbitration, all the while maintaining an unreasonable posture at the negotiating table.  Metro-North proposed

15

an agreement that would have permitted pantograph testing as early as March 18, 2026, and was prepared to sign it promptly. (*See* Roth Decl. ¶¶ 27–29). Rather than accept that offer or propose any workable alternative, Amtrak prolonged negotiations by repeatedly challenging Metro-North's proposed fees. (*See* Roth Decl. ¶¶ 36–42). Meanwhile, Metro-North continued to submit revised proposals and permitted non-passenger movements when compensation was provided. (*See* Roth Decl. ¶¶ 32, 34, 39, 41, 44). Yet Amtrak never once identified what compensation it would accept. (*See* Roth Decl. ¶¶ 37, 39–43). Amtrak cannot now invoke injury—irreparable or otherwise—that is the product of its own delay strategy. *See Sun Chem. Bank v. Dainippon Ink & Chems., Inc.*, 635 F. Supp. 1417, 1423 (S.D.N.Y. 1986) (denying preliminary injunction where the alleged harm was "avoidable").

*Third*, Amtrak purports to describe irreparable harm associated with three specific types of non-passenger services. None comes close to satisfying the required showing for interim relief.

*Track Geometry Testing*. Amtrak claims it is being harmed by being unable to undertake federally mandated geometry track testing on Amtrak's own lines east of New Haven. (*See* Mem. at 7, 11–12, 14–15). But Amtrak's own statements confirm that it has already identified and implemented adequate alternatives. "[I]rreparable harm does not exist where alternatives are available to a movant, even if these alternatives are less convenient." *Convergen Energy WI, LLC*, 2020 WL 5894079, at *5 (quoting *Molloy* v. *Metro. Transp. Auth.*, 94 F.3d 808, 813 (2d Cir. 1996)). Amtrak concedes that it can perform its inspections by attaching a geometry car to the rear of a regularly scheduled passenger train. (Jagodzinski Decl. ¶¶ 40–41). That mitigation has, by Amtrak's own description, allowed it to "maintain track safety and preserve train speed." (Mem. at 16). Irreparable harm requires far more than an inconvenience—it requires injury that "cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp.*

*Malmo AB* v. *Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). Amtrak has not made—and cannot make—that showing here.

*Commissioning Test Runs*. Amtrak claims it must undertake commissioning test runs on railroads operated by Metro-North before placing a NextGen Acela train into passenger service. (*See* Mem. at 11). But Amtrak falls far short of specifying any harm associated with those runs. Amtrak admits that it continues to undertake test runs, albeit under a "shortened standard" and fails to specify any irreparable injury from using these standards. (*Id.* at 15). The availability of such alternatives "weigh[s] heavily against a claim of irreparable harm." *Metro. Transp. Auth.* v. *Duffy*, 784 F. Supp. 3d 624, 689 (S.D.N.Y. 2025); *see also Molloy*, 94 F.3d at 813 (finding no irreparable harm where the alleged injury concerned "a diminished ability," "not an inability," to engage in the conduct at issue).

*Equipment Repositioning.* Amtrak purports that Metro-North is denying requests for equipment repositioning and transportation of NextGen Acela trainsets to Amtrak facilities. (Mem. at 12–13). But Amtrak's own submissions undercut its claim: of the eight alleged denials Amtrak cites, only two involved an equipment repositioning request, one of which was ultimately granted. (*See id.* at 9–10). Tellingly, Amtrak fails to note that when Amtrak agreed to provide compensation its request was approved. (*See id.* at 10; Roth Decl. ¶ 34). In any event, a single purported denial and an approval after a three-day negotiation cannot establish the kind of ongoing or imminent injury that preliminary injunctive relief demands. *Smith* v. *City of New York*, 754 F. Supp. 3d 581, 584 (S.D.N.Y. 2024) (finding no irreparable harm in part because "Plaintiff has not asserted any facts to indicate that [the defendant's] alleged conduct continued after" a single incident).

*Finally*, Amtrak has made no showing that any of these purported harms would actually result in irreparable injury (or any legally cognizable injury for that matter). Amtrak asserts that the alleged denials will "negatively impact[] Amtrak's schedule, passenger experience, and, most importantly, Amtrak's reputation." (Mem. at 15). But, "conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Two Hands IP LLC* v. *Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 301 (S.D.N.Y. 2021) (quotation omitted). Amtrak offers no concrete evidence of any actual or imminent reputational harm, relying instead on speculation. And even if Amtrak's reputation is under strain, it not from Metro-North's conduct but from Amtrak's own well-documented delays and setbacks with its NextGen Acela trains. (Laufer Decl., Exs. A, B, C.) While Amtrak can support no claim grounded in safety, its actions have already created safety risks on Metro-North's lines, which is why Metro-North has been clear that further testing needs to be governed by appropriate agreements.

