**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NATIONAL RAILROAD PASSENGER
CORPORATION—AMTRAK

*Petitioner*,

- v. -

METRO-NORTH COMMUTER RAILROAD
COMPANY,

*Respondent*.

---

Case No. 26-cv-3339 (JSR)

**DECLARATION OF HANNAH ROTH**
**IN SUPPORT OF METRO-NORTH'S OPPOSITION TO**
**AMTRAK'S PETITION FOR A PRELIMINARY INJUNCTION**
<u>**IN AID OF ARBITRATION**</u>

I, Hannah Roth, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.       I am Chief of Staff of the Metro-North Commuter Railroad Company ("Metro-North"), Respondent in the above-captioned action.  I submit this Declaration in support of Metro-North's opposition to Petitioner National Railroad Passenger Corporation's ("Amtrak") motion for preliminary injunctive relief.

2.       I have been employed by Metro-North since approximately June 2025.  In my current role, I oversee the Office of the President and support the organization's strategic and operational priorities.

3.       Metro-North is a public benefit corporation of the State of New York and a subsidiary of the Metropolitan Transportation Authority ("MTA").  Metro-North operates one of the busiest commuter railroads in North America, with a ridership of 70.3 million in 2025.

4.      Metro-North operates commuter rail service over three rail lines east of the Hudson—the Hudson, New Haven, and Harlem Lines.

5.      Metro-North contracts with a variety of train operators that use these lines—both freight and intercity—and is responsible for ensuring the safe and timely transport of various trains across lines that have limited capacity.

**A.      The Passenger Agreements**

6.      Metro-North and Amtrak are parties to longstanding passenger agreements governing Amtrak's operation of intercity passenger trains on the New Haven Line and Hudson Line (the "Passenger Agreements").  These agreements govern, among other things, the compensation Amtrak provides to Metro-North relating to Amtrak's operation of passenger trains on Metro-North's territory.

7.      With respect to the Hudson Line, Metro-North and Amtrak entered into an agreement dated January 1, 1990 (the "Hudson Line Passenger Agreement") governing Amtrak's passenger train operations on that line.  A true and correct copy of the Hudson Line Passenger Agreement is attached hereto as Exhibit A.

8.      With respect to the New Haven Line, the relationship between Amtrak and Metro-North is governed by at least two agreements.

9.      First, a January 30, 1991 agreement (the "New Haven Line Testing Agreement") states that Amtrak should have the "ability, to the extent reasonably possible, to test high-speed operations and other operational improvements on the New Haven Line in an effort to improve its service in the future."  A true and correct copy of the New Haven Testing Agreement is attached hereto as Exhibit B.  There is no equivalent of the New Haven Testing Agreement with respect to the Hudson Line.

10.     Second, a November 1, 1991 agreement (the "New Haven Line Passenger Agreement") governs Amtrak's passenger train operations on Metro-North's New Haven Line.  A true and correct copy of the New Haven Line Passenger Agreement is attached hereto as Exhibit C.

11.     In 2018, the parties executed an amendment to the New Haven Line Passenger Agreement that included updated payment terms pursuant to the recently approved Northeast Corridor Commuter and Intercity Rail Cost Allocation Policy.

12.     Under the terms of the Passenger Agreements, Metro-North has developed established processes with Amtrak for the approval of modifications or additions to Amtrak's "Intercity Rail Passenger Service."  Exs. A, C § 3.3(C).

13.     Metro-North's Service Design Department – Train Scheduling team coordinates directly with Amtrak to accommodate requests to modify its schedule or add additional Intercity Passenger Service trains.  For example, after the COVID-19 pandemic, Amtrak requested to increase the number of passenger trains on the New Haven Line to restore service to near pre-pandemic levels.  Metro-North also accommodates Amtrak's requests to run additional passenger service on high-volume travel days, such as around Thanksgiving or Christmas.

14.     In 2011, Metro-North and Amtrak executed a Mutual Aid Amendment to the New Haven Line Agreement in which the parties agreed that in circumstances involving equipment, infrastructure, or human failure, the services of one railroad may be needed by the other in order to provide the best possible service to passengers.  The parties agreed to provide whatever aid necessary to assist the customers of the other railroad, consistent with safety and operational needs, and set forth compensation provisions in connection with that assistance.

