# EXHIBIT C

MNCRC SECRETARY'S REG. NO. 1204

FILE COPY –
RETURN TO REGISTRY

AGREEMENT BETWEEN

METRO-NORTH COMMUTER RAILROAD

AND

CONNECTICUT DEPARTMENT OF TRANSPORTATION

AND

NATIONAL RAILROAD PASSENGER CORPORATION

FOR OPERATION BETWEEN

NEW ROCHELLE AND NEW HAVEN

DATED:  November 1, 1991

MNCRC SECRETARY'S REG. NO.

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| | RECITALS | 1 |
| | ARTICLE I | |
| | ACCESS TO NEW HAVEN LINE | 3 |
| | ARTICLE II | |
| | (Not Applicable) | |
| | ARTICLE III | |
| | THE SERVICES | |
| Section 3.1 | Right to Services | 3 |
| Section 3.2 | Modification of the Services | 4 |
| Section 3.3 | Standards of Performance | 5 |
| Section 3.4 | Control of Operations | 6 |
| Section 3.5 | No Violation of Labor Agreements | 6 |
| Section 3.6 | Termination of the Services | 6 |
| Section 3.7 | Performance by Other Than Railroad | 6 |
| | ARTICLE IV | |
| | RAIL LINES | |
| Section 4.1 | Rail Lines | 7 |
| Section 4.2 | Maintenance of Rail Lines | 8 |
| Section 4.3 | Additional Maintenance and Improvements | 8 |

- i -

PAGE

ARTICLE V

ACCOUNTS AND PAYMENTS

Section 5.1    Basis of Payment                          9

Section 5.2    Billing and Payment                      13

ARTICLE VI

ARBITRATION                                             16

ARTICLE VII

GENERAL

Section 7.1    (Reserved)

Section 7.2    Risk of Liability                        18

Section 7.3    Information                              21

Section 7.4    NRPC Operations Officer                  21

- ii -

ARTICLE VIII

MISCELLANEOUS

Section 8.1    Force Majeure                          22

Section 8.2    Successors and Assigns                 22

Section 8.3    Interpretation                         22

Section 8.4    Severability                           23

Section 8.5    Notices                                23

Section 8.6    Counterparts                           24

Section 8.7    Relationship of Parties                24

Section 8.8    Term                                   25

Section 8.9    Equal Employment Opportunity           26

Section 8.10   Rights Reserved                        27


APPENDIX I       Initial Track Speeds                 30

APPENDIX II      (Not Applicable)

APPENDIX III     Current Cost Summary                 32

APPENDIX IV      Cost Detail                          36

APPENDIX V       Performance Payments and Penalties   38

APPENDIX VI      Administrative and Statutory Requirements 45

THIS Agreement is between National Railroad Passenger Corporation, a corporation organized under the Rail Passenger Service Act (the Act), and the laws of the District of Columbia, having offices at 60 Massachusetts Avenue, N.E., Washington, D.C.  20002 (hereafter referred to as "NRPC" or "Amtrak"), and Metro-North Commuter Railroad, a public benefit corporation of the State of New York and subsidiary of Metropolitan Transportation Authority, having a place of business at 347 Madison Avenue, New York, N.Y.  10017 (hereafter referred to as "Metro-North") and the State of Connecticut Department of Transportation (hereafter referred to as "Connecticut"); Metro-North and Connecticut are hereafter collectively referred to as "Railroad";

WHEREAS, Metro-North controls and operates a railroad over lines of Metro-North between CP 216, NY (MP 16.3) and the New York/Connecticut state line (MP 26.1), and, pursuant to and subject to the Amended and Restated Service Agreement, dated June 21, 1985 among Connecticut, Metropolitan Transportation Authority, and Metro-North, currently controls and operates a railroad over lines owned by the State of Connecticut between the New York/Connecticut state line and New Haven, CT (MP 72.8).  The entire line between CP 216 and New Haven is hereafter referred to as "the New Haven Line".

WHEREAS, Amtrak operates intercity passenger trains between Penn Station, NY and New Haven, CT over its own rail line from Penn Station to CP 216 and over the New Haven Line;

WHEREAS, the Metropolitan Transportation Authority and the Trustees of the Penn Central Transportation Company entered into the MTA Purchase and Lease Agreement, dated October 27, 1970, and effective January 1, 1971, and the Connecticut Transportation Authority of the Connecticut Department of Transportation and the Trustees of the Penn Central Transportation Company entered into the CTA Lease Agreement,

-2-

dated and effective on the above same dates (hereafter collectively referred to as the "New Haven Leases").  The New Haven Leases provide, in part, for the operation of rail passenger service on the New Haven Line; and Metro-North, Connecticut, and Amtrak and others have succeeded to the interests of the original parties to the New Haven Leases;

WHEREAS, operation of Amtrak intercity passenger trains has previously been conducted pursuant to Amtrak's rights under the New Haven Leases, the parties hereto mutually wish to revise and restate the trackage rights of Amtrak over and across the New Haven Line in accordance with the terms hereof, effective as of January 1, 1990, and further, the parties desire to effectuate the release, extinguishment and termination of any and all rights and obligations of Amtrak under the New Haven Leases;

WHEREAS, the risk of liability with respect to operations on the New Haven Line as between Amtrak and Metro-North has been governed by a letter agreement dated December 30, 1982, between Amtrak and Metro-North, as subsequently extended by mutual agreement of the parties (hereafter referred to as the "December 30, 1982 Liability Agreement"), and the parties wish to terminate that agreement, effective November 1, 1991;

WHEREAS, Connecticut has the authority pursuant to Connecticut General Statutes, Sections 13b-23, 13b-36, and 13b-34(a) to enter into this Agreement.

NOW THEREFORE, except as specifically provided to the contrary in Section 8.8, effective January 1, 1990, the parties agree as follows:

-3-

## ARTICLE I

### ACCESS TO NEW HAVEN LINE

As of the effective date of this Agreement, Metro-North is the commuter rail operator for the entire New Haven Line and is the service operator acting on behalf of itself, the Metropolitan Transportation Authority, and Connecticut under the Amended and Restated Service Agreement (hereafter referred to as the "Service Agreement") among Connecticut, Metropolitan Transportation Authority, and Metro-North, dated June 21, 1985.  In the event Metro-North ceases at some future date to be the commuter rail service operator of the portion of the New Haven Line located in Connecticut, Metro-North agrees (on behalf of itself and the Metropolitan Transportation Authority) to continue providing NRPC access to (and services on) the portion of the line located in New York State to the same extent as is currently provided in this Agreement, and Connecticut, by itself or a successor rail service operator, agrees to continue providing NRPC access to (and services on) the portion of the line located in Connecticut to the same extent as is currently provided in this Agreement.

## ARTICLE II

(RESERVED)

## ARTICLE III

### THE SERVICES

Section 3.1  Right to Services.

Subject to and in accordance with the terms and conditions of this Agreement, Railroad hereby agrees to provide NRPC with the use of facilities and the services requested by NRPC for or in connection with

-4-

the operation of Amtrak's trains over the New Haven Line.

Section 3.2  Modification of The Services.

A.  NRPC shall have the right from time to time to request, and, subject to and in accordance with the terms and conditions of this Agreement including Section 3.3, Railroad hereby agrees to provide modified or additional services in connection with the operation of Amtrak trains on the New Haven Line.  Such modified or additional services shall be provided by Railroad upon the filing by NRPC of a request on a date sufficiently in advance of the date upon which any such request is to be implemented to permit adequate joint planning and joint preparation for the modified services provided for in such request.  The services requested in any such request shall be subject to the physical and financial capabilities of Railroad and shall give due regard to Railroad's speed, weight and similar operating restrictions and rules and safety standards and to the avoidance of unreasonable interference with the adequacy, safety, and efficiency of its other railroad operations.  In applying the foregoing, recognition shall be given to the importance of fast and convenient schedules and passenger comfort and convenience to the success of NRPC's Intercity Rail Passenger Service.

B.  Railroad hereby agrees to provide emergency services over the New Haven Line required as a result of the rail lines of another railroad used in the operation of passenger trains by or on behalf of NRPC becoming impassable, unsafe, or impractical for use in rail passenger service or other operating emergency.  NRPC may request the performance of such emergency services orally; however, any such request shall be made as far in advance as possible of the time the emergency services are required, and shall be confirmed in writing

within 24 hours after communication to Railroad.  The emergency services requested shall be compatible with the physical capabilities of Railroad, and shall give due regard to Railroad's speed, weight, and similar operating restrictions and rules and safety standards. Railroad agrees to use its best efforts to provide emergency services requested under this Agreement in an expeditious and efficient manner. Railroad will be reimbursed by NRPC for all of Railroad's additional costs resulting from provision of the emergency services.

Section 3.3  Standards of Performance.

A.  Railroad further agrees to provide and furnish all labor, materials, equipment and facilities necessary to perform the services to be provided under Sections 3.1 and 3.2 (except as the same are provided by NRPC), but shall not, except as otherwise provided in this Agreement or upon agreement with NRPC, be required to purchase, construct, rebuild or replace the New Haven Line or ancillary facilities.

B.  Railroad shall provide services hereunder in an economic and efficient manner and shall make every reasonable effort:

1.  To deliver Amtrak trains to all scheduled passenger stops on Railroad by the scheduled time therefor;

2.  To avoid excessive delays to trains and, consistent with safety, to make up delays incurred on the New Haven Line or on rail lines of other railroads and;

3.  To perform emergency mechanical service or repairs when necessary to permit an Amtrak locomotive or a passenger car in the consist of an Amtrak train to complete a trip over the New Haven Line.

C.  Railroad shall cooperate in good faith with NRPC in providing

-6-

service which will contribute to the success of NRPC's Intercity Rail Passenger Service.

D.  Railroad shall have no obligation to maintain locomotives or cars except as provided in paragraph B.3 above.

Section 3.4  Control of Operations.

In the performance of services referred to in this Agreement, Railroad shall have sole control of the operation of NRPC's Intercity Rail Passenger Trains while on the New Haven Line.

Section 3.5  No Violation of Labor Agreements.

NRPC agrees that it will not require the performance of services hereunder by Railroad, nor will it exercise its rights under Section 3.7, in a manner which would cause Railroad to violate the terms of or incur penalties, unless reimbursed by NRPC, in connection with any then current labor agreements between Railroad and any organization representing any of its employees.

Section 3.6  Termination of The Service.

NRPC shall have the right to terminate provision of any or all services by Railroad on not less than thirty (30) days' prior written notice to Railroad, but exercise of such right shall not limit NRPC's future exercise of its rights thereafter pursuant to Sections 3.1 and 3.2.

Section 3.7  Performance by Other Than Railroad.

All personnel rendering any services which involve responsibility for Railroad's operating facilities or for the handling or movement of any Intercity Rail Passenger Train shall be subject to the direction,

supervision and control of Railroad, and such services performed by or for NRPC shall be governed by and subject to all then current operating and safety rules, orders, procedures and standards of Railroad with respect thereto.

Railroad may, for cause, require that any person performing services under this Section be prohibited or removed from performance of such services, subject to the requirement that Railroad shall support any action defending such prohibition or removal and bear any claims growing out of any improper prohibition or removal.

ARTICLE IV

RAIL LINES

Section 4.1   Rail Lines.

