# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

NATIONAL RAILROAD PASSENGER
CORPORATION—AMTRAK,

                    Petitioner,

        v.

METRO-NORTH COMMUTER RAILROAD
COMPANY,

                    Respondent.

Case No. 26-cv-3339

## REPLY MEMORANDUM IN SUPPORT OF AMTRAK'S MOTION FOR <u>PRELIMINARY INJUNCTIVE RELIEF</u>

Elizabeth Edmondson
**JENNER & BLOCK LLP**
1155 Avenue of the Americas
New York, NY 10036-2711
(212) 891-1606
eedmondson@jenner.com

Jessica Ring Amunson*
**JENNER & BLOCK LLP**
1099 New York Ave NW, Suite 900
Washington, DC 20001-4412
(202) 639-6023
jamunson@jenner.com

*admitted *pro hac vice*

*Counsel for Amtrak*

**TABLE OF CONTENTS**

**INTRODUCTION**................................................................................................................1

**ARGUMENT**..................................................................................................................2

I.   The Undisputed Record Demonstrates that Amtrak Will Suffer Irreparable Harm in the
     Absence of an Injunction. ...............................................................................................2

II.  Amtrak Has Established Serious Questions Going to the Merits of this Dispute.....................4

III. The Injunction Amtrak Seeks Is Workable and Prohibitory.........................................................7

IV.  The Balance of Hardships and Public Interest Weighs Decidedly in Amtrak's Favor ............10

V.   No Bond is Warranted in Connection with This Preliminary Injunction.................................10

**CONCLUSION** ................................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Cash Card Corp. v. AT&T Corp.*,
   No. 95 Civ. 10607, 1995 WL 758883 (S.D.N.Y. Dec. 21, 1995)................................................3

*Brenntag Int'l Chems., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999)........................................................................................................2

*Credico v. New York State Bd. of Elections*,
   751 F. Supp. 2d 417 (E.D.N.Y. 2010) ........................................................................................4

*Christa McAuliffe Intermediate Sch. v. de Blasio*,
   364 F. Supp. 3d 253 (S.D.N.Y. 2019)........................................................................................8

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*,
   No. 20-CV-181, 2020 WL 915824 (S.D.N.Y. Feb. 26, 2020)................................................7, 8

*Hopkins Hawley LLC v. Cuomo*,
   No. 20-CV-10932, 2021 WL 8200607 (S.D.N.Y. Jan. 8, 2021) ................................................4

*loanDepot.com, LLC v. CrossCountry Mortg., LLC*,
   No. 22 Civ. 5971, 2023 WL 3884032 (S.D.N.Y. June 8, 2023) ..............................................10

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018)..........................................................................................................8

*Nassau Tr. Co. v. Montrose Concrete Prods. Corp.*,
   56 N.Y.2d 175 (N.Y. 1982) ........................................................................................................6

*Nat'l R. R. Passenger Corp. v. Chesapeake & O. Ry. Co.*,
   551 F.2d 136 (7th Cir. 1977) ......................................................................................................7

*Rogers, Burgun, Shahine & Deschler, Inc. v. Dongsan Const. Co.*,
   598 F. Supp. 754 (S.D.N.Y. 1984)..............................................................................................7

*Seaboard Coast Line R. Co. v. Nat'l R.R. Passenger Corp.*,
   554 F.2d 657 (5th Cir. 1977) ......................................................................................................7

**Statutes**

49 U.S.C. § 24308(a) ...................................................................................................................4, 5

**Court Rules**

Fed. R. Civ. P. 65(c) .......................................................................................................................10

Local Rules Rule 7.1(c) ............................................................................................................12

Local Rules Rule 2(e) ..............................................................................................................12

## INTRODUCTION

Metro-North's Opposition does not contest the central tenets of Amtrak's Petition.[1] Metro-North does not dispute that—in accordance with Amtrak's statutory right to access and the parties' contractual terms for that access—Metro-North has for more than thirty years routinely accommodated Amtrak's non-revenue service requests on the Hudson and New Haven Lines. Metro-North does not dispute that, beginning in March 2026, it abruptly reversed course and started denying virtually every non-revenue request Amtrak submitted. Metro-North does not dispute that this reversal coincided with—and is being used as leverage in—an unrelated dispute over a damaged catenary wire. And finally, Metro-North does not meaningfully contest, nor could it, the increasing disruption its denials are causing to Amtrak's operations, including slowing, delaying, and cancelling passenger trains. Based on these uncontested facts, and others set forth in Amtrak's petition, a preliminary injunction to preserve the status quo pending the parties' arbitration is required in this case.