## B. Amtrak Cannot Show a Substantial Likelihood That Metro-North Violated Any Agreement

Amtrak argues that Metro-North violated Section 3.2 of the Passenger Agreements by claiming that non-passenger services supposedly qualify as "modified or additional services" under that provision. (Mem. at 19–20). But that theory falls well short of the "substantial" likelihood of success required to obtain the mandatory injunction it seeks. *N.Y.C.L. Union* v. *N.Y.C. Transit Auth*., 684 F.3d 286, 294 (2d Cir. 2012). To do so, Amtrak "must demonstrate 'actual success' on the merits." *Id*. It cannot for a straightforward reason: no contract governs the subject matter underlying Amtrak's purported claims.

*First*, Section 3.2 of both Passenger Agreements governs changes to Amtrak's scheduled *passenger* service—not *ad hoc* non-passenger movements. By its express terms, Section 3.2 addresses "Modification of The Services," granting Amtrak the right to request "modified or

18

additional services in connection with the operation of Amtrak trains" on the Hudson and New Haven Lines. (Passenger Agreements § 3.2). Those "modified or additional services" refer to adjustments to scheduled passenger service. Under the Passenger Agreements, Amtrak's trains operate on "Scheduled Times," a framework that applies *only* to passenger service. (*See Id.*, App. V § E). Section 3.2 itself is likewise expressly tied to "convenient schedules and passenger comfort and convenience" and to "the success of [Amtrak's] Intercity Passenger Service." (*See Id.*, § 3.2). Consistent with that framework, Metro-North has established a defined process with Amtrak for approving "modified or additional services," managed through Metro-North's Service Design Department and Train Scheduling team. (*See* Roth Decl. ¶ 13). Nothing in the text or structure of Section 3.2 supports applying it outside the context of passenger service.

***Second***, the Passenger Agreements, read as a whole, confirm that Section 3.2 was intended to apply only to passenger services. Where, as here, the "the document as a whole makes clear the parties' over-all intention," this Court should interpret each provision to "carry out the plain purpose and object of the [agreement]." *Lockheed Martin Corp.* v. *Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (quotation omitted). There can be no dispute that the purpose of the Passenger Agreements is to reach an agreement with respect to passenger service trains. For example, the liability-sharing provisions compensate Metro-North for assuming liability arising from Amtrak's operations on a "per passenger train mile[]" basis and thus only apply to passenger trains. (Passenger Agreements § 7.2(e)). Likewise, the performance standards are defined entirely in terms of scheduled passenger operations—requiring, for example, delivery of Amtrak's trains "to all scheduled passenger stops on Railroad by the scheduled time." (*Id.* § 3.3(B)). That framework leaves no room to suggest that the Passenger Agreements were intended to govern non-passenger movements, much less to bring such movements within the scope of Section 3.2.

19

*Third*, the parties knew exactly what language to adopt if they had intended to cover non-passenger trains. Indeed, although not mentioned in Amtrak's moving papers, Metro-North and Amtrak also entered into a January 30, 1991 New Haven Line Testing Agreement that expressly referred to non-passenger services. (Roth Decl. ¶ 9, Ex. B). That agreement granted Amtrak the "ability, to the extent reasonably possible, to test high-speed operations and other operational improvements on the New Haven Line," reflecting only a general, discretionary principle of cooperation. (Roth Decl. ¶ 9, Ex. B at 1). That agreement was executed during the same period of the New Haven Line Passenger Agreement and makes clear that non-passenger services—like testing for high-speed trains—were not intended to be governed by the New Haven Line Passenger Agreement. Where an agreement omits "terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission." *Surrey Propco LLC* v. *Denihan Ownership Co., LLC*, 2023 WL 4553551, at *2 (2d Cir. July 17, 2023) (quotation omitted). While this agreement reflected a general statement that the parties would "cooperate" with respect to testing, it did not give Metro-North the same rights as in the Passenger Agreements.

*Fourth*, Amtrak's conduct over more than 30 years—including over the last several weeks—further confirms that non-passenger services were not covered by Section 3.2. If—contrary to the plain text—non-passenger services were examples of "modified or additional services," Amtrak would need to "specify proposed payments," "specify proposed performance standards," and pay for the services. (Passenger Agreements §§ 5.1, 5.1(B), 5.1(C)). Amtrak does not assert that it has ever done any of this in connection with non-passenger service requests. (*See* Roth Decl. ¶ 16). While the 2018 amendment to the New Haven Line Passenger Agreement removed the requirement for Amtrak to affirmatively propose payments, Amtrak does not claim

20

to have proposed non-passenger service payments in the 20-year-period prior to that amendment and it does not assert that it has affirmatively offered payment under the Hudson Line Passenger Agreement, where that requirement still applies. Amtrak's conduct is exactly what one would expect, however, if non-passenger movements services fall outside the scope of Section 3.2.