3

**B.    Informal Non-Passenger Requests**

15.    With respect to non-passenger service, Metro-North and Amtrak historically worked cooperatively to address such requests.  Unlike changes or modifications related to passenger service—which were negotiated on a formal basis between Metro-North's Train Scheduling team and Amtrak—non-passenger, *ad hoc* requests were handled informally between Metro-North's rail traffic control personnel and Amtrak's counterparts.  Approval of such requests was not automatic and was reviewed on a case-by-case basis in Metro-North's discretion.

16.    Amtrak routinely requested non-passenger services without offering compensation, and those non-passenger services were not subject to the billing arrangements applicable to the Passenger Agreements.

**C.    Metro-North's Catenary System and Amtrak's Pantograph Strikes**

17.    Metro-North maintains and operates the rail infrastructure associated with the Hudson and New Haven Lines.  That infrastructure includes the catenary system—the network of overhead wires that supplies electric power to trains operating on the New Haven line.

18.    A pantograph is a structure affixed to the roof of an electric train that maintains contact with the overhead catenary wire to draw power.

19.    In mid-2025, Amtrak introduced the NextGen Acela train on Metro-North's New Haven Line.  From the outset, the train's pantograph posed significant operational issues and required Metro-North to regularly dispatch a repair crew to inspect the system and perform repairs.

20.    On July 15, 2025, during a NextGen test run on the New Haven Line, a horn of the train's pantograph detached and became entangled in the catenary owned by the State of Connecticut and maintained by Metro-North.  This forced the train to stop at the platform in New Haven station and required Metro-North to dispatch a repair crew to inspect the system and perform repairs.

4

21.     Again on August 11, 2025, September 9, 2025, and October 7, 2025, a horn on the pantograph of a NextGen Acela train detached during passenger service on the New Haven Line. After each incident, Metro North had to dispatch an inspection crew to ensure that the line was operating safely.

22.     On January 20, 2026, a horn on a NextGen Acela train's pantograph once again detached during passenger service on the New Haven Line, resulting in damage to the catenary. This incident resulted in Metro-North providing its own train to Amtrak's passengers and deploying a maintenance crew to assess and repair the damage.  The incident also resulted in substantial delays for thousands of Metro-North customers.

**D.     Negotiations Surrounding Pantograph Testing and Other Non-Passenger Services**

23.     On January 23, 2026, following the fifth incident, Metro-North placed Bulletin Order 2-334 into effect, which provided that all Amtrak NextGen Acela trains must manually lower their pantographs away from the overhead catenary when operating in the vicinity of the prior incidents.  This measure was intended to mitigate the risk of additional catenary strikes on an interim basis while the parties addressed the defects in the NextGen Acela pantographs.

24.     On January 27, 2026, Metro-North's Senior Vice President for Operations, Joe Lagana, sent a letter to Amtrak regarding the "ongoing issues involving the NextGen Acela fleet and its repeated risk and damage to Metro-North's catenary system."  The letter explained that the NextGen Acela pantograph strikes "undermine service reliability and erode the safety and confidence of our customers and employees."

25.     The letter also set forth Metro-North's operational expectations in connection with remedying the pantograph issues, including that there be a "meaningful and lasting fix to prevent further damage" to Metro-North's infrastructure.

26. On March 14, 2026, following a redesign of the horns on the NextGen Acela pantographs, Amtrak's Vice President of Commissioning and Corridor Optimization, Christopher Jagodzinski, emailed Metro-North requesting to operate non-passenger NextGen Acela trains to conduct pantograph testing on the New Haven Line.

27. Mr. Lagana responded on March 16, 2026, informing Mr. Jagodzinski that there needed to be "an agreement put in place before we can proceed with this test train" and that he "hopes to get this completed tomorrow."

28. Later that day, on March 16, 2026, Amtrak's Assistant Vice President of Infrastructure Access & Investment, Thomas Moritz, responded to Mr. Jagodzinski, stating "we have long operated both revenue and test trains under the terms of the 1991 New Haven Line Agreement, so did not anticipate the need for an additional agreement."

29. On March 18, 2026, Metro-North's General Counsel, Eamonn Foley, transmitted to Amtrak a proposed testing agreement that would cover the renewed tests of the NextGen pantograph on the New Haven Line (the "New Haven Line Pantograph Testing Agreement"), including payment for Metro-North to deploy specialized personnel to monitor and support the safe and orderly operation of the test runs, including personnel positioned to respond in the event of any damage to Metro-North's infrastructure. In the cover email, Mr. Foley stated that "Metro-North can't release the current restriction without an agreement that Amtrak will cover our past expenses and will cover Metro-North's expenses for the next phase of Amtrak's testing."