Connecticut (as to the portion of the New Haven Line located in Connecticut) and Metro-North (as to the portion of the New Haven Line located in New York) shall retain and not dispose of or abandon their rights in the New Haven Line used in the operation of NRPC trains for as long as such use continues, or for the term of this Agreement, whichever period is the shorter, provided that seasonal changes or suspensions of service shall not be deemed discontinuance of use. Nothing herein shall prevent Railroad, Connecticut or Metro-North from modifying, changing, or relocating any facility or any segment of its tracks, provided that with respect to tracks covered by this paragraph, the continuity of the tracks is retained.

The New Haven Line shall include the Connecticut and Metro-North rights of way and real properties appurtenant thereto reasonably necessary to operate NRPC's Intercity Rail Passenger Service and all of their rights to use such properties of others, together with the

-8-

roadway structures thereof or appurtenant thereto used in connection with the actual operation of NRPC trains.

Section 4.2    Maintenance of Rail Lines.

Railroad agrees to continue maintenance at not less than the level of utility existing on January 1, 1990.  However, the parties agree that Railroad may be required to reduce maintenance to some lesser level if necessary due to general budgetary constraints imposed upon its system.  The parties agree that the speeds shown in Appendix I were in effect as of January 1, 1990.

Section 4.3    Additional Maintenance and Improvements.

Upon the request of NRPC, Railroad shall as promptly as feasible modify the New Haven Line maintenance, at the sole expense of NRPC for any additional cost to the extent such additional costs is not reimbursed under Appendix IV, so as to increase the level of utility of any part of the New Haven Line to the level specified in such request.

NRPC shall have the right (i) at its sole expense, to the extent that the cost thereof is not reimbursed under Appendix IV, to require Railroad to improve the New Haven Line as provided in such request, or (ii) subject to mutually satisfactory arrangements, to improve the  New Haven Line; provided that any such improvement shall not unduly interfere with or unduly limit Railroad's other rail operations, that any such requested improvement shall be made by Railroad as promptly as feasible, and that any increase in maintenance cost occasioned by such improvement shall be paid by NRPC to the extent that such increased cost is not reimbursed under Appendix IV.

-9-

ARTICLE V

ACCOUNTS AND PAYMENTS


Section 5.1  Basis of Payment.

As full and complete compensation for the services and activities performed and the facilities and equipment made available to NRPC under this Agreement, and for Railroad's provision of management and corporate resources necessary to enable Railroad to provide the services, activities, and facilities specified in an efficient manner, NRPC will pay Railroad amounts set forth or calculated in accordance with Subsections A, B, and C, below, and other adjustments provided in Subsection D, below.

Authorization Notice.

For work and/or services performed when requested or required under NRPC's Authorization Notice Procedure, which may include certain items in Appendix IV, NRPC shall pay Railroad the incremental cost (including fringe benefits), plus overheads (exclusive of profit) for capital work, to the extent such additional cost is not reimbursed under Appendix IV.

A.  Initial Service.

With respect to the operation of Amtrak trains by Railroad hereunder, and the services initially provided by Railroad in connection therewith, NRPC shall pay Railroad the amounts specified in Appendix IV.

B.  Modified or Additional Service.

With respect to any modified or additional services requested by NRPC to be provided by Railroad pursuant to Section 3.2, in connection with the filing of a request for such modified or additional service,

NRPC will specify proposed payments corresponding to those in Subsection A of this Section 5.1 for such service.  Such proposed payments shall be calculated using the methodology employed in calculating the costs in Appendix IV and shall be designed to provide Railroad with payment as nearly as possible on the same basis as for comparable services being rendered at that time, taking into account, however, any relevant differences.

In the event Railroad considers that the method of payment proposed by NRPC pursuant to this subsection differs in any significant degree from the basis of payment used for the initial service operated by Railroad as provided in Subsection A, at the request of either party, the matter shall be submitted to arbitration for an order prescribing the payment to be made for the modified services on the same basis as payments were established pursuant to Subsection A.  Such order shall be effective on the date agreed by the parties or (in the absence of such agreement) on the date set by the arbitrators.  During the pendency of any such proceeding, Railroad shall provide the services requested by NRPC under the terms of this Agreement and NRPC shall pay Railroad the amount proposed by NRPC or an interim amount set by the arbitrators.  The parties agree to adjust any interim payments to the final compensation determination as established by the arbitrators.


C.  Performance Payments.

In addition to the reimbursement paid to Railroad under this section, Railroad may earn additional payments for schedule adherence as set forth in Appendix V.  With respect to any modified or additional services requested by NRPC to be provided by Railroad pursuant to Section 3.2, NRPC shall, in connection with filing of a request for

-11-

such modified service, specify proposed performance standards and payments consistent with those in Appendix V in connection with the operation of such service.

D.  Payment Adjustment.

The amount of payments stated to be payable by NRPC under Subsection A of this Section 5.1, and the amounts which become effective for payment under Subsection B of this Section 5.1, shall be subject to further adjustments as follows:

1.  For the purpose of keeping the cost provisions current with the Railroad's labor, fringe benefit, and material costs, the fixed payments specified in Appendix IV shall be adjusted in accordance with the provisions set forth in Appendix III, Table 1.

2.  The basis or the amounts of payment shall be appropriately adjusted whenever:

(a)  Railroad ceases or fails to commence performing any service or activity;

(b)  The provision of any service, activity, or facility hereunder, are changed in accordance with this Agreement.

3. NRPC may notify Railroad that it no longer desires Railroad to perform or furnish any service, activity, or facility for which NRPC compensates Railroad, and Railroad shall cease to perform or provide such service on the date requested, which shall be at least thirty (30) days after receipt of written notice unless otherwise agreed.  Such notice shall include a schedule of the services, activities, or facilities to be terminated, and upon the date requested for termination of performance, NRPC shall no longer be required to make payment to Railroad with respect thereto.  NRPC agrees, however, to reimburse Railroad the avoidable costs specified in Appendix IV or the cost of removing facilities installed at NRPC's request which are

incurred as a consequence of Railroad's termination of such services, activities, or facilities, irrespective of the date incurred. With respect to removal of facilities, such removal must be necessary and reasonable. This paragraph D.3 shall have no effect on the application of Article III of this Agreement or of Section 402(a) of the Rail Passenger Service Act.

4. If NRPC and Railroad are unable to resolve any dispute regarding the amount of any change in the basis of payment which may be made pursuant to Paragraphs 1 through 3 of this Subsection D, either party may submit the matter to arbitration pursuant to Article VI for an order prescribing the basis of payment consistent with such paragraphs. Such order shall be effective on the date agreed by the parties or (in the absence of such agreement) upon the date set by the arbitrators. During the pendency of any such proceedings, Railroad shall provide the services requested by NRPC under the terms of this Agreement and NRPC shall pay Railroad the amount due for services provided by Railroad pursuant to the terms of this Agreement and not requested to be terminated in accordance with paragraph 3, above, or shall for additional services requested, pay the amount proposed by NRPC or an interim amount set by the Panel. The parties agree to adjust any interim payments to the final compensation determination as established by the arbitrators.

E. Redetermination of Compensation.

The foregoing shall be the basis for compensation for the services and activities performed and the facilities and equipment provided to NRPC by Railroad hereunder from the date of the Agreement until the parties have reached a new agreement with respect to compensation or until the Interstate Commerce Commission has issued any order pursuant

to a joint application of the parties as hereinafter provided.  At any time five (5) years after the effective date of this Agreement, NRPC or Railroad may notify the other that it wishes to negotiate as to a redetermination of the amount or method of computing the amount of payment for any service or activity performed or provided by Railroad hereunder.  In such event, the other party shall promptly negotiate with respect to such a redetermination.

If, within 180 days after the date of such notice, NRPC and Railroad are unable to agree as to a new basis of compensation, NRPC and Railroad shall, at the request of either, jointly make application to the Commission under Section 402(a) of the Act for an order fixing just and reasonable compensation.  Until a new basis of compensation is established, NRPC shall continue to make periodic payments to Railroad in the manner and amount provided in this Agreement; provided, however, that for any period after the issuance of an initial service order pursuant to the filing of a joint application hereunder, compensation shall be that which is established by the Commission.

Section 5.2  Billing and Payment.

A.  Within thirty (30) days after the last day of each calendar month, Railroad shall submit a Statement of Charges to NRPC calculated for such month in accordance with the provisions of Section 5.1.  The Statement of Charges shall be submitted in a form to be mutually agreed upon.  If any revisions in the forms and methods of billing significantly change the amount of work required by Railroad in connection with billing NRPC, the parties will negotiate a new basis of compensation for such activity.

Within fifteen (15) days after receipt of such Statement, NRPC shall pay Railroad the amount due Railroad in accordance with

Section 5.1.  Billing disputes shall be resolved in accordance with Subsection D below.

NRPC shall mail its payment checks (or at the Railroad's election make wire transfer payment or make checks available at the Controller's office of NRPC for Railroad's authorized agent) to Railroad on or before the fifteenth (15) day after receipt of the aforementioned Statement.

B.  Any payment by NRPC shall be subject to an audit and evaluation of operations, performance, and costs.  The scope of such audit and evaluation shall be both financial and operational, and may include, in addition to costs and wages reimbursed by NRPC, Railroad's controls, practices, and procedures and their effect upon the efficiency and quality of performance provided by Railroad.  Except as provided in Subsections 5.1 D and E and Subsection 5.2 E, no flat-rated item shall be subject to adjustment as a result of such audit and evaluation.

C.  Railroad shall maintain supporting accounting, operating, and mechanical department records and any other related data which may be required, and such supporting documents shall be available for NRPC review and audit at points where such records are ordinarily kept by Railroad.  All such records shall include the NRPC designated locomotive number, and shall be maintained and accumulated on a location-by-location basis.  Such records shall be retained not less than 36 months and shall be available to NRPC during the regular business hours of the location where the record is retained.

D.  In the event either party believes it has made a payment which exceeds (or has received a payment which is less than) the amount required by the provisions of the Agreement or a settlement between the parties of a matter covered by this Agreement, such party shall

formally submit its claim in reasonable detail to the other party. Undisputed audit adjustments shall be paid promptly by the other party. In the event that a party disagrees with the proposed audit adjustment, such party shall provide a written statement of the theory of its disagreement and the facts supporting that theory in a form which will permit the claiming party to evaluate the merits of the other party's position. Any adjustment which is unresolved 90 days after having been formally presented shall, at the request of either party, be submitted to arbitration for resolution. If it is established by agreement or arbitration more than 90 days after a claim is initially submitted to a party that an overpayment or underpayment has occurred, the amount of such excess or shortfall shall bear monthly compound interest at the Chase Manhattan prime rate from the date (or dates) on which it was originally paid or should have been paid until the date the appropriate adjustment is made.

E. If the amount of compensation specified in Appendix IV for a flat rated item varies clearly and substantially from the actual costs incurred by Railroad in connection with such item, and if the flat rate is inaccurate because of the existence of a material mistake of fact, the compensation with respect to such item shall be changed prospectively from the date notice is given of the discovery in order that it will reasonably reflect the avoidable costs incurred by Railroad which are covered by that item. For purposes of this provision, a material mistake of fact has occurred where there has been significant factual understanding which was incorrect and (1) was relied upon by both parties without knowledge of its error, or (2) was relied upon by one party, where that party could not reasonably have known that it was incorrect, while the other party either knew it was incorrect or failed to take reasonable steps to determine its accuracy.

For purpose of this provision, a variance between actual, avoidable costs and the agreed upon flat rate amount for that item which is less than 20% (unless such variance exceeds $25,000 per year for the item) will normally be deemed not to be substantial.