Metro-North's newfound and remarkable position is that it is entitled to issue these denials because the parties' Agreements do not cover non-revenue runs. Metro-North claims it granted thirty years' worth of Amtrak's non-revenue requests only "on an individualized, *ad hoc* basis." Opp. at 1. This argument ignores Amtrak's statutory right to access Metro-North's facilities, is inconsistent with the text of the Agreements setting the terms of that access, and completely disregards the parties' thirty-year course of performance. In any event, the interpretation of the parties' Agreements is a question for the arbitrators. In the meantime, Amtrak needs immediate relief to prevent the irreparable harm Amtrak is experiencing from these denials.

---

[1] Capitalized terms not defined herein shall have the same meaning as in Amtrak's Memorandum in Support of Its Motion for Preliminary Injunctive Relief, Dkt. No. 7 ("Memorandum" or "Mem.").

Metro-North's other arguments are just as far afield. The injunction Amtrak seeks is neither "mandatory" nor unworkable; it would simply prohibit Metro-North from imposing its new policy of systematic denials and instead return to its long-standing practice of evaluating the operational feasibility of specific requests. Metro-North's complaint that it needs to be compensated for the risk of permitting NextGen Acela pantograph tests on its lines may be grounds for negotiation or even arbitration, but it certainly provides no justification for denying *other* types of non-revenue runs. Finally, contrary to Metro-North's suggestion, Amtrak has acted promptly to protect its rights, pursuing the arbitration process (now formally initiated) in tandem with its Petition. And while Metro-North now asserts that its new position on non-revenue runs was clear in March, the undisputed record demonstrates that Metro-North was still pretending to deny non-revenue runs for contractual reasons just one week before Amtrak filed this Petition.

Because an injunction is necessary to avoid irreparable harm to Amtrak pending the arbitration of the parties' dispute, Amtrak respectfully requests that its motion be granted.

## **ARGUMENT**

### I.     **The Undisputed Record Demonstrates that Amtrak Will Suffer Irreparable Harm in the Absence of an Injunction.**

Metro-North claims that Amtrak's harms are "speculative" because Amtrak has thus far managed to keep at least some of its non-revenue trains running through emergency workarounds. That argument inverts the irreparable harm inquiry. The question is not whether Amtrak has been able to delay the worst consequences of Metro-North's conduct through stopgap measures; it is whether, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). The record establishes precisely that.

2

Metro North's Opposition, tellingly, ignores the deficiencies Amtrak identified with each stopgap measure. For example, Metro-North asserts that attaching Amtrak's geometry cars to its passenger trains is an "adequate alternative[]" to ordinary geometry test runs. Opp. at 16-17. But Amtrak already explained that, because the geometry cars must run at a slower speed, they require that Amtrak slow down the passenger train to which they are attached, delaying Amtrak's passengers. Mem. at 15. Likewise, Metro-North's assertion that Amtrak's equipment-repositioning runs are too infrequent to cause irreparable harm, Opp. at 17, ignores that its denial has *already* caused Amtrak to cancel and delay passenger trains, Mem. at 12. And as Metro-North has now openly admitted that it will continue to deny equipment-positioning runs unless Amtrak breaks with the parties' thirty-year course of performance, *see* Opp. at 14, 16-17, those cancellations and delays will continue. These effects on Amtrak's customers and reputation cannot be remedied with money and are paradigmatic examples of irreparable harm. *See, e.g.*, *Am. Cash Card Corp. v. AT&T Corp.*, No. 95 Civ. 10607, 1995 WL 758883, at *2 (S.D.N.Y. Dec. 21, 1995) (granting injunction because "disruption in service" plaintiff would suffer absent injunction would "result in the loss of customers and good will").