Accordingly, because the Passenger Agreements do not apply to non-passenger services, Amtrak cannot demonstrate a substantial likelihood that Metro-North breached those agreements.

### C.       Amtrak Cannot Show a Substantial Likelihood That Metro-North Violated the Implied Covenant of Good Faith and Fair Dealing

Amtrak also argues that Metro-North has breached the implied covenant of good faith and fair dealing. But that assertion fails as a matter of law. The implied covenant "relates only to the performance of obligations *under an extant contract*." *Indep. Ord. of Foresters* v. *Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 941 (2d Cir. 1998) (emphasis added). It cannot be used to create "new, unbargained-for obligations." *Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*, 650 F. Supp. 2d 314, 325 (S.D.N.Y. 2009), *aff'd*, 976 F.3d 239 (2d Cir. 2020). Because there is no "governing valid contract" covering non-passenger services, there is no violation—or serious likelihood of a violation—of the implied covenant. *Jane Doe et al.* v. *Carelon Behav. Health, Inc.*, 2026 WL 880639, at *7 (S.D.N.Y. Mar. 31, 2026).

In any event, the implied covenant claim is impermissibly duplicative of Amtrak's breach-of-contract claim as it rests on identical facts and seeks identical relief. *See Deutsche Bank Nat'l Tr. Co.* v. *Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (affirming dismissal of implied covenant claim as duplicative of contract claim that arose from the same facts related to the knowing sale of defective loans).

Amtrak's suggestion that Metro-North acted arbitrarily and in bad faith is likewise conclusory and legally insufficient, particularly in the face of Amtrak's heavy burden in seeking

21

an injunction.  *See Crichlow* v. *Fischer*, 2015 WL 678725, at \*8 (S.D.N.Y. Feb. 17, 2015) ("Conclusory allegations lacking supporting evidence will not support a preliminary injunction."). Indeed, Amtrak's declarant does not even attempt to explain what evidence it has of Metro-North's supposed bad faith.  The fact of the matter is that Metro-North sought in good faith to negotiate a framework to govern any non-passenger service relationship, but it was Amtrak—not Metro-North—that declined to reach an agreement.  To that end, Metro-North specifically sought to resolve the issue with the NextGen Acela pantograph testing and, more broadly, the issues surrounding the movement of non-passenger trains.  (*See* Roth Decl. ¶¶ 29–44).  Indeed, Amtrak has not responded to the revised proposal that Metro-North made on April 17 regarding NextGen Acela pantograph testing.  (*See* Roth Decl. ¶ 42).

## IV.    Amtrak Fails to Meet the Distinct Requirements for a Prohibitory Injunction

Even if Amtrak's requested relief were somehow deemed prohibitory (which it is not) as opposed to mandatory (which it clearly is), Amtrak still would fail to meet the governing standards. A party seeking a prohibitory preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *Citigroup Glob. Markets, Inc.* v. *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  Amtrak has failed to demonstrate irreparable harm and likelihood of success on the merits for the reasons explained above, and fails to satisfy the alternative governing standard.

### A.    Amtrak Cannot Show That the Balance of Hardships Tips Decidedly in Its Favor

Even if it was able to show irreparable harm, Amtrak fails to show that the balance of hardships tips decidedly in its favor.  When a movant seeks a preliminary injunction based on the

22

existence of a serious question going to the merits, "its overall burden is no lighter than the one it bears under the 'likelihood of success' standard" because it must show that the balance of hardships tips "*decidedly*" towards it.  *Citigroup*, 598 F.3d at 35 (quotation omitted).  The "balance of hardships" factor requires the Court to "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief."  *Gov't Emps. Ins. Co.*, 166 F.4th 280 at 296 (quotation omitted).  On this record, the balance tips decidedly in favor of Metro-North and away from Amtrak.