30. In response, on March 18, 2026, Amtrak's Senior Associate General Counsel, Jackie Meredith-Batchelor, asserted that she "took a look at the 1991 tri-party New Haven Line Agreement and note that Section 3.2.A (copied below) covers the operation of the type of train

6

Amtrak is seeking to operate, and I'm led to believe Section 3.2.A has been used by the parties to cover prior NextGen Acela tests on the New Haven Line."

31.     On March 27, 2026, Ms. Meredith-Batchelor transmitted to Mr. Foley a revised draft of the New Haven Line Pantograph Testing Agreement.

32.     Mr. Foley transmitted to Ms. Meredith-Batchelor a further revised draft on April 3, 2026.

33.     While negotiations over the New Haven Line Pantograph Testing Agreement were ongoing, the parties also began negotiations over terms to cover other non-passenger services involving both the recently launched NextGen Acela trains and other equipment in Amtrak's fleet.

34.     On March 31, 2026 Amtrak made a non-passenger service request to move a NextGen Acela trainset across the Hudson Line.  That same day, Mr. Foley sent an email to Ms. Meredith-Batchelor stating that Amtrak would need to agree to provide, among other things, compensation for the non-passenger train move.  Following Amtrak's agreement to provide compensation, Metro-North approved Amtrak's non-passenger service request on April 3, 2026.

35.     On April 1, 2026, I attended a virtual meeting with Amtrak personnel, including Eileen Downing, Mr. Moritz, and Ms. Meredith-Batchelor to discuss the NextGen Acela pantograph testing agreement.  At that meeting, I conveyed that with respect to non-passenger train service, Metro-North would require a written agreement, including compensation, going forward.

36.     On April 13, 2026, Ms. Meredith-Batchelor emailed a revised draft of the New Haven Line Pantograph Testing Agreement.  In her cover email, she requested "more detailed information regarding MNR's costs."

37.     On April 15, 2026, I attended an in-person meeting with Amtrak personnel, including Mr. Moritz, Mr. Jagodzinski, and Ms. Downing to continue the discussions over

pantograph testing and other non-passenger services.  At that meeting, I conveyed to Amtrak leadership that such non-passenger requests would need to be part of a formalized relationship going forward, and that Metro-North would require a written agreement, including compensation for these non-passenger train movements.  The parties agreed that, in addition to working to finalize an agreement on the next phase of pantograph testing, the attorneys would meet to discuss and draft, for everyone's review and discussion, an agreement to cover Amtrak's non-passenger services on the Hudson and New Haven lines, which would include appropriate compensation and indemnification.

38.     In mid-April 2026, discussions on the New Haven Line Pantograph Testing Agreement continued.

39.     On April 17, 2026, Mr. Foley transmitted a further revised draft agreement, and provided detail on Metro-North's costs, including a proposed access fee of $2,213.06 for the pantograph test train.

40.     On April 21, 2026, Amtrak requested a "detailed calculation" of the $2,213.06 access fee, which Metro-North provided that day.  The next day, on April 22, 2026, Amtrak requested a call with Metro-North's revenue management team for further clarification about the calculations, which was held on April 24, 2026.

41.     During the April 24, 2026 call to discuss the calculations surrounding the proposed test train access fee, Amtrak represented that it would follow up with its own calculation for comparison purposes.  After the call, Metro-North sent multiple emails to Amtrak requesting that calculation, but Amtrak did not provide it.  To date, Metro-North has not received any such calculation from Amtrak.

42.     To date, Amtrak has neither provided a revised draft of the New Haven Line Pantograph Testing Agreement in response to Metro-North's April 17, 2026, draft nor identified what access fee it would agree to.

43.     Rather than continue negotiations on those pending agreements, Amtrak filed its petition on April 22, 2026.

44.     Metro-North has continued to respond to Amtrak's requests for information in relation to the New Haven Line Pantograph Testing Agreement, including during the aforementioned April 24, 2026 meeting.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: May 8, 2026
        New York, New York


By: _____
        Hannah Roth
        Chief of Staff
        Metro-North Commuter Railroad Company