## ARTICLE VI

## ARBITRATION

(a)  As between Amtrak, on one hand, and Railroad or Metro-North or Connecticut individually, on the other, except as provided in Subsection (b) below, the parties agree to make a good faith effort to resolve any dispute, claim, or controversy between them relating to the interpretation, application, or implementation or this Agreement; provided that any such dispute, claim, or controversy that cannot be resolved by agreement shall be submitted to binding arbitration in the following manner:

(1)  The party wishing to initiate arbitration shall notify the other parties in writing of its desire to submit the matter to arbitration.  Such notice shall contain a statement of the issues and shall designate one arbitrator.

(2)  Within fifteen (15) days of such notice, the other parties shall respond in writing by designating a second arbitrator.

(3)  Within fifteen (15) days of designation of the second arbitrator, the two arbitrators designated as aforesaid shall appoint a third arbitrator to serve as chairman except that if a second arbitrator has not been designated as provided in clause (b), no arbitrator other than the first one named need be designated.  If the two arbitrators so designated fail to appoint a third arbitrator within the time provided herein, the initiating party may request the Chief

Judge of the United States District Court for the district in which the initiating party's principal office is located to appoint a third arbitrator.

(4)  The arbitrators shall promptly hear and decide the issues submitted to them, giving each party reasonable notice of the time and place of hearing.

(5)  The arbitrators, or a majority of them, shall promptly render their decision and award in writing to the parties.

(6)  Any arbitration award rendered hereunder shall be final and binding upon the parties.  Judgment upon any such arbitration award may be entered in any court having jurisdiction over the parties.

(7)  Each party shall bear its own costs and expenses of arbitration, including the cost and any expenses of the arbitrator designated by it.  The fees of the chairman and any other remaining expenses shall be borne equally by the parties, except that the arbitrators may impose a greater proportion or all of such fees and expenses upon one of the parties if it is determined that such party has unreasonably delayed the arbitration process or taken a position which is totally lacking in merit as to one or more of the issues.

(b)  The parties agree that in the event of any dispute affecting only Connecticut and Metro-North, which does not involve NRPC, arbitration will be in accordance with Article Ten of the Amended and Restated Service Agreement among Connecticut, Metropolitan Transportation Authority, and Metro-North, dated June 21, 1985.


ARTICLE VII

GENERAL


Section 7.1  (Reserved).

Section 7.2  Risk of Liability.

(a)  NRPC agrees to indemnify and save harmless Railroad, irrespective of any negligence or fault of Railroad, its employees, agents or servants, or howsoever the same shall occur or be caused, from any and all liability for injuries to or death of any employee of NRPC (including employees of Amtrak contractors) and for loss of, damage to, or destruction to his property; but is is expressly understood and agreed that labor furnished by Railroad for an on behalf of NRPC and for which Railroad bills NRPC shall not be regarded for purposes of this Section 7.2(a) as employees of NRPC.

(b)  NRPC agrees to indemnify and save harmless Railroad, irrespective of any negligence or fault of Railroad, its employees, agents or servants, or howsoever the same occur or be caused, from any and all liability for injuries to or death of any person or passenger who has purchased or obtained a NRPC-approved ticket for any train operated by or for the account of NRPC and for loss of, damage to or destruction of property of such person or passenger and for injuries to or death of any other person who may be on, getting on, or alighting from such train for the purpose of accompanying or meeting a passenger, and for loss of, damage to or destruction of the property of such person.

(c)  NRPC agrees to indemnify and save harmless Railroad, irrespective of any negligence of fault of Railroad, its employees, agents or servants, or howsoever the same shall occur or be caused, from any and all liability for, loss of, damage to or destruction of any locomotive, passenger car or any other property or equipment owned by, leased to, used by or otherwise in control, custody or possession of NRPC.

(d)  NRPC agrees to indemnify and save harmless Railroad,

irrespective of any negligence of fault of Railroad, its employees, agents and servants of howsoever the same shall occur or be caused, and notwithstanding the provisions of Section 7.2(f) hereof, from any and all liability for injury to or death of any person and for loss of, damage to, or destruction of any property, other than property specified in Section 7.2(e) hereof, if such injury, death, loss, damage, or destruction arises from or is proximately caused as a result of a collision of a vehicle or a person with an NRPC train at the intersection of a street or road, whether public or private, and the tracks of Railroad.

(e)  Metro-North agrees to indemnify and save harmless NRPC, irrespective of any negligence or fault of NRPC, its agents, employees or servants, or howsoever the same shall occur or be caused, from any and all liability for injury to or death of any employee or employees of Railroad and for loss of, damage to or destruction of any property or equipment owned by, leased to, used by, or otherwise in control, custody, or possession of Railroad or its employees, other than property described in Section 7.2(c) hereof, which arises from activities conducted by or for the account of NRPC pursuant to this Agreement.  In consideration of Metro-North assuming the obligation described in this Section, NRPC will compensate Railroad at the rate of 7.34 cents per passenger train mile ("passenger train mile" means a passenger train operated over the New Haven Line for the account of NRPC for one mile).

(f)  Metro-North agrees to indemnify and save harmless NRPC, irrespective of any negligence of fault of NRPC, its employees, agents or servants, or howsoever the same shall occur or be caused, from any and all liability for injury to or death of any person or persons (other than those persons, employees or passengers described in Section

-20-

7.2(a), 7.2(b), and 7.2(d) hereof) and from any and all liability for loss, damage or destruction to any property (other than property described in Section 7.2(a), 7.2(b), 7.2(c), and 7.2(d) hereof) which arises from activities conducted by and for the account of NRPC.

(g)   In case suit shall at any time be brought against either NRPC, Metro-North, or Connecticut asserting a liability against which NRPC or Metro-North agrees to indemnify and save harmless the party sued, the indemnifying party shall, at its own cost and expense and without any cost or expense whatever to the party sued, defend such suit and indemnify and save harmless the party sued against all costs and expenses thereof and promptly pay or cause to be paid any final judgement recovered against the party sued; provided, however, that the party sued shall promptly upon the bringing of any such suit against it give notice to the indemnifying party and thereafter provide all such information as may from time to time be requested.  Each party shall furnish to the other all such information relating to claims made for injuries, deaths, losses, damage or destruction of the type covered by this Section 7.2 as such other party may from time to time request.

(h)   On or after January 1, 1994, either NRPC or Metro-North may request the other party (excluding Connecticut) to renegotiate in its entirety this Section 7.2.  If within 180 days after a request for renegotiation is made, the parties are unable to agree with respect to any proposed change in said Section 7.2, then the parties shall at the request of either party submit the matter to the Commission for resolution pursuant to Section 402(a) of the Act.  The parties shall make all reasonable efforts to expedite such proceedings.  During the period of negotiations or while the matter is pending before the Commission, the method of handling such liability pursuant to said Section 7.2 shall remain in effect.

(i)   In the event that Metro-North ceases to be the contract rail service operator for Connecticut on the portion of the New Haven Line located in the State of Connecticut, Metro-North's indemnification of NRPC pursuant to this section shall be limited to operations conducted on the portion of the rail line located in New York State, and NRPC and Connecticut shall attempt to agree upon new provisions governing the risk of liability and damage with respect to operations on the segment of the New Haven Line located in Connecticut.

Section 7.3   Information.

Any party hereto shall have the right to inspect the books and records of any other party pertaining to the performance of this Agreement at its usual place of business, on reasonable notice, and during regular business hours.

At any reasonable time NRPC or its designated agents shall have the right upon reasonable conditions and notice to examine the tracks used in performing Intercity Rail Passenger Service for NRPC.  Railroad shall furnish, when reasonably requested by NRPC, reports to NRPC pertaining to the level of utility of the tracks of the Railroad for rail passenger transportation use, which reports shall set forth the speed and load capacity of each line segment of the tracks, the condition and capacity of stations and terminals (including any contractual limitations governing Railroad's use of such stations and terminals), the availability and capacity of maintenance facilities, and current maintenance procedures.

Section 7.4   NRPC Operations Officer.

Railroad shall appoint an individual of appropriate rank to be NRPC Operations Officer and shall so notify NRPC.  The NRPC Operations

-22-

Officer shall have the responsibility for the performance by Railroad of its obligations under this Agreement.  The NRPC Operations Officer shall report directly either to the chief executive or chief operating officer of Metro-North.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1  Force Majeure.

The obligations of the parties hereunder shall be subject to force majeure (which shall include strikes, riots, floods, accidents, Acts of God, and other causes or circumstances beyond the control of the party claiming such force majeure as an excuse for nonperformance), but only as long as, and to the extent that, such force majeure shall prevent performance of such obligations.

Section 8.2  Successors and Assigns.

All the covenants and obligations of the parties hereunder shall bind their successors and assigns whether or not expressly assumed by such successors and assigns.

Section 8.3  Interpretation.

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof. All Appendices attached hereto are integral parts of this Agreement and the provisions set forth in the Appendices shall bind the parties hereto to the same extent as if such provisions had been set forth in their entirety in the main body of this Agreement.  Nothing expressed or implied herein shall give or be construed to give to any person,

firm or corporation other than NRPC or Railroad any legal or equitable right, remedy or claim under or in respect of this Agreement. Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing signed by NRPC and Railroad unless a provision hereof expressly permits either of said parties to effect termination, amendment, supplementation, waiver or modification hereunder, in which event such action shall be taken in accordance with the terms of such provision.

Section 8.4  Severability.

If any part of this Agreement is determined to be invalid, illegal or unenforceable, such determination shall not affect the validity, legality, or enforceability of any other part of this Agreement, and the remaining parts of this Agreement shall be enforced as if such invalid, illegal, or unenforceable part were not contained herein.

Section 8.5  Notices.

Any request, demand, authorization, direction, notice, consent, waiver, or other document provided for or permitted by this Agreement to be made upon, given or furnished to, or filed with one party by the other party, shall be in writing and shall be delivered by hand or by deposit in the mails of the United States postage prepaid, if to NRPC, in an envelope addressed as follows:

National Railroad Passenger Corporation
60 Massachusetts Avenue, N.E.
Washington, D.C.    20002

Attention:  Director, Contract Administration

and if to Railroad, in an envelope addressed to the attention of Railroad's NRPC Operations Officer, as follows:

-24-

        Metro North Commuter Railroad
        347 Madison Avenue
        New York, NY    10017

With a copy of such document and any other notices to Connecticut

mailed to Connecticut as follows:


        Director of Rail Operations
        Connecticut Department of Transportation
        PO Drawer A
        24 Wolcott Hill Rd.
        Wethersfield, CT 06109

Each party may change the address at which it shall receive

notification hereunder by notifying the other of such change.


Section 8.6   Counterparts.

    This Agreement may be executed in any number of counterparts, each

of which shall be an original.


Section 8.7  Relationship of Parties.

    (a)  In rendering any service or in furnishing any equipment,

materials or supplies hereunder, Metro-North and/or Connecticut are

acting solely pursuant to this Agreement with NRPC made pursuant to the

Act and not in their capacity as a common carrier by railroad.

    (b)  As between Metro-North and Connecticut, nothing in this

Agreement is intended to amend or negate any provisions of the Service

Agreement among Connecticut, Metropolitan Transportation Authority, and

Metro-North, as it may be amended.  As between Connecticut and

Metro-North, in the event of any inconsistency between any provision of

this Agreement and the Service Agreement, the provision of the Service

Agreement shall govern; provided, however that nothing contained in the

Service Agreement shall in any way amend, change, alter, or otherwise

affect NRPC's rights, duties, responsibilities, and obligations set forth in this Agreement.