Nor is Amtrak's conduct somehow inconsistent with a finding of irreparable harm. Metro-North's arguments rely on the assertion that it was clear by March 18, 2026, that Metro-North would not permit non-revenue runs without compensation. Opp. at 14. But the communication Metro-North points to falls well short of a declaration that Metro-North would be denying all non-revenue runs. *Id*. (citing Roth Decl. ¶¶ 26-30).[2] As late as April 15—just one week before Amtrak submitted its petition—Metro-North was still pretending that some of its non-revenue denials were

---

[2] The exchange indicates, at most, that Metro-North conditioned a single test run of Amtrak's NextGen Acela pantographs on "an agreement" being "put in place." Roth Decl. ¶ 27.

for capacity reasons. Jagodzinski Decl. ¶ 30.[3] In the meantime, Metro-North ignored multiple emails from Amtrak, including on March 27, April 14, and April 21, demanding that it cease the unjustified denials or provide a satisfactory explanation. *See* Edmondson Decl. Exs. 1-2. Indeed, Metro-North did not formally declare that it was systematically denying Amtrak's non-revenue runs until after Amtrak filed its Petition. *See* Opp. at 14.[4]

## II.     Amtrak Has Established Serious Questions Going to the Merits of this Dispute.

Metro-North's Opposition on the merits reduces to a single contention—that the Hudson and New Haven Agreements do not cover non-revenue services at all. That argument ignores Amtrak's statutory right of access, is wrong on the text, and is irreconcilable with the parties' thirty-year course of performance. In any event, this presents an interpretive question reserved for the arbitrators in the first instance. At a minimum, Amtrak has established serious questions going to the merits of its claims.

Amtrak has the statutory right to access the lines of freight and commuter host railroads and to contract with those railroads to set the terms for such access. *See* 49 U.S.C. § 24308(a). Although host railroads may seek to renegotiate those agreements from time to time, they may not

---

[3] On April 1, 2026, for example, Metro-North denied Amtrak's request to move a NextGen Acela trainset out of its manufacturing plant in Hornell, New York due to "ongoing infrastructure repairs." Jagodzinski Decl. ¶ 28. And on April 15, 2026, Metro-North denied Amtrak's request to operate a track geometry car on the New Haven Line due to "potential conflicts with ongoing infrastructure improvements." *Id.* ¶ 30.

[4] Metro-North's seeming suggestion that Amtrak's decision not to move for a temporary restraining order is grounds to deny Amtrak's motion for a preliminary injunction is of course contrary to caselaw, including that cited by Metro-North. *See, e.g.*, *Hopkins Hawley LLC v. Cuomo*, No. 20-cv-10932, 2021 WL 8200607, at *2 (S.D.N.Y. Jan. 8, 2021) ("In denying the TRO request, the Court expresses no view on the merits of Plaintiff's pending application for a Preliminary Injunction."); *see also Credico v. New York State Bd. of Elections*, 751 F. Supp. 2d 417, 419 n.1 (E.D.N.Y. 2010) (denying TRO and granting preliminary injunction). Metro-North's suggestion that Amtrak's purported delay in seeking arbitration warrants denial is likewise wrong. And in any event, Amtrak has initiated the arbitration process. Edmondson Decl. ¶ 4.

deny Amtrak's statutory right to access simply because they are no longer happy with the terms of their agreements. Metro-North asks this Court to conclude that, because the objective of the Agreements is to facilitate Amtrak's provision of passenger service over Metro-North's lines, the Agreements should be read as excluding *any* non-revenue service. But the non-revenue service Amtrak is requesting here is not unconnected to passenger service; to the contrary, the movements Amtrak seeks are necessary to facilitate safe and efficient passenger service. Running a geometry car to inspect tracks for alignment ensures the safety of Amtrak's passengers. Moving equipment where it is most needed helps passengers arrive on time.