*First*, Amtrak's requested relief would impose significant hardship on Metro-North by forcing it to bear the risks of continued NextGen Acela testing without any assurances of adequate compensation by Amtrak.  The cost of such damage is borne in the first instance by Metro-North, but ultimately by the public.  *See Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("[I]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

*Second*, the proposed relief Amtrak wants, undeveloped as it is, would effectively saddle Metro-North with an unlimited and potentially uncompensated obligation to permit non-passenger movements.  It would require Metro-North to approve any and all non-passenger train movements Amtrak requests, with no cap on the number, type, or frequency of such requests.  Critically, there is nothing in the proposed injunctive language that limits the scope of non-passenger movements Amtrak might demand or that provides for any payment to Metro-North for accommodating those movements.  And, even if payment were somehow implied, there are no specifics as to how such compensation would be calculated.  Metro-North would thus be compelled to absorb the operational burden of a potentially unlimited number of Amtrak non-passenger trains with no contractual mechanism ensuring that Metro-North is made whole.

23

***Third***, even accepting Amtrak's alleged harms to its operations and reputation at face value—a tall order in light of the threadbare evidentiary submission accompanying Amtrak's petition—any such harms must be weighed against Metro-North's risk of future catenary damage, and the operational and financial burdens in the event that Amtrak requests non-passenger services without paying compensation. Amtrak's invocation of the public interest does not tip the equities because both parties are governmental or quasi-governmental entities. (Mem. at 22). Like Amtrak, Metro-North serves a riding public and is committed to ensuring the safety, reliability, and continuity of public rail service. Where, as here, the "equities are in equipoise" under the most liberal view of Amtrak's position, Amtrak likewise cannot carry its burden of showing that the balance of hardships tips decidedly in its favor. *Shake* v. *Wilmington Tr., Nat'l Ass'n.*, 2020 WL 5261223, at *13 (S.D.N.Y. Sept. 3, 2020).

### B.    Amtrak Cannot Show That It Has Raised a Serious Question

In any event, Amtrak fails to show that a "serious question" on the merits exists on this record. A movant may proceed under the "serious questions" pathway to obtaining injunctive relief only by raising issues "so serious, substantial, difficult and doubtful as to make them a fair ground for litigation." *State Farm Mut. Auto. Ins. Co.*, 120 F.4th at 79. No such question is presented here. The Passenger Agreements speak solely in terms of passenger trains, and the sole provision Amtrak puts at issue, Section 3.2, is framed entirely around passenger services. For more than 30 years, Amtrak itself treated non-passenger services as outside the scope of the Passenger Agreements. Because Amtrak claims that Metro-North breached obligations it never assumed, Amtrak has not shown that a "serious question" on the merits exists here.

24

**V.    A Bond Is Required in Light of Amtrak's Demand for Uncompensated Non-Passenger Services**

Rule 65(c) of the Federal Rules of Civil Procedure states that a court can order interim relief only if the movant "gives security" that the court deems sufficient "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *Blumenthal*, 910 F.2d 1049 at 1055. The cases Amtrak cites to avoid Rule 65(c)'s bond requirement are inapplicable because there—unlike here—the court had already established non-movants' obligation to comply with the relevant contract, which "cannot constitute a 'harm'." *See LaForest* v. *Former Clean Air Holding Co.*, 376 F.3d 48, 60–61 (2d Cir. 2004); *Building Service 32BJ Health Fund* v. *S&A Building Services, LLC.,* 2013 WL 1701012, at *1 (S.D.N.Y. Apr. 17, 2013). Here, by contrast, an injunction would force Metro-North to provide non-passenger services that the parties never contracted for, and potentially at no cost.

Accordingly, to the extent an injunction issues—which, for the reasons set out above, should not happen—Amtrak should be required to post a bond sufficient to cover Metro-North's potential costs and damages that could result from whatever form of relief Amtrak might secure.

## CONCLUSION

The Court should deny the petition for a preliminary injunction pending arbitration.

25

Dated: May 8, 2026
   New York, New York

            PAUL, WEISS, RIFKIND,
            WHARTON & GARRISON LLP

            */s/ Gregory F. Laufer*
            Gregory F. Laufer
            Samuel Kleiner
            1285 Avenue of the Americas
            New York, NY  10019-6064
            Telephone: (212) 373-3000
            glaufer@paulweiss.com
            skleiner@paulweiss.com

            *Attorneys for Respondent*
            *Metro-North Commuter Railroad Company*

**<u>CERTIFICATION</u>**

I, Gregory F. Laufer, hereby certify that the foregoing Opposition complies with Local Civil Rule 7.1 and the Court's Individual Rule 4(b) in that the total number of words in this Opposition, exclusive of the caption, table of contents, table of authorities, and the signature block, is 7,668 words and 25 pages according to Microsoft Word, and therefore does not exceed either 8,750 words or 25 pages. I further certify that the foregoing Opposition complies with the formatting requirements set forth in Local Civil Rule 11.1.

By: */s/ Gregory F. Laufer*
　　 Gregory F. Laufer