(c)  In the event that the Service Agreement is terminated prior to the termination of this Agreement, the reference to Railroad in this Agreement shall mean:  1) Metro-North as to the portion of the New Haven Line located in New York and 2) Connecticut as to the portion of the New Haven Line located in Connecticut.  Upon such termination of the Service Agreement, as between Metro-North and Connecticut, said parties agree to allocate and apportion any and all payments made by Amtrak under Article V hereof in accordance with terms and conditions to be mutually agreed upon between Metro-North and Connecticut.

Section 8.8  Effective Dates, Term, and Termination of Prior Agreements

(a)  Except for Section 7.2 and Appendix V, this Agreement shall become effective January 1, 1990, and shall remain in effect at least through December 31, 2009.  This Agreement shall remain in effect after December 31, 2009, until it is terminated by 12 months written notice by any party to all other parties.  Such notice may be given at any time after December 31, 2008.  Section 7.2 of this Agreement shall be effective November 1, 1991, and the December 30, 1982 Liability Agreement is terminated effective November 1, 1991.  Appendix V of this Agreement shall be effective November 1, 1991.

(b)  Compensation for NRPC's operation on the New Haven Line for the period January 1, 1983 through December 31, 1989 has been negotiated and all outstanding issues with respect to such operation for such period settled.  The parties agree that NRPC's obligation for this period is to compensate Railroad in the amounts of $4,886,645 for ticket selling and $27,720,000 for electricity.  NRPC will pay Railroad for costs payable pursuant to Appendix IV of this Agreement on the

basis specified in Appendix IV, commencing January 1,1990. Additionally, the parties have agreed that NRPC will pay Railroad $515,252 as final settlement for all claims by Metro-North for all services provided between January 1, 1983 and April 30, 1990 other than 1) ticket selling and electricity provided between January 1, 1983 and December 31, 1989, 2) services provided subsequent to January 1, 1990 that are covered by Appendix IV of this Agreement, and 3) services covered by Appendices IV and V to the agreement between NRPC and Metro-North, dated January 1, 1990, for operation on the Hudson Line.

(c)  Amtrak does hereby grant, convey, release and remit unto MTA and Metro-North (as to New York trackage) and Connecticut (as to Connecticut trackage) all right, title or interest of Amtrak, if any, as Amtrak has under the New Haven Leases, in excess of those trackage rights specifically described herein.  Amtrak further agrees forthwith to memorialize the foregoing at the request of either Metro-North or Connecticut in writing suitable for recordation upon the appropriate public records.

Section 8.9  Equal Employment Opportunity and Non-Discrimination.

(a)  Railroad shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.  Railroad will take affirmative action to insure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin.  Such action shall include, but not be limited to, the following:  employment, upgrading, demotion, or transfer, recruitment advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship.

(b)  As between Connecticut on one hand and Metro-North and Amtrak on the other, Metro-North and Amtrak agree to comply with the applicable State of Connecticut and federal laws, regulations and administrative orders as set forth in Appendix VI, which are hereby made part of this Agreement.

Section 8.10  Rights Reserved.

(a)  Notwithstanding anything possibly to the contrary, Metro-North specifically reserves the following independent rights, powers and privileges with respect to that portion of the New Haven Line owned by Metropolitan Transportation Authority ("MTA"):  (i)  to conduct ongoing commuter passenger and freight rail operations under, across and over the New Haven Line, all portion(s) thereof and all trackage in MTA's ownership and Metro-North's control; (ii)  to enter into service and trackage rights agreements for freight and commuter service, whether written or oral, with Connecticut and others, including without limitation, Consolidated Rail Corporation, relating to all or any portion(s) of the New Haven Line trackage owned by MTA; and (iii) subject to its obligation to Amtrak pursuant to this Agreement and to Amtrak's approval, which shall not be unreasonably withheld, to grant, convey, assign, pledge, mortgage, hypothecate, sell, encumber and/or lease all or any portions(s) of the New Haven Line trackage or facilities owned by MTA; provided, however, that if Amtrak fails to respond to a request for approval pursuant to this Item (a)(iii) within 30 days of its receipt, Amtrak shall be deemed to have approved such request, and that no Amtrak approval shall be required with respect to stations that are not used by Amtrak, with respect to the portions of Amtrak-used stations that are not used by Amtrak, or with respect to other property not used in rail operations.

(b)  Notwithstanding anything possibly to the contrary, Connecticut specifically reserves the following independent rights, powers and privileges with respect to that portion of the New Haven Line owned by the State of Connecticut:  (i)  to conduct ongoing commuter passenger and freight rail operations under, across and over the New Haven Line, all portions(s) thereof and all trackage in Connecticut's ownership; (ii)  to enter into service and trackage rights agreements for freight and commuter service, whether written or oral, with MTA/Metro-North and others, including without limitation, Consolidated Rail Corporation, relating to all or any portion(s) of the New Haven Line trackage owned by Connecticut; and (iii)  subject to its obligation to Amtrak pursuant to this Agreement and to Amtrak's approval, which shall not be unreasonably withheld, to grant, convey, assign, pledge, mortgage, hypothecate, sell, encumber and/or lease all or any portion(s) of the New Haven Line trackage or facilities owned by Connecticut; provided, however, that if Amtrak fails to respond to a request for approval pursuant to this Item b(iii) within 30 days of its receipt, Amtrak shall be deemed to have approved such request, and that no Amtrak approval shall be required with respect to stations that are not used by Amtrak, with respect to the portions of Amtrak-used stations that are not used by Amtrak, or with respect to other property not used in railroad operations.

-29-

IN WITNESS WHEREOF, NRPC and Metro-North and Connecticut have caused this Agreement to be duly executed, and Metropolitan Transportation Authority has concurred therein, by their respective officers thereunto duly authorized.

NATIONAL RAILROAD PASSENGER CORPORATION

Date: _October 3, 1991_    By _W. Graham Claytorch_

METRO-NORTH COMMUTER RAILROAD

Date: OCT - 7 1991    APPROVED AS TO FORM    By _____

Donald N. Nelson
President

CONNECTICUT DEPARTMENT OF TRANSPORTATION
Emil H. Frankel
Commissioner of Transportation

Date: OCT 2 8 1991    By _____

James F. Byrnes, Jr.
Deputy Transportation Commissioner
Bureau of Public Transportation
Duly Authorized

Approved as to form:

Date: 10/30/91    _____

Deputy Associate Attorney General
State of Connecticut

CONCURRENCE: _____    Date: OCT 1 5 1991

METROPOLITAN TRANSPORTATION AUTHORITY

STATE OF CONNECTICUT
DEPARTMENT OF TRANSPORTATION
EXPRESS FINDING
PURSUANT TO SECTION 13b-35
OF THE
GENERAL STATUTES OF CONNECTICUT, AS REVISED

BE IT KNOWN, THAT I, James F. Byrnes, Jr., Deputy Transportation Commissioner, Bureau of Public Transportation, State of Connecticut, intend to exercise the powers conferred by Subsection (a) of Section 13b-34 of the General Statutes of Connecticut, as revised, and herewith make this Express Finding, pursuant to Section 13b-35 of the General Statutes of Connecticut, as revised, as follows:

1)  The New Haven Line railroad between the New York/ Connecticut state line and New Haven, Connecticut (MP 72.8) is utilized by Amtrak to operate intercity passenger trains and Metro-North Commuter Railroad, and

2)  The New Haven Line usage by Amtrak has not been operated in a manner required by the general welfare of the state and the exercise of my statutory authority is essential to the improvement of rail services, and

3)  Amtrak has agreed to enter into an agreement which will provide for fair and reasonable compensation to the state for Amtrak's use of the New Haven Line.

Therefore, I, James F. Byrnes, Jr., Deputy Transportation Commissioner, Bureau of Public Transportation, State of Connecticut, intend to exercise the powers conferred by Subsection (a) of Section 13b-34 of the General Statutes of Connecticut, as revised, by executing an agreement with the National Railroad Passenger Corporation Corporation (Amtrak) and Metro-North Commuter Railroad Company for operation on the New Haven Line.

Dated at Wethersfield, Connecticut, this 28TH day of October, 1991.

WITNESSES:

_Ulaie T. Parson_
Name: MARIE T. PARSON

_Joyce W. Norman_
Name: JOYCE W. NORMAN

STATE OF CONNECTICUT
DEPARTMENT OF TRANSPORTATION

_____ (Seal)
James F. Byrnes, Jr.
Deputy Transportation Commissioner
Bureau of Public Transportation

**CERTIFICATE OF INCUMBENCY AND AUTHORITY
NATIONAL RAILROAD PASSENGER CORPORATION ("AMTRAK")
OFFICE OF THE SECRETARY**

I hereby certify that W. Graham Claytor, Jr., is the President and Chairman of the Board of Directors of the National Railroad Passenger Corporation ("Amtrak") as of this date and that he is authorized to execute on behalf of Amtrak an agreement for Amtrak's use of rail lines and associated facilities of Metro-North Commuter Railroad, the Connecticut Department of Transportation, and the Metropolitan Transportation Authority in the manner provided in the agreement between the parties for operation between New Rochelle and New Haven, dated November 1, 1991.

I further certify that the following is the signature of W. Graham Claytor, Jr.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the corporate seal of the National Railroad Passenger Corporation this 3rd day of October, 1991.

ATTEST:

Assistant Corporate Secretary

S E A L

## INCUMBENCY CERTIFICATE

I, the undersigned, Richard K. Bernard, being the duly appointed and incumbent Secretary of Metro-North Commuter Railroad Company, ("Metro-North") do hereby certify that at all times since April 4, 1991, Donald N. Nelson has been the duly appointed and incumbent President of Metro-North and that a true and correct specimen of his signature is set forth in the space below:

_____
DONALD N. NELSON

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of Metro-North on this _14th_ day of _October_ , 1991.

_____
RICHARD K. BERNARD

(SEAL)

39/3802Q

METRO-NORTH COMMUTER RAILROAD COMPANY

OFFICE OF THE SECRETARY

I HEREBY CERTIFY, that the officers of Metro-North Commuter Railroad Company have been delegated authority, pursuant to a resolution adopted by the Board of Directors of the Company, to execute on behalf of the Company, such contracts and agreements necessary or desirable for or in connection with the operation of commuter service and other transactions in connection therewith and that such delegations remain in full force and effect; and

I FURTHER CERTIFY, that the duly appointed and acting officers of the corporation are as follows:

        Chairman
        President
        Executive Vice President
        Vice President - Operations
        Vice President - Capital Programs
        Vice President - Planning and Development
        Vice President - Human Resources
        General Counsel and Secretary
        Assistant Secretary
        Treasurer

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the corporate seal of Metro-North Commuter Railroad Company this 14th day of October, 1991.