The operative provisions in both Agreements, Sections 3.1 and 3.2(A) obligate Metro-North to provide "the use of facilities and the services requested by [Amtrak] for or *in connection with* the operation of Amtrak's trains" and to furnish "modified or additional services *in connection with* the operation of Amtrak trains." Agreements §§ 3.1, 3.2(A) (emphases added). The non-revenue movements of running geometry cars, moving equipment, and commissioning new trains all fit within the plain meaning of services made "in connection with the operation of Amtrak trains."

Metro-North's appeal to Section 3.2(A)'s "due regard" clause does not suggest otherwise. That clause directs Metro-North to give "due regard to . . . the success of [Amtrak's] Intercity Rail Passenger Service" in providing the requested services. The interest in the success of Amtrak's passenger service that the clause identifies is exactly the interest the non-revenue moves at issue serve: a geometry car inspection preserves passenger-train speed; NextGen Acela commissioning validates passenger equipment for revenue service; and repositioning returns passenger equipment to revenue service. All of this is in service of Amtrak's statutory rights and obligations as the national provider of intercity passenger rail service under 49 U.S.C. § 24308(a).

Nor does Metro-North's argument fare better when one looks at other provisions of the Agreements. While some references in the Agreements are to "passenger train mile," as Metro-North points out, Opp. at 19, other references are to "locomotive mile" or "car mile." *E.g.*, Jagodzinski Decl. Ex. A, App. III, Tbl. 1, App. IV, Item 3 ("$.3139 per each locomotive mile and car mile for trains operated between Spuyten Duyvil and Poughkeepsie," which is measured in "UNIT MI." not "passenger train mile"). And the 2015 Amendment to the New Haven Agreement is even more explicit. It incorporates the Northeast Corridor Cost Allocation Policy, which explains that the cost-allocation methodology was based on statistics that included "scheduled revenue *and non-revenue movements*." Jagodzinski Decl. Ex. B, Policy § 5.1.1(3) (emphasis added).

The parties' course of performance only strengthens Amtrak's position. Metro-North processed, scheduled, and approved Amtrak's non-revenue requests under the Agreements regularly for more than thirty years. *See* Jagodzinski Decl. ¶ 7. It strains credulity, to say the least, that Metro-North did that only on an *ad hoc*, extra-contractual basis, rather than as a logical application of the Agreements between the parties. And even if that had been true at the beginning of the parties' relationship, the extreme length of the course of performance here—more than thirty years—would give Amtrak a reliance interest in continuing the practice sufficient to justify an injunction in favor of the status quo. *See, e.g.*, *Nassau Tr. Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (N.Y. 1982) (recognizing that estoppel can be available to prevent injustice to one who has justifiably relied upon other party's conduct).

Finally, Metro-North's invocation of a separate January 30, 1991 letter agreement cuts against Metro-North's position. The letter expressly committed Metro-North to "continue their past practice of cooperating with Amtrak in efforts to implement higher operating speeds on the New Haven Line," indicating that the parties intended to continue the cooperative framework they

6

had built. Roth Decl. ¶ 9, Ex. B at 1. The letter is not, as Metro-North contends, evidence of a carve-out from the New Haven Agreement. Opp. at 20.

In any event, to the extent any residual ambiguity remains, the Agreements' arbitration clause commits questions of "interpretation, application, or implementation" of the Agreements to the arbitrators in the first instance. Agreements, Art. VI. Metro-North has not contested that it is a party to those Agreements or that the arbitration clause governs disputes about the Agreements' scope, and Amtrak has shown well more than a serious question to put before the arbitrators. *See Nat'l R. R. Passenger Corp. v. Chesapeake & O. Ry. Co.*, 551 F.2d 136, 140 (7th Cir. 1977) (holding that what qualifies as "modified or additional service" under Section 3.2 of Amtrak's agreement with a host railroad is a matter for the arbitrator); *Seaboard Coast Line R. Co. v. Nat'l R.R. Passenger Corp.*, 554 F.2d 657, 660-61 (5th Cir. 1977) (holding that the scope of "services" covered by Amtrak's contract with a host railroad was a matter for the arbitrator).[5]