ATTEST:

Richard K. Bernard
General Counsel & Secretary

(SEAL)

40/3802Q

MNCRC SECRETARY'S REG. NO. 1204

-30-

# APPENDIX I

## MAXIMUM PASSENGER

## TRAIN SPEEDS

**Two or more tracks**
Current of traffic or TCS as follows

| NEW HAVEN LINE Between | No. 4 Track | No. 2 Track | No. 1 Track | No. 3 Track |
|---|---|---|---|---|
| CP 212 & Devon | TCS | TCS | TCS | TCS |
| Devon & Div Post (N E C Reg) | TCS | TCS | TCS | |

Tracks are numbered from South to North 4 2 1 and 3

**SPEEDS, PASSENGER TRAINS AND FREIGHT TRAINS**
**Maximum Speeds, Unless Otherwise Specified**

| NEW HAVEN LINE Between | No 4 Track Psgr | Frt | No 2 Track Psgr | Frt | No 1 Track Psgr | Frt | No 3 Track Psgr | Frt |
|---|---|---|---|---|---|---|---|---|
| | | | Miles | Per | Hour | | | |
| MP 11.9 and MP 12.5 | | | 45 | 25 | 45 | 25 | 45 | 25 |
| MP 12.2 and MP 12.5 | 45 | 25 | | | | | | |
| MP 12.5 and MP 15.0 | 60 | 35 | 60 | 35 | 60 | 35 | 60 | 35 |
| MP 15.0 and MP 17.2 | 70 | 40 | 70 | 40 | 70 | 40 | 70 | 40 |
| MP 17.2 and MP 21.4 | 90 | 40 | 90 | 40 | 90 | 40 | 90 | 40 |
| MP 21.4 and MP 26.1 | 75 | 40 | 75 | 40 | 75 | 40 | 75 | 40 |
| MP 26.1 and MP 30.0 | 70 | 40 | 70 | 40 | 70 | 40 | 70 | 40 |
| MP 30.0 and MP 34.5 | 75 | 40 | 75 | 40 | 75 | 40 | 75 | 40 |
| MP 34.5 and MP 42.0 | 70 | 40 | 70 | 40 | 70 | 40 | 70 | 40 |
| MP 42.0 and MP 52.5 | 75 | 40 | 75 | 40 | 75 | 40 | 75 | 40 |
| MP 52.5 and MP 57.0 | 70 | 40 | 70 | 40 | 70 | 40 | 70 | 40 |
| MP 57.0 and MP 61.1 | 75 | 40 | 70 | 40 | 75 | 40 | 70 | 40 |
| MP 61.1 and MP 71.8 | 75 | 40 | 70 | 40 | 75 | 40 | | |
| MP 71.8 and MP 72.5 | 15 | 10 | 15 | 10 | 15 | 10 | | |
| MP 72.5 and Div. Post (N.E.C.) | 10 | 10 | 10 | 10 | 10 | 10 | | |

**SPEED RESTRICTIONS—CURVES, BRIDGES, ETC.**

| NEW HAVEN LINE Between | No 4 Track Psgr | Frt | No 2 Track Psgr | Frt | No 1 Track Psgr | Frt | No 3 Track Psgr | Frt | Other Track Psgr | Frt |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Miles | Per | Hour | | | | |
| Curve West of CP Shell MP 15.8 and MP 16.0 | 60 | 40 | 60 | 40 | 60 | 40 | 60 | 40 | | |
| Curve through CP Shell Int MP 16.0 and MP 16.4 | 30 | 25 | 30 | 25 | 30 | 25 | 30 | 25 | | |
| To and From Hell Gate Line at CP Shell MP 16.0 and MP 16.4 | | | 15 | 10 | 15 | 10 | | | | |
| MP 16.6 & MP 17.0 | 50 | 40 | | | | | | | | |
| MP 16.9 & MP 17.0 | | | 60 | 30 | | | | | | |
| MP 17.2 and MP 17.5 | 75 | 40 | 75 | 40 | 75 | 40 | 75 | 40 | | |
| MP 21.4 and MP 22.5 | 70 | 40 | 70 | 40 | 70 | 40 | 70 | 40 | | |
| Curve East & West of Rye MP 23.8 and MP 24.7 | 60 | 40 | 60 | 40 | 60 | 40 | 60 | 40 | | |
| MP 23.9 and MP 24.2 | | | | | | | 50 | 40 | | |
| First Curve East of Port Chester MP 25.7 and MP 26.1 | 45 | 30 | 45 | 30 | 45 | 30 | 45 | 30 | | |
| CP Cob Movable Bridge | 50 | 30 | 50 | 30 | 50 | 30 | 50 | 30 | | |
| First Curve West of Stamford MP 32.5 and MP 32.9 | 60 | 40 | 60 | 40 | 60 | 40 | 60 | 40 | | |
| West Stam and Stam Int MP 32.9 and MP 33.6 | 50 | 25 | 50 | 25 | 50 | 25 | 50 | 25 | | |
| MP 33.6 and MP 34.5 | 60 | 40 | 60 | 40 | 60 | 40 | 60 | 40 | | |
| Curve through Walk and Movable Bridge MP 41.2 and MP 41.6 | 45 | 30 | 45 | 30 | 45 | 30 | 45 | 30 | | |
| Saga Movable Bridge | 40 | 30 | 40 | 30 | 40 | 30 | 40 | 30 | | |
| MP 49.3 and MP 49.6 | 70 | 40 | 70 | 40 | 70 | 40 | 70 | 40 | | |
| Burr Road Int MP 53.2 and MP 53.5 | 50 | 40 | 50 | 40 | 50 | 40 | | | | |
| First Curve West of Bridgeport MP 54.7 and MP 55.2 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | | |
| MP 55.2 and MP 55.6 | 45 | 30 | 45 | 30 | 45 | 30 | 45 | 30 | | |
| MP 55.6 and MP 56.0 | | | 10 | 10 | 30 | 10 | 30 | 10 | | |
| Peck Movable Bridge | 10 | 10 | | | | | | | | |
| MP 56.0 and MP 57.0 | | | 50 | 40 | 50 | 40 | 50 | 40 | | |
| MP 56.0 and MP 56.7 | 50 | 40 | | | | | | | | |
| Limits of Central Int (MP 56.7 & MP 57.0) | 40 | 30 | | | | | | | | |
| Devon Int MP 60.0 and MP 61.1 | 60 | 40 | 60 | 40 | 60 | 40 | 60 | 40 | | |
| Devon Movable Bridge | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | | |
| MP 63.0 and MP 65.0 | 60 | 40 | 60 | 40 | 60 | 40 | | | | |
| MP 66.0 and MP 66.5 | 70 | 40 | | | 70 | 40 | | | | |
| MP 69.6 and MP 69.9 | | | 60 | 40 | | | | | | |
| All Tracks at New Haven between MP 71.8 and MP 72.5 | 15 | 10 | 15 | 10 | 15 | 10 | | | 15 | 10 |
| MP 72.5 and MP 72.8 | 10 | 10 | 10 | 10 | 10 | 10 | | | 10 | 10 |

Source:   Metro-North Commuter Railroad, General Order No.305,

pages 16 & 17, effective January 1, 1990.

APPENDIX II

(Not Applicable)

APPENDIX II

## APPENDIX III

### CURRENT COSTS AND COST CHANGES

Table 1 lists in summary form the authorized cost elements which comprise the monthly charges to NRPC from the Railroad under this Agreement.  Column 1 lists the reference to the item in Appendix IV where the contractual agreement governing the cost element is found. Column 2 describes the item.  Column 3 shows the latest Amendment Agreement Change number which affects the cost item.  Column 4 shows the current cost and describes the unit of measure for flat-rated items, or indicates that an item is to be compensated on an actual basis.  Column 5 shows the method to be used to adjust individual cost items in order to keep the cost provisions at current price levels.

Table 2 defines the different methods for adjusting fixed cost items that are identified in Table 1.

Appendix III shall constitute the authority for the Railroad to bill the amounts shown under Column 4 as of the date of the latest revision of this Appendix III.

APPENDIX III

TABLE 1

CURRENT COST SUMMARY

| (1)<br>Appendix<br>IV<br>Item No. | (2)<br><br><br>Description | (3)<br>Latest<br>Update<br>Refer. | (4)<br><br>Current<br>Amount | Unit<br>of<br>Cost | (5)<br>Price Level<br>Adjustment<br>Method |
|---|---|---|---|---|---|
| 1 | Electric Propulsion | Original | $.6103 | UNIT MI. | C |
| 2 | Emergency Mechanical<br>    Service and Repairs | Original | | ACTUAL | A |
| 3 | Ticket Clerks | Original | $72,630 | MONTH | A |
| 4 | Incr. Track Maintenance | Original | $.12 | UNIT MI. | B |

Note:  UNIT MI. means each car mile and locomotive mile.

-34-  MNCRC SECRETARY'S REG. NO. 1204

APPENDIX III

Table 2

PRICE LEVEL ADJUSTMENT METHODS

Method A

When the rates of pay, actual fringe benefit costs, labor
arbitraries, or allowances change, the amount of fixed payments to
Railroad based upon these elements shall be adjusted to reflect such
change; provided, however, that NRPC shall have previously approved
all changes affecting only intercity passenger train crews or
intercity passenger service personnel of Railroad or affecting such
personnel differently than commuter personnel of Railroad.

The term "fringe benefits" refers to provisions for vacation pay,
holiday pay, health and welfare benefits, funded pensions (excluding
"past service costs" relating to Railroad operations prior to May 1,
1971), railroad unemployment, supplemental annuity, and railroad
retirement taxes.  Fringe benefits will be computed, where
applicable, as a payroll additive to labor elements included in
Appendix IV.  The computation will be based upon actual fringe
benefits for identifiable personnel and for all other personnel upon
estimated system rates or, at the option of NRPC, upon estimated
rates by craft of employees if such are reasonably obtainable.
Fringe benefit rates shall not include supervision, administration,
use of tools, or other overheads.

Where amounts shown for fringe benefits are estimates, an annual
adjustment reflecting actual fringe benefit cost will be made for the
overpayment (or underpayment) by NRPC to Railroad in the previous
calendar year.

Method B

Components to be adjusted using this method shall be adjusted
annually for price level changes beginning January 1, 1991, based on
the relationship of the most recent Third Quarter index from
Association of American Railroads (AAR) Quarterly Indices of
Chargeout Prices and Wage rates (Table C)-East "Material prices, wage
rates and supplements combined (excluding fuel)", to comparable
indices of the prior Third Quarter.  The adjustment to be made on
January 1, 1991 shall be based on the comparison of the Third Quarter
1990 index value to the 1989 Third Quarter index value.  The index
value as of the Third Quarter 1989 is 216.4.

<u>Method C</u>

This method is the same as Method B except that the index used shall be the "<u>Material prices, wage rates and supplements combined (including fuel)</u>". The index value as of the Third Quarter 1989 is 210.2.

<u>Summary of Current Estimated Fringe Benefit Rates</u>

Ticket Clerks                                                    62.69 %

MNCRC SECRETARY'S REG. NO. 1204

-36-

APPENDIX IV

COST DETAIL

MNCRC SECRETARY'S REG. NO. 1204

-37-

APPENDIX IV

COST DETAIL

Item 1   Electric Propulsion Power

NRPC shall pay Railroad $.6103 for the cost of electric power for each car mile and locomotive unit mile operated by electric propulsion power utilized to propel NRPC trains between CP 216 (MP 16.3) and New Haven (MP 72.3).

Item 2   Emergency Mechanical Service and Repairs

NRPC shall reimburse Railroad the actual cost incurred (including fringe benefits) when Railroad employees are utilized to perform emergency mechanical service or repairs.