### III.    The Injunction Amtrak Seeks Is Workable and Prohibitory.

Amtrak's proposed injunction precisely tracks the language in the Agreements and the parties' thirty-plus-year course of performance thereunder—in other words, the status quo preceding this dispute. There is nothing vague or unworkable about such an injunction. *See, e.g.*, *Rogers, Burgun, Shahine & Deschler, Inc. v. Dongsan Const. Co.*, 598 F. Supp. 754, 759 (S.D.N.Y. 1984) (granting preliminary injunction preserving status quo under contract pending arbitration); *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181, 2020 WL 915824, at *15 (S.D.N.Y. Feb. 26, 2020) (similar).

Metro-North contends that no injunction would be workable unless it specifies whether

---

[5] Moreover, contrary to Metro-North's contentions, its systematic denials of non-revenue runs to gain leverage in an unrelated dispute constituted an arbitrary and bad-faith exercise of its discretion that violated the covenant of good faith and fair dealing. Opp. at 21-22; Mem. at 20-21.

7

Metro-North would receive compensation or indemnification for permitting a non-revenue run, but as Metro-North essentially concedes, additional compensation and separate indemnification provisions for non-revenue runs are not part of the status quo. *See* Opp. at 6. To the extent Metro-North claims that is "unfair," *id*. at 11, that once again goes to the question before the arbitrator of whether the current Agreements already cover compensation and indemnification for non-revenue services. But it does not provide a basis for Metro-North to deny Amtrak's requests for non-revenue service in the meantime.

Similarly misguided is Metro-North's argument about the nature of the injunction Amtrak seeks. Amtrak's proposed injunction is prohibitory, not mandatory.[6] "Status quo," in preliminary-injunction parlance, really means "status quo ante"—"that is, the last actual, peaceable uncontested status which *preceded the pending controversy*." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 & n.5 (2d Cir. 2018) ("*NASL*") (emphasis added; internal quotation omitted); *see also Christa McAuliffe Intermediate Sch. v. de Blasio*, 364 F. Supp. 3d 253, 275 (S.D.N.Y. 2019) ("When an injunction seeks to require a party who has recently disturbed the status quo to reverse its actions, it seeks to restore, rather than disturb the status quo ante." (internal quotation marks omitted)). The status preceding the pending controversy here is undisputed: Metro-North evaluated Amtrak's non-revenue requests based solely on the capacity constraints set out in Section 3.2 of the Agreements without demanding separate compensation or liability arrangements. Jagodzinski Decl. ¶ 7; Opp. at 6.

Amtrak's proposed injunction merely requires Metro-North to resume evaluating non-

---

[6] In any event, despite Metro-North's arguments, Amtrak's showings also meet the standard for mandatory injunctions, and mandatory injunctions in aid of arbitration are permissible in this Circuit. *See General Mills*, 2020 WL 915824, at *7 & n.3 ("[P]reservation of status quo is [not] a requirement for preliminary injunctions pending arbitration." (emphasis omitted))).

revenue requests in that same manner. Metro-North's reliance on *NASL*, accordingly, is misplaced. Opp. at 13. *NASL* denied a request for an injunction mandating a *particular resolution* to the defendant's yearly evaluations of the plaintiff's applications. 883 F.3d at 37. Amtrak is not asking for a particular resolution to its requests, only that its requests be evaluated under the same standards as previously. *See* Dkt. No. 6 at 2 (providing that Metro-North will grant non-revenue requests subject to the capacity grounds provided in the Agreements); *NASL*, 883 F.3d at 37 (observing that the status quo ante between the parties entailed regular evaluations of plaintiff's applications).

Indeed, Metro-North has essentially conceded that the denials beginning in March represented a new policy that broke with thirty years of practice and was adopted by Metro-North in response to the pantograph incident. *See* Opp. at 6 (acknowledging past practice); *id.* at 8, 14 (stating that, after the pantograph-testing dispute, Metro-North resolved to require compensation for non-revenue runs); Roth Decl. ¶ 35. Amtrak's requested injunction would simply prohibit Metro-North from implementing that policy until the issues are resolved by arbitration.