Item 3 Ticket Clerks

NRPC shall pay the amount per month as detailed below for the cost of additional ticket clerks required for NRPC operations.

| Location | Positions | Wages | Fringe Benefits | Total Per Month |
|---|---|---|---|---|
| New Rochelle, NY | 2.1 | $5,978 | $3,748 | $9,726 |
| Stamford, CT | 3.0 | 8,540 | 5,354 | 13,894 |
| Bridgeport, CT | 2.0 | 5,693 | 3,569 | 9,262 |
| New Haven, CT | 3.0 | 8,540 | 5,354 | 13,894 |
| Extra Positions | 2.0 | 5,693 | 3,569 | 9,262 |
| Relief Positions | 2.0 | 5,693 | 3,569 | 9,262 |
| Overtime: | | 3,216 | 2,016 | 5,232 |
| | | 1,608 | -0- | 1,608 |
| Telephones | | | | 267 |
| Training | | | | 223 |
| | | Total Per Month | | $72,630 |

Item 4 Incremental Track Maintenance

As payment for the incremental cost of maintaining Rail Lines of Railroad in connection with the operation of NRPC passenger service, NRPC shall pay Railroad $.12 per each locomotive mile and car mile for trains operated between CP 216 (MP 16.3) and New Haven Division Post (MP 72.8).

MNCRC SECRETARY'S REG. NO. 1204

APPENDIX V


PERFORMANCE PAYMENTS AND PENALTIES

APPENDIX V


PERFORMANCE PAYMENTS AND PENALTIES


Performance payments will be paid for trains when an on-time performance greater than 80% during a month is achieved.  Performance penalties will be assessed against trains when the on-time performance is less than 70% during a month.


A. Performance Calculation

Percentage on-time for the total of all trains shown in Table 1 of this Appendix V during a calendar month will be calculated by dividing the number of trains which arrived on-time at their final destination by the number of trains operated during the month.  In making this calculation, the following conditions will apply:


1.   A trip of an eastbound train on the New Haven Line commences for purposes of this Appendix V when the train arrives at the CP 216 home signal and is concluded when the train arrives at New Haven passenger terminal.  A trip of a westbound train on the New Haven Line commences for purposes of this Appendix V when such train is released for westbound departure by NRPC from the station at New Haven and concludes upon its passing CP 216.  A trip shall be considered on-time if a train completes its trip between its endpoints on Railroad in the number of minutes (or less) shown in Table 1 of this Appendix V, plus any of the conditions in paragraphs (a), (b), and (c) below:

(a)   A 5-minute tolerance.

(b)   Any passenger related holds which are expressly requested by authorized NRPC personnel who have been identified to Railroad in writing.

(c)   The time a westbound train is delayed at CP 216 due to NRPC's inability to accept the train on its line.

There will be no other allowable delays or tolerance in determining whether a train is on-time or late.

2.   A train which is annulled or terminated by NRPC before arriving at its end point on Railroad, for reasons not related to conditions on the New Haven Line, will not be counted as late or as operated in calculating the train's monthly on-time performance.

3.   If, because of conditions on the New Haven Line, a train is terminated, or annulled, and fails to operate to any station on the route, the train will be considered late.

4.   A special train or an extra section of a scheduled train which is requested by NRPC shall not be counted in the calculation of on-time performance unless otherwise agreed by the parties.

5.   Railroad shall perform all servicing which is required for safe operation or for basic passenger comfort.

6.    The scheduled date of origin of each train will be used for determining whether a train is includable in a particular period for calculation of performance payments and penalties, regardless of whether the train originates on Rail Lines of Railroad or not.

B. Calculation of Performance Payments

If the percentage of on-time performance is greater than 80% in a month, the performance payment for that month is calculated as follows:

1.    Subtract .800 from the percentage on-time (expressed in three decimal places);

2.    Multiply the resulting amount by the Performance Rate as shown in Table 1; and

3.    Multiply that resulting number by the number of trips operated during the month.

C. Calculation of Performance Penalties

If the percentage of on-time performance is less than 70% in a month, the performance penalty for that month is calculated as follows:

1.    Subtract the percentage on-time (expressed in three decimal places) from .700;

2.    Multiply the resulting amount by the Performance Rate as shown in Table 1; and

3.    Multiply that resulting number by the number of trips operated during the month.

D.    <u>Remittance of Performance Payments and Penalties</u>

Performance payments will be paid to Railroad in accordance with Section 5.2 (Billing and Payment).  Penalties may be deducted from the amounts otherwise payable to Railroad pursuant to this Agreement or paid separately to NRPC; provided however, that penalties shall only apply up to the amount of performance payments earned in the preceding twelve-month period.

E.    <u>Revision of Scheduled Times</u>

The Scheduled Time for each train covered by this Appendix V is set forth in Table 1.  Scheduled Time shall also be revised by the parties in the event that the condition of the New Haven Line is modified or the authorized speeds established by federal, state, or local regulation are increased or decreased in a way which is likely to have a significant impact on the operation of a train.  Upon request of NRPC, station stops or services shall be added to or deleted from the operation of a train.  When changes pursuant to the two preceding sentences require a net change in time of operation which exceeds 5 minutes, the parties shall adjust the schedules to reflect such differences in operating time (unless such adjustment has previously been effected) at the next NRPC timetable change.  For

the purposes of the foregoing sentence, upon the request of either party, the parties shall jointly conduct a field test to determine the proper amount of time to be added or deleted as a result of the change in stops; provided, however, that in the event the parties cannot reach agreement concerning such time, the parties specifically agree that operating time shall be reduced or increased by 5 minutes for each regular stop which is eliminated or added to the train operation.

F. <u>Price Level Adjustments</u>

The performance rate specified in Table 1 to this Appendix V shall be adjusted annually for price level changes beginning January 1, 1991, based on the relationship of the most recent Third Quarter index from Association of American Railroads (AAR) Quarterly Indices of Chargeout Prices and Wage rates (Table C)-East "<u>Material prices, wage rates and supplements combined (excluding fuel)</u>", to the 1989 Third Quarter index value.  The index value as of the Third Quarter 1989 is 216.4.

-44-

Appendix V
Table 1

| Route | Train No. | Scheduled Time From Origin (Minutes) | Performance Rate |
|---|---|---|---|
| The New Haven Line (between between CP 216, NY (MP 16.3) and New Haven, CT (MP 72.3)) | | | $700 |
| Westward: | 67 DAILY (7) | 65 | |
| | 61 DAILY (7) | 69 | |
| | 205 M-SA (6) | 71 | |
| | 653 DAILY (7) | 72 | |
| | 141 DAILY (7) | 80 | |
| | 13 M-F (5) | 65 | |
| | 151 M-F (5) | 60 | |
| | 15 S&S (2) | 63 | |
| | 95 DAILY (7) | 71 | |
| | 441 DAILY (7) | 72 | |
| | 85 DAILY (7) | 69 | |
| | 173 DAILY (7) | 74 | |
| | 153 DAILY (7) | 60 | |
| | 175 DAILY (7) | 72 | |
| | 177 DAILY (7) | 76 | |
| | 157 SU (1) | 65 | |
| | 179 M-F (5) | 67 | |
| | 167 S&S (2) | 71 | |
| | 193 DAILY (7) | 74 | |
| | 155 S&S (2) | 60 | |
| Eastward: | 66 DAILY (7) | 69 | |
| | 160 M (1) | 72 | |
| | 12 TU-SU (6) | 72 | |
| | 198 S&S (2) | 75 | |
| | 190 M-F (5) | 75 | |
| | 170 DAILY (7) | 75 | |
| | 154 DAILY (7) | 60 | |
| | 86 DAILY (7) | 71 | |
| | 140 DAILY (7) | 84 | |
| | 94 DAILY (7) | 72 | |
| | 156 DAILY (7) | 60 | |
| | 442 DAILY (7) | 72 | |
| | 176 DAILY (7) | 74 | |
| | 178 DAILY (7) | 74 | |
| | 60 DAILY (7) | 70 | |
| | 222 SU-FR (6) | 75 | |
| | 654 DAILY (7) | 74 | |
| | 162 M-SA (6) | 70 | |

Revised Effective:  October 27, 1991

MNCRC SECRETARY'S REG. NO. 1204

-45-

APPENDIX VI


ADMINISTRATIVE AND STATUTORY REQUIREMENTS


Metro-North, Amtrak and Connecticut ("Parties") Agree:


(1)   The parties shall comply with the Regulations of the United States Department of Transportation (Title 49, Code of Federal Regulations, Part 21) issued in implementation of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U.S.C. 200d to 200d-4, as applicable, which are hereby made a part of this Exhibit.


(2)   (a)   For the purpose of this section, "minority business enterprise" means any small contractor or supplier of materials fifty-one percent of more of the capital stock, if any, or assets of which is owned by a person or persons:  (1) who are active in the daily affairs of the enterprise, (2) who have the power to direct the management and policies of the enterprise and (3) who are members of a minority, as such term is defined in subsection (a) of Conn. Gen. Stat. 32-9n; and "good faith" means that degree of diligence which a reasonable person would exercise in the performance of legal duties and obligations.  "Good faith efforts" shall include, but not be limited to, those reasonable initial efforts necessary to comply with statutory or regulatory requirements and additional or substituted efforts when it is determined that such initial efforts will not be sufficient to comply with such requirements.


For purpose of this section, "Commission" means the Commission on Human Rights and Opportunities.

(b)  (1)  The Parties agree and warrant that in the performance of this Agreement the Parties will not discriminate or permit discrimination against any person or group of persons on the grounds of race, color, religious creed, age, martial status, national origin, sex, mental retardation or physical disability, including but not limited to, blindness, unless it is shown by the Parties that such disability prevents performance of the work involved, in any manner prohibited by the laws of the United States or the State of Connecticut.  The Parties further agrees to take affirmative action to ensure that applicants with job-related qualifications are employed and that employees are treated when employed without regard to their race, color, religious creed, age, martial status, national origin, ancestry, sex, mental retardation, or physical disability, including, but not limited to, blindness, unless it is shown by the Parties that such disability prevents performance of the work involved; (2) the Parties agree, in all solicitations or advertisements for employees placed by or on behalf of the Parties individually, to state that it is an "affirmative action-equal opportunity employer" in accordance with regulations adopted by the Commission; (3) the Parties agree to provide each labor union or representative of workers with which the Parties have a collective bargaining agreement or other contract or understanding and each vendor with which the Parties have a contract or understanding, a notice to be provided by the Commission advising the labor union or workers' representative or the Parties commitments under this section, and to post copies of the notice in conspicuous places available to employees and applicants for employment; (4) the Parties agree to comply with each provision of this section and Conn. Gen. Secs. 46a-68e and 46a-68f; (5) the Parties agree to provide the

Commission on Human Rights and Opportunities with such information requested by the Commission, and permit access to pertinent books, records and accounts, concerning the employment practices and procedures of the Parties related to the provisions of this section and Section 46a-56.  If the contract is a public works contracts, the Parties agree and warrant that it will make good faith efforts to employ minority business enterprises as subcontractors and suppliers of materials on such public works project.

(c)  Determination of the Parties' good faith efforts shall include but shall not be limited to the following factors:  the Parties employment and subcontracting policies, patterns and practices; affirmative advertising, recruitment and training; technical assistance activities and such other reasonable activities or efforts as the Commission may prescribe that are designed to ensure the participation of minority business enterprises in public works projects.

(d)  The Parties shall develop and maintain adequate documentation, in a manner prescribed by the Commission, of its good faith efforts.