Finally, Metro-North's complaints about the damage to its lines from the original model of Amtrak's NextGen Acela pantographs, Opp. at 7-8, and its desire for compensation for testing of new pantographs, *id.* at 18, are not grounds for denying Amtrak's requested relief. As Amtrak's opening papers explain, Metro-North cannot deny *every* type of non-revenue run that Amtrak needs to perform on Metro-North's lines due to ongoing negotiations for an agreement governing NextGen Acela pantograph test runs. Mem. at 19-21. Moreover, certain of the trains in the incidents Metro-North refers to were *revenue* trains whose services Metro-North is indisputably required to facilitate, *see, e.g.,* Agreements § 3.3(B), and whose damages Metro-North is already compensated for through a monthly risk fee, *see* Agreements § 7.2(e); Jagodzinski Decl. ¶ 19. Amtrak remains

9

open to negotiating an agreement governing NextGen Acela pantograph test runs, but it is not open to doing so under duress while regular train operations are being significantly impaired.

### IV. The Balance of Hardships and Public Interest Weighs Decidedly in Amtrak's Favor.

The Opposition has no answer for the fact that Metro-North—and the customers it serves—had no problem with the status quo for thirty-plus years prior to this dispute. *See* Opp. at 22-24. Amtrak has explained the harms that will occur if Metro-North is permitted to continue to deny Amtrak's requests for non-revenue service for pretextual reasons while the parties arbitrate their disputes. Mem. at 14-17. The public has a strong interest in ensuring Amtrak's continued success as the nation's provider of intercity passenger rail service. Accordingly, as explained in the Memorandum, the balance of hardships and public interest weigh decidedly in Amtrak's favor in this dispute. Mem. at 21-22.

### V. No Bond is Warranted in Connection with This Preliminary Injunction.

The status quo Amtrak's proposed injunction would preserve worked for Metro-North for more than thirty years. Metro-North did not seek additional compensation for Amtrak's non-revenue runs until an unrelated dispute over pantograph testing arose. Because Metro-North "has not convincingly established a likelihood of harm flowing from the issuance of a preliminary injunction," no bond is required pursuant to Fed. R. Civ. P. 65(c). *loanDepot.com, LLC v. CrossCountry Mortg., LLC*, No. 22 Civ. 5971, 2023 WL 3884032, at *9 (S.D.N.Y. June 8, 2023) (requiring no bond in connection with preliminary injunction preserving status quo under the parties' contracts).

### CONCLUSION

For the foregoing reasons, Amtrak respectfully requests that the Court grant its Petition for a preliminary injunction in aid of arbitration.

Dated: May 15, 2026

Respectfully submitted,

/s/Elizabeth A. Edmondson
Elizabeth A. Edmondson
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY 10036-2711
(212) 891-1606
eedmondson@jenner.com

Jessica Ring Amunson*
Jenner & Block LLP
1099 New York Ave NW, Suite 900
Washington, DC 20001-4412
(202) 639-6023
jamunson@jenner.com

* admitted *pro hac vice*

*Counsel for Petitioner Amtrak*

## <u>CERTIFICATION OF COMPLIANCE WITH WORD COUNT LIMIT</u>

I hereby certify that the foregoing Reply complies with Rule 7.1(c) of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York and Rule 2(e) of this Court's Individual Rules of Practice. The Reply is written in 12-point type on 8½-by-11-inch paper in Times New Roman font and does not exceed 10 pages in length. The total number of words in the foregoing Reply, exclusive of the caption, table of contents, table of authorities, and signature block, is 3,183 words. In making this certification, I have relied on the word count of the word-processing system used to prepare the document.

Dated: May 15, 2026    /s/Elizabeth A. Edmondson
      New York, New York    Elizabeth A. Edmondson
                                      JENNER & BLOCK LLP
                                      1155 Avenue of the Americas
                                      New York, NY 10036
                                      (212) 891-1606
                                      eedmondson@jenner.com

                                      *Counsel for Petitioner Amtrak*