(e)  The Parties shall include the provisions of subsection (b) of this section in every subcontract or purchase order entered into in order to fulfill any obligation of a contract with Connecticut Department of Transportation (Connecticut) and such provisions shall be binding on a subcontractor, vendor or manufacturer unless exempted by regulations or orders of the Commission.  The Parties shall take such action with respect to any such subcontract or purchase order as the Commission may direct as a means of enforcing such provisions including

sanctions for noncompliance in accordance with Conn. Gen. Stat. Sec. 46a-56, as amended by Section 5 of Public Act 89-253; provided if the Parties become involved in, or are threatened with, litigation with a subcontractor or vendor as a result of such direction by the Commission, the Parties may request the Connecticut to enter into such litigation or negotiation prior thereto to protect the interests of Connecticut and Connecticut may so enter.

(f)  The notice provisions of subparagraph (b) (3) above apply only to those vendors, if any that are intended to be used in fulfillment of obligations under this Agreement.

(3)  If applicable, this Agreement is subject to the provisions of the Governor's Executive Order No. Three promulgated June 16, 1971 and, as such, this Agreement may be cancelled, terminated or suspended by the State Labor Commissioner for violation of or noncompliance with said Executive Order No. Three, or any state or federal law concerning nondiscrimination, notwithstanding that the Labor Commissioner is not a party to this Agreement.  The Parties to this Agreement, as part of the consideration hereof, agree that the attached Executive Order No. Three is incorporated herein and made a part hereof. — The Parties agree to abide by said Executive Order and agree that the State Labor Commissioner shall have continuing jurisdiction in respect to performance in regard to nondiscrimination, until the Agreement is completed or terminated prior to completion.  The Parties agrees, as part consideration hereof, that this Agreement is subject to the Guidelines and Rules issued by the State Labor Commissioner to implement Executive Order No. Three, and the Parties will not discriminate in employment practices or policies, will file all reports

as required, and will fully cooperate with the State of Connecticut and the State Labor Commissioner.  A copy of said Guidelines is attached and hereby made a part of this Agreement.

(4)  If applicable, this Agreement is executed subject to the Governor's Executive Order No. 17, a copy of which is attached hereto and is hereby made a part of this Agreement.  Governor's Executive Order No. 17 requires, inter alia, that all contractors and subcontractors shall list all employment openings with the Office of the Connecticut State Employment Service in the area where the work is to be performed or where the services are to be rendered.  Failure of the Parties to conform with the requirements of the Governor's Executive Order No. 17 and any others, rules or regulations issued pursuant thereto, shall be a basis for termination of the Agreement by CDOT.

(5)  Pursuant to the provisions of Public Act No. 91-58, as amended by Public Act No. 91-407, Section 8, of the 1991 Session of the Connecticut General Assembly, (1) the parties agree and warrant that in the performance of the Agreement, such parties will not discriminate or permit discrimination against any person or group of persons on the grounds of sexual orientation, in any manner prohibited by the laws of the United States or of the state of Connecticut, and that employees are treated when employed without regard to their sexual orientation; (2) the parties agree to provide each labor union or representative of workers with which such parties have a collective bargaining agreement or other contract or understanding and each vendor with which such parties have a contract or understanding, a notice to be provided by the Commission advising the labor union or workers' representative of

-50-

the parties' commitments under this section, and to post copies of the notice in conspicuous places available to employees and applicants for employment; (3) the parties agree to comply with each provision of this section and with each regulation or relevant order issued by said Commission pursuant to Section 46a-56 of the general statutes; (4) the parties agree to provide the Commission with such information requested by the Commission, and permit access to pertinent books, records and accounts, concerning the employment practices and procedures of the parties which relate to the provisions of this section and Section 46a-56 of the general statutes.  The parties shall include these provisions in every subcontract or purchase order entered into in order to fulfill any obligation of a contract with the state and such provisions shall be binding on a subcontractor, vendor or manufacturer unless exempted by regulations or orders of the Commission.  The parties shall take such action with respect to any such subcontract or purchase order as the Commission may direct as a means of enforcing such provisions including sanctions for noncompliance in accordance with Section 46a-56 of the general statutes; provided, if such parties become involved in, or are threatened with, litigation with a subcontractor or vendor as a result of such direction by the Commission, the parties may request the state of Connecticut to enter into any such litigation or negotiation prior thereto to protect the interests of the state and the state may so enter.

STATE OF CONNECTICUT

BY HIS EXCELLENCY

THOMAS J. MESKILL

GOVERNOR

EXECUTIVE ORDER NO. THREE

WHEREAS, sections 4-61d (b) and 4-114a of the 1969 supplement to the general statutes require nondiscrimination clauses in state contracts and subcontracts for construction on public buildings, other public works and goods and services and

WHEREAS, section 4-61c (c) of the 1969 supplement to the general statutes requires the labor department to encourage and enforce compliance with this policy by both employers and labor unions, and to promote equal employment opportunities, and

WHEREAS, the government of this state recognizes the duty and desirability of its leadership in providing equal employment opportunity, by implementing these laws,

NOW, THEREFORE, I, THOMAS J. MESKILL, Governor of the State of Connecticut, acting by virtue of the authority vested in me under section twelve of article fourth of the constitution of the state, as supplemented by section 3-1 of the general statutes, do hereby ORDER and DIRECT, as follows, by this Executive Order:

I

The labor commissioner shall be responsible for the administration of this Order and shall adopt such regulations as he deems necessary and appropriate to achieve the purposes of this Order. Upon the promulgation of this Order, the commissioner of finance and control shall issue a directive forthwith to all state agencies, that henceforth all state contracts and subcontracts for construction on public buildings, other public works and goods and services shall contain a provision rendering such contract or subcontract subject to this Order, and that such contract or subcontract may be cancelled, terminated or suspended by the labor commissioner for violation of or noncompliance with this Order or state or federal laws concerning nondiscrimination, notwithstanding that the labor commissioner is not a party to such contract or subcontract.

II

Each contractor having a contract containing the provisions prescribed in section 4-114a of the 1969 supplement to the general statutes, shall file, and shall cause each of his subcontractors to file, compliance reports with the contracting agency or the labor commissioner, as may be directed. Such reports shall be filed within such times and shall contain such information as to employment policies and statistics of the contractor and each subcontractor, and shall be in such form as the labor commissioner may prescribe. Bidders or prospective contractors or subcontractors may be required to state whether they have participated in any previous contract subject to the provisions of this Order or any preceding similar Order, and in that event to submit on behalf of themselves and their proposed subcontractors compliance reports prior to or as an initial part of their bid or negotiation of a contract.

III

Whenever the contractor or subcontractor has a collective bargaining agreement or other contract or understanding with a labor organization or employment agency as defined in section 31-122 of the general statutes, the compliance report shall identify the said organization or agency and the contracting agency or the labor commissioner may require a compliance report to be filed with the contracting agency or the labor commissioner, as may be directed, by such organization or agency, signed by an authorized officer or agent of such organization or agency, with supporting information, to the effect that the signer's practices and policies, including but not limited to matters concerning personnel, training, apprenticeship, membership, grievance and representation, and upgrading, do not discriminate on grounds of race, color, religious creed, age, sex, or national origin, or ancestry of any individual, and that the signer will either affirmatively cooperate in the implementation of the policy and provisions of this Order, or that it consents and agrees that recruitment, employment and the terms and conditions of employment under the proposed contract shall be in accordance with the purposes and provisions of the Order.

IV

The labor commissioner may by regulation exempt certain classes of contracts, subcontracts or purchase orders from the implementation of this Order, for standard commercial supplies or raw materials, for less than specified amounts of money or numbers of workers or for subcontractors below a specified tier. The labor commissioner may also provide by regulation for the exemption of facilities of a contractor which are in all respects separate and distinct from activities of the contractor related to the performance of the state contract, provided only that such exemption will not interfere with or impede the implementation of this Order, and provided further, that in the absence of such an exemption, all facilities shall be covered by the provisions of this Order.

V

Each contracting agency shall be primarily responsible for obtaining compliance with the regulations of the labor commissioner with respect to contracts entered into by such agency or its contractors. All contracting agencies shall comply with the regulations of the labor commissioner in discharging their primary responsibility for securing compliance with the provisions of contracts and otherwise with the terms of this Order and of the regulations of the labor commissioner issued pursuant to this Order. They are directed to cooperate with the labor commissioner and to furnish the labor commissioner such information and assistance as he may require in the performance of his functions under this Order. They are further directed to appoint or designate from among the personnel of each agency, compliance officers, whose duty shall be to seek compliance with the objectives of this Order by conference, conciliation, mediation, or persuasion.

VI

The labor commissioner may investigate the employment practices and procedures of any state contractor or subcontractor and the practices and policies of any labor organization or employment agency hereinabove described, relating to employment under the state contract, as concerns nondiscrimination by such organization or agency as hereinabove described, or the labor commissioner may initiate such investigation by the appropriate contract agency, to determine whether or not the contractual provisions hereinabove specified or statutes of the state respecting them have been violated. Such investigation shall be conducted in accordance with the procedures established by the labor commissioner and the investigating agency shall report to the labor commissioner any action taken or recommended.

VII

The labor commissioner shall receive and investigate or cause to be investigated complaints by employees or prospective employees of a state contractor or subcontractor or members or applicants for membership or apprenticeship or training in a labor organization or employment agency hereinabove described, which allege discrimination contrary to the contractual provisions specified hereinabove or state statutes requiring nondiscrimination in employment opportunity. If this investigation is conducted for the labor commissioner by a contracting agency, that agency shall report to the labor commissioner what action has been taken or is recommended with regard to such complaints.

VIII

The labor commissioner shall use his best efforts, directly and through contracting agencies, other interested federal, state and local agencies, contractors and all other available instrumentalities; including the commission on human rights and opportunities. the executive committee on human rights and opportunities, and the apprenticeship council under its mandate to provide advice and counsel to the labor commissioner in providing equal employment opportunities to all apprentices and to provide training, employment and upgrading opportunities for disadvantaged workers, in accordance with section 31-51 (d) of the 1969 supplement to the general statutes, to cause any labor organization or any employment agency whose members are engaged in work under government contracts or referring workers or providing or supervising apprenticeship or training for or in the course of work under a state contract or subcontract to cooperate in the implementation of the purposes of this Order. The labor commissioner shall in appropriate cases notify the commission on human rights and opportunities or other appropriate state or federal agencies whenever it has reason to believe that the practices of any such organization or agency violate equal employment opportunity requirements or state or federal law.

IX

The labor commissioner or any agency officer or employee in the executive branch designated by regulation of the labor commissioner may hold such hearings, public or private, as the labor commissioner may deem advisable for compliance, enforcement or educational purposes under this Order..

X

(a) The labor commissioner may hold or cause to be held hearings, prior to imposing ordering or recommending the imposition of penalties and sanctions under this Order. No order for disbarment of any contractor from further state contracts shall be made without affording the contractor an opportunity for a hearing. In accordance with such regulations as the labor commissioner may adopt, the commissioner or the appropriate contracting agency may

   (1) Publish or cause to be published the names of contractors or labor organizations or employment agencies as hereinabove described which it has concluded have complied or failed to comply with the provisions of this Order or the regulations of the labor commissioner in implementing this Order.

   (2) Recommend to the commission on human rights and opportunities that in cases in which there is substantial or material violation or threat thereof of the contractual provision or related state statutes concerned herein, appropriate proceedings be brought to enforce them, including proceedings by the commission on its own motion under chapter 563 of the general statutes and the enjoining, within the limitations of applicable law, of organizations, individuals or groups who prevent directly or indirectly or seek to prevent directly or indirectly compliance with the provisions of this Order.

   (3) Recommend that criminal proceedings be brought under chapter 939 of the general statutes.

   (4) Cancel, terminate, suspend or cause to be cancelled, terminated, or suspended in accordance with law any contract or any portion or portions thereof for failure of the contractor or subcontractor to comply with the nondiscrimination provisions of the contract. Contracts may be cancelled, terminated, suspended absolutely or their continuance conditioned upon a program for future compliance approved by the contracting agency.

   (5) Provide that any contracting agency shall refrain from entering into any further contracts or extensions or modifications of existing contracts with any contractor until he has satisfied the labor commissioner that he has established and will carry out personnel and employment policies compliant with this Order.

   (6) Under regulations prescribed by the labor commissioner each contracting agency shall take reasonable efforts within a reasonable period of time to secure compliance with the contract provisions of this Order by methods of conference, conciliation, mediation or persuasion, before other proceedings shall be instituted under this Order or before a state contract shall be cancelled or terminated in whole or in part for failure of the contractor or subcontractor to comply with the contract provisions of state statute and this Order.

   (b) Any contracting agency taking any action authorized by this Order, whether on its own motion or as directed by the labor commissioner or pursuant to his regulations shall promptly notify him of such action. Whenever the labor commissioner makes a determination under this Order, he shall promptly notify the appropriate contracting agency and other interested federal, state and local agencies of the action recommended. The state and local agency or agencies shall take such action and shall report the results thereof to the labor commissioner within such time as he shall specify.

XI

If the labor commissioner shall so direct, contracting agencies shall not enter into contracts with any bidder or prospective contractor unless he has satisfactorily complied with the provisions of this Order, or submits a program for compliance acceptable to the labor commissioner, or if the labor commissioner so authorizes, to the contracting agency.

XII

Whenever a contracting agency cancels or terminates a contract, or a contractor has been disbarred from further government contracts because of noncompliance with the contract provisions with regard to nondiscrimination, the labor commissioner or the contracting agency shall rescind such disbarment, upon the satisfaction of the labor commissioner that the contractor has purged himself of such noncompliance and will thenceforth carry out personnel and employment policies of nondiscrimination in compliance with the provision of this Order.

XIII

The labor commissioner may delegate to any officer, agency or employee in the executive branch any function or duty of the labor commissioner under this Order except authority to promulgate regulations of a general nature.

XIV

This Executive Order supplements the Executive Order issued on September 28, 1967. All regulations, orders, instructions, designations and other directives issued heretofore in these premises, including those issued by the heads of various departments or agencies under or pursuant to prior order or statute, shall remain in full force and effect, unless and until revoked or superseded by appropriate authority, to the extent that they are not inconsistent with this Order.

This Order shall become effective thirty days after the date of this Order.

Dated at Hartford, Connecticut, this 16th day of June, 1971.

_____
GOVERNOR

GUIDELINES AND RULES
OF STATE LABOR COMMISSIONER
IMPLEMENTING GOVERNOR'S EXECUTIVE
ORDER NO. THREE

SEC. 1.    PERSONS AND FIRMS SUBJECT TO EXECUTIVE ORDER NO. THREE AND GUIDELINES AND RULES.

a. Every contractor, or subcontractor as defined in Sec. 2 hereof, supplier of goods or services, vendor, bidder and prospective contractor or subcontractor, having ten or more employees as defined in Sec. 3 of these Guidelines, having or entering into or bidding to enter into any type of contractual relationship with the State of Connecticut or any of its agencies, boards, commissions, departments or officers, and if the consideration, cost, subject matter or value of the goods or services exceeds $5,000.00, shall be subject to the Governor's Executive Order No. Three and these Guidelines and Rules.

b. A copy of the Governor's Executive Order No. Three and of these Guidelines and Rules shall be available to each said contractor, subcontractor, supplier, vendor, bidder and prospective contractor and subcontractor, and the said executive Order No. Three and these Guidelines and Rules shall be incorporated by reference and made a part of the contract, purchase order, agreement or document concerned. A copy of the Executive Order and of these Guidelines and Rules shall be furnished to a contracting party or bidder on request.

c. All persons, partnerships, associations, firms, corporations and other entities having less than ten employees as defined in Sec. 3 at the time of the bid and execution of the contract and continuing through the performance of the contract are exempt from the provisions of the said Executive Order and these Guidelines and Rules. All contracts, subcontracts, purchase orders and agreements wherein the consideration is $5,000.00 or less shall be exempt from Executive Order No. Three and from these Guidelines and Rules.

SEC. 2.    SUBCONTRACTORS.

As used herein, subcontractors are persons, partnerships, associations, firms or corporations or other entities having contractual relationship with a contractor who in turn has a contract with the State of Connecticut or any of its agencies, boards, commissions or departments. Subcontractors below this tier are exempt from the Executive Order and from these Guidelines and Rules.

SEC. 3    EMPLOYEES.

As used herein, employees are persons working full or part-time irrespective of personnel classification whose wages, salaries, or earnings are subject to the Federal Insurance Contribution Act and/or to Federal Withholding Tax as a matter of law (whether in fact or not any actual withholding occurs in a given case), in an employee-employer relationship at the time of bid, contract execution, or offer or acceptance, and/or during any time thereafter during the existence of the performance period of the contract to the conclusion thereof.

SEC. 4.    REPORTS.

a. Prior to the execution of the contract or prior to acceptance of a bid, as the case may be, the contractor, subcontractor, bidder or vendor shall file a report with the State Labor Commissioner, which report shall be complete and contain all of the information therein prescribed. The report shall be on Form E.O. 3-1, a facsimile of which is attached hereto and made a part hereof, or in lieu thereof the contractor, subcontractor, bidder or vendor shall submit a detailed report containing all of the information required in Form E.O. 3-1.

b. The Labor Commissioner may require the filing of additional reports prior to final payment or prior to any renewal or extension of the contract and during the duration of the contract at such times as the Commissioner may, in his discretion, from time to time deem necessary. The Labor Commissioner may require the filing of additional information or reports, and the contractor, subcontractor, bidder or vendor shall furnish said information or reports within the times prescribed by the Labor Commissioner.

c. The Labor Commissioner may, at his discretion, also require timely statistical reports on the number of minority employees employed or to be employed in the performance of the contract, and the Labor Commissioner may define such minority groups or persons.

d. Reports filed pursuant to these Guidelines and Rules in implementation of Executive Order No. Three are not public records subject to public inspection, but may be inspected only by federal and state officials having jurisdiction and authority to investigate matters of this type. All federal and state agencies empowered by law to investigate matters relating to Executive Order No. Three shall have access to these reports for inspection or copying during regular business hours.

e. Any person who wilfully, wantonly or through negligence destroys or permits to be destroyed, alters or allows to be altered after filing, any reports submitted in compliance herewith shall be subject to penalties as prescribed by law.

STATE OF CONNECTICUT

BY HIS EXCELLENCY

THOMAS J. MESKILL

GOVERNOR

EXECUTIVE ORDER NO. SEVENTEEN

WHEREAS, Section 31-237 of the General Statutes of Connecticut as amended requires the maintaining of the established free services of the Connecticut State Employment Service to both employers and prospective employees and

WHEREAS, Section 31-5 of the General Statutes of Connecticut requires that no compensation or fee shall be charged or received directly or indirectly for the services of the Connecticut State Employment Service and

WHEREAS, large numbers of our citizens who have served in the Armed Forces of our nation are returning to civilian life in our state and seeking employment in civilian occupations and

WHEREAS, we owe a duty as well as gratitude to these returning veterans including the duty to find suitable employment for them and

WHEREAS, many of our handicapped citizens are fully capable of employment and are entitled to be placed in suitable employment and

WHEREAS, many of the citizens of our state who are unemployed are unaware of the job openings and employment opportunities which do in fact exist in our state and

WHEREAS, notwithstanding the free services of the Connecticut State Employment Service, many of our Connecticut employers do not use its free services or do not avail themselves fully of all of the services offered.

NOW, THEREFORE, I, THOMAS J. MESKILL, Governor of the State of Connecticut, acting by virtue of the authority vested in me under the fourth article of the Constitution of the State and in accordance with Section 3-1 of the General Statutes, do hereby ORDER and DIRECT, as follows, by this Executive Order:

I

The Labor Commissioner shall be responsible for the administration of this Order and shall do all acts necessary and appropriate to achieve its purpose. Upon promulgation of this Order, the Commissioner of Finance and Control shall issue a directive forthwith to all state agencies that henceforth all state contracts and subcontracts for construction on public buildings, other public works and goods and services shall contain a provision rendering such contract or subcontract subject to this Order, and that such contract or subcontract may be cancelled, terminated or suspended by the Labor Commissioner for violation of or noncompliance with this Order, notwithstanding that the Labor Commissioner is not a party to such contract or subcontract.

II

Every contractor and subcontractor having a contract with the state or any of its agencies, boards, commissions, or departments, every individual partnership, corporation, or business entity having business with the state or who or which seeks to do business with the state, and every bidder or prospective bidder who submits a bid or replies to an invitation to bid on any state contract shall list all employment openings with the office of the Connecticut State Employment Service in the area where the work is to be performed or where the services are to be rendered.

III

All state contracts shall contain a clause which shall be a condition of the contract that the contractor and any subcontractor holding a contract directly under the contractor shall list all employment openings with the Connecticut State Employment Service. The Labor Commissioner may allow exceptions to listings of employment openings which the contractor proposes to fill from within its organization from employees on the rolls of the contractor on the date of publication of the invitation to bid or the date on which the public announcement was published or promulgated advising of the program concerned.

IV

Each contracting agency of the state shall be primarily responsible for obtaining compliance with this Executive Order. Each contracting agency shall appoint or designate from among its personnel one or more persons who shall be responsible for compliance with the objectives of this Order.

V

The Labor Commissioner shall be and is hereby empowered to inspect the books, records, payroll and personnel data of each individual or business entity subject to this Executive Order and may hold hearings or conferences, formal or informal, in pursuance of the duties and responsibilities hereunto delegated to the Labor Commissioner.

VI

The Labor Commissioner or any agency officer or employee in the executive branch designated by regulation of the Labor Commissioner may hold such hearings, public or private, as the Labor Commissioner may deem advisable for compliance, enforcement or educational purposes under this Order.

VII

(a) The Labor Commissioner may hold or cause to be held hearings, prior to imposing, ordering, or recommending the imposition of penalties and sanctions under this Order. In accordance herewith, the Commissioner or the appropriate contracting agency may suspend, cancel, terminate, or cause to be suspended, cancelled, or terminated in accordance with law any contract or any portion or portions thereof for failure of the contractor or subcontractor to comply with the listing provisions of the contract. Contracts may be cancelled, terminated, suspended absolutely or their continuance conditioned upon a program for future compliance approved by the contracting agency.

(b) Any contracting agency taking any action authorized by this Order, whether on its own motion or as directed by the Labor Commissioner, shall promptly notify him of such action. Whenever the Labor Commissioner makes a determination under this Order, he shall promptly notify the appropriate contracting agency of the action recommended. The agency shall report the results to the Labor Commissioner promptly.

VIII

If the Labor Commissioner shall so direct, contracting agencies shall not enter into contracts with any bidder or prospective contractor unless he has satisfactorily complied with the provisions of this Order.

This Order shall become effective sixty days after the date of this Order.

Dated at Hartford, Connecticut, this 15th day of February, 1973.

_Thomas J. Meskill_