UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL RAILROAD PASSENGER
CORPORATION--AMTRAK

       Petitioner,

  -v-

METRO-NORTH COMMUTER RAILROAD
COMPANY,

       Respondent.

---

26-cv-3339 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

On May 22, 2026, the Court denied the petition of National Railroad Passenger Corporation--Amtrak ("Amtrak") for a preliminary injunction in aid of arbitration against respondent Metro-North Commuter Railroad Company ("Metro-North"). See ECF No. 23. This Opinion & Order sets forth the reasons for that decision and orders the entry of final judgment.

## I.  **Background**

The Court assumes the parties' familiarity with the case and sets forth the underlying facts only briefly. This petition arises from a dispute over Amtrak's access to Metro-North's New Haven and Hudson Line tracks for its non-revenue trains.[1] Amtrak and Metro-North have

---

[1] Amtrak's train movements fall into two categories: revenue service and non-revenue service. Revenue service refers to passenger trains. Jagodzinski Decl. ¶ 6, ECF No. 8. Non-revenue service includes non-passenger trains that are nonetheless "essential . . . to maintain safe and reliable passenger transit." Id. ¶ 7. Examples of non-revenue service include (a) commissioning and testing runs of new train cars; (b) track geometry cars, which are used to measure "critical safety

entered into two agreements that govern Amtrak's access to Metro-North's rails, one for the Hudson Line and another for the New Haven Line. See Jagodzinski Decl, Ex. A ("Hudson Agreement"), Ex. B ("New Haven Agreement"). There is no dispute that those Agreements govern Amtrak's operation of revenue (passenger) trains. The parties disagree, however, about whether the Agreements also cover Amtrak's non-revenue service. Amtrak contends that its non-revenue service is covered by Metro-North's contractual agreement to "provide modified or additional services in connection with the operation of Amtrak trains on" the Hudson and New Haven Lines. See Hudson Agreement § 3.2(A); New Haven Agreement § 3.2(A). Metro-North disagrees.

Since the execution of the Hudson and New Haven Agreements more than thirty years ago, Amtrak's practice has been to submit requests to Metro-North for non-revenue service and Metro-North has generally approved the requests or explained its operational constraints and discussed alternative scheduling. Jagodzinksi Decl. ¶ 14, ECF No. 8. Starting on March 18, 2026, however, Metro-North began denying all or nearly all Amtrak's requests for non-revenue movement on the New Haven and Hudson Lines. Id. ¶¶ 22-31. Metro-North has not specified operational reasons for the denials. See id. ¶¶ 23-32.

Amtrak's inability to run non-revenue trains has allegedly impacted its ability to offer reliable, on-time service. Among other

_____

parameters" as required by federal law; and (c) repositioning equipment for use in passenger service. Id. ¶¶ 7-13.

things, Amtrak alleges, Amtrak has had to run passenger trains at lower speeds, to delay or alter the commissioning of new NextGen Acela trains, and to cancel or delay trains due to the unavailability of necessary equipment (although looming in the background are several serious accidents detailed below that occurred during Amtrak's recent use of Metro-North rails for non-revenue trains). See id. ¶¶ 33-44.

On April 22, 2026, Amtrak filed this petition for a preliminary injunction in aid of arbitration. It sought an injunction that would preserve the status quo pending the resolution of the parties' dispute by arbitration.[2] Its requested injunction would enjoin Metro-North from

> denying, refusing, or failing to timely approve Amtrak's requests for non-revenue train movements on Metro-North's New Haven Line and Hudson Line, including but not limited to, track geometry car runs, commissioning runs for next-generation Acela trainsets, repositioning of passenger equipment, and other non-revenue movements, except where Metro-North's physical and financial capabilities; speed, weight or similar operating restrictions; or rules and safety standards require Metro-North to schedule the non-revenue train movement at a later date or time.

Pet. at 10, ECF No. 1.

---

[2] The parties agree that the New Haven and Hudson Agreements require disputes to be resolved by arbitration. Following the procedures outlined in those Agreements, Amtrak designated an arbitrator on May 15, 2026. Edmondson Decl. ¶ 4, ECF No. 22. At oral argument, counsel for Amtrak explained that the several week delay in initiating arbitration was due to Amtrak attempting to resolve the dispute with Metro-North directly, which would have obviated the need for formal dispute resolution. The Court credits this explanation and places no weight on the timing of Amtrak's initial designation of an arbitrator.

The Court set a briefing schedule on Amtrak's petition and, after receiving the briefs, heard oral argument on May 21, 2026. On May 22, after careful consideration of the briefs, the supportive declarations, and the arguments of counsel, the Court denied Amtrak's petition. The Court now sets forth the reasons for that decision.

## II.  Discussion

"Where the parties have agreed to arbitrate a dispute, a district court has jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration." Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 894-95 (2d Cir. 2015). Injunctions in aid of arbitration are subject to the same standard as are preliminary injunctions generally. Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 125-26 (2d Cir.1984).

A party seeking a preliminary injunction must demonstrate: (1) "a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [movant's] favor"; (2) a likelihood of "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the [movant's] favor"; and (4) that the "public interest would not be disserved" by the issuance of an injunction. Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir.2010). "A preliminary injunction is an extraordinary remedy and is never awarded as of right." JTH Tax, LLC v. Agnant, 62 F.4th 658, 666-67 (2d Cir. 2023) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).

## A. Nature of the Relief Sought

Before turning to the preliminary injunction standard, the Court addresses a preliminary objection from Metro-North. As a general matter, preliminary injunctions can be prohibitory or mandatory in nature. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc. ("NASL"), 883 F.3d 32, 36 (2d Cir. 2018). This difference is significant because, among other things, mandatory injunctions require the movant to satisfy a heightened standard, Daileader v. Certain Underwriters at Lloyds London Syndicate 1861, 96 F.4th 351, 357 (2d Cir. 2024), and, as Metro-North points out, there is reason to conclude that injunctions in aid of arbitration must be prohibitory injunctions, Bernadino v. Barnes & Noble Booksellers, Inc., 2017 WL 3727230, at *10 (S.D.N.Y. Aug. 11, 2017), report and recommendation adopted, 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017) (citing Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1053-54 (2d Cir. 1990)). Metro-North argues that the injunction Amtrak seeks is a mandatory one. The Court disagrees.

To determine whether a requested preliminary injunction is prohibitory or mandatory in nature, the court must first determine the status quo ante -- that is, "the last actual, peaceable uncontested status which preceded the pending controversy." Mastro v. Sibelius, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam) (quoting LaRouche v. Kezer, 20 F.3d 68, 74 n.7 (2d Cir. 1994)). The actual phrasing of the

injunction is of lesser significance because "in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or in prohibitory terms." NASL, 883 F.3d at 36 n.4 (quoting Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 835 (1994).

As Amtrak describes it, the "'actual' status quo ante between the parties" preceding this controversy, Daileader, 96 F.4th at 357 (quoting NASL, 883 F.3d at 37), was that Amtrak would submit requests to Metro-North for non-revenue service and that Metro-North, in almost all cases, would approve such requests. Jagodzinksi Decl. ¶ 14. On the rare occasions that Metro-North denied Amtrak's request for non-revenue service, Metro-North explained the operational constraints behind its denial and discussed alternative scheduling for such service. Id. Metro-North does not meaningfully dispute this description.[3]

The preliminary injunction Amtrak seeks would do no more than restore the status quo just described. It would not require Metro-North to approve all Amtrak's requests or, indeed, any particular request. Instead, it would require Metro-North to either grant or deny Amtrak's

---

[3] Metro-North insists that its review of Amtrak's non-revenue requests has always been "ad hoc" and that "[a]pproval . . . was not automatic" but rather "on a case-by-case basis in Metro-North's discretion." Roth Decl. ¶ 15, ECF No. 20. But this characterization of the status quo is not inconsistent with Amtrak's description of individual requests and approvals. Moreover, Metro-North notably does not dispute Amtrak's assertion that Metro-North has historically offered operational explanations for all its denials of Amtrak's non-revenue requests or that it has approved nearly all such requests.

non-revenue requests on the same terms as it has historically done, namely, based only on the sort of operational or similar constraints outlined in the Hudson and New Haven Agreements. See Hudson Agreement § 3.2(A); New Haven Agreement § 3.2(A).

For these reasons, the preliminary injunction Amtrak seeks is not akin to the mandatory injunction sought in NASL. There, the Second Circuit explained that the status quo between the parties was one in which defendant would "regularly evaluate [plaintiff's] applications and determine [its] divisional designation." NASL, 885 F.3d at 37. The requested injunction, by contrast, would have mandated a certain divisional designation "absent the annual process" of application and review. Id. Because the requested injunction would have "upend[ed]" how the parties had operated "year after year," the Second Circuit concluded that the injunction was mandatory in nature. Id. By contrast, for the reasons just described, Amtrak's requested injunction seeks only a return to Metro-North's longstanding -- and, as noted, undisputed -- practice of reviewing Amtrak's non-revenue requests and granting them absent operational constraints. The injunction would not mandate any particular outcome in the case of any specific request. The requested injunction is therefore prohibitory in nature.

B. **Entitlement to Relief**

As it turns out, however, the Court need only address one prong of the preliminary injunction test: likelihood of success on the merits. Amtrak does not contend that it can meet the traditional test for likelihood of success on the merits. Instead, it relies on the

7

alternative "serious questions" standard, which permits a party seeking an injunction to demonstrate "sufficiently serious questions going to the merits" combined with a "balance of hardships tipping decidedly in [that party's] favor." Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd., 598 F.3d 30, 35 (2d Cir. 2010).[4] This formulation allows a district court to grant a preliminary injunction even when it "cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." Id. However, because of the additional requirement that the balance of hardships tips "decidedly" in the movant's favor, the movant's "overall burden is no lighter" even when applying the "serious questions" standard. Id.

But even assuming arguendo that Amtrak has demonstrated "sufficiently serious questions going to the merits," Amtrak has not made the showing necessary on the balance of hardships.[5]

---

[4] Amtrak suggests that the Court's inquiry is limited to whether there are "sufficiently serious question[s] going to the merits." Pet. Mem. at 17, ECF No. 7. But the case Amtrak cites involves application of the standard for specific performance in the context of a request for a preliminary injunction in aid of arbitration based on a contract containing a "status quo provision." Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 434 (2d Cir. 1993). In the absence of such a provision, the standard test for preliminary relief applies. See id. (citing Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc., 749 F.2d 124, 125 (2d Cir. 1984)). Under that test, Amtrak can rely on the presence of sufficiently serious questions, but it then must also show that the hardships tip decidedly in its favor. See Benihana, Inc., 784 F.3d at 894-95.

[5] Although Amtrak's argument that the New Haven and Hudson Agreements cover non-revenue service is by no means certain,

The "balance of hardships" factor requires the Court to "balance the competing claims of injury" and to "consider the effect on each party of the granting or withholding of the requested relief." Yang v. Kosinski, 960 F.3d 119, 134 (2d Cir. 2020) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). As with the irreparable injury prong, the "relevant harm [is] that which . . . 'cannot be remedied after a final injunction.'" State Farm Mut. Auto. Ins. Co., 120 F.4th at 84-85 (quoting Salinger, 607 F.3d at 81). Injury to a business's reputation is a well-recognized example of irreparable harm. Benihana, Inc., 784 F.3d at 896.

Amtrak has identified irreparable harm that it is likely to suffer in the absence of an injunction. As Amtrak explains, Metro-North's blanket refusal to permit Amtrak's non-revenue service on its tracks is contributing to disruptions to Amtrak's operations across the

_____

Metro-North's counterarguments do not persuade the Court that the references in the Agreements to "modified or additional services" decidedly do not extend to Amtrak's non-revenue trains. Metro-North's arguments are principally based on references elsewhere in the Agreements to passenger service. But the fact that certain metrics or promises in the Agreements apply only to revenue service is not evidence that the entirety of the Agreements apply only to such service. Nor does the separate New Haven Line Testing Agreement provide conclusive evidence of the kind Metro-North suggests. See Roth Decl., Ex. B ("New Haven Testing Agreement"). The Testing Agreement says nothing about Metro-North's agreement to permit or approve Amtrak's non-revenue use of its rails. Instead, it is a narrow agreement to "cooperat[e] with Amtrak in efforts to implement higher operating speeds" and to "assist Amtrak in its efforts to obtain . . . waivers from [federal] regulations as may be necessary to undertake [such] testing." Id. There is no reason to conclude that this is an exhaustive statement of the parties' agreement regarding Amtrak's non-revenue use of Metro-North's lines.

Northeast Corridor, a route that accounts for approximately 50 percent of all Amtrak passenger trips. Jagodzinski Decl. ¶ 5. Amtrak's inability to run non-revenue trains has caused it to lower operating speeds and to limit the commissioning of new trainsets. See id. ¶¶ 40-41, 33-35. It has also prevented Amtrak from conducting routine equipment repositioning, forcing Amtrak to cancel and delay passenger trains. Id. ¶¶ 42, 44. These effects all erode Amtrak's ability to offer its customers reliable passenger service and, as a result, erode customers' confidence in Amtrak as a reliable mode of transportation.[6] This reputational damage constitutes irreparable harm.

The harm that Amtrak has identified is, however, limited. Amtrak has been able to mitigate the disruptions to its service by, among other things, attaching geometry cars to late-night passenger trains and shortening the commissioning runs for new trains in a way that avoids Metro-North's tracks. Id. ¶¶ 40-41; 35. Although these interventions have not wholly addressed the disruptions to Amtrak's service, they have largely minimized the impact on its customers. New NextGen Acela trains can still enter service and the reduced train speeds impact only passengers on late-night trains. In turn, any resulting reputational harm is likely to be limited in nature.

On the other side of the ledger, the imposition of a preliminary injunction would impose some hardship on Metro-North as well.

---

[6] The Court accepts for the purposes of the petition that Amtrak supposedly enjoys customer confidence.

Metro-North would be required to approve at least some non-revenue service that it would otherwise reject, requiring it to absorb additional operational burden and to take on the risk of disruptions to its train service. For example, the genesis of the current dispute between Amtrak and Metro-North is a series of incidents involving damage to Metro-North's overhead track wiring from the pantograph mounted on top of a NextGen Acela train.[7] See Roth Decl. ¶¶ 20-33; Jagodzinski Decl. ¶¶ 15-21. The most recent incident caused substantial disruption to Metro-North's rush hour service and substantial delays for its customers. Roth Decl. ¶ 22. Even though future disruptions to Metro-North's service are somewhat less certain than the service disruptions Amtrak describes, the attendant risk of reputational harm is no less salient.[8]

Because Amtrak cannot prevail merely by showing that its hardship is greater than Metro-North's, but must show a "decidedly" greater hardship, Amtrak has not met its burden. Both parties have identified hardships from either granting or not granting the injunction. But

---

[7] A "pantograph" is an apparatus mounted to the roof of a train that connects to, and receives power from, an overhead power line. Pet. Mem. at 8 n.2; Roth Decl. ¶ 18.

[8] At argument, counsel for Amtrak argued that most of Metro-North's denials of its requests for non-revenue service do not involve NextGen Acela trains and therefore have nothing to do with the claimed safety concerns posed by the pantograph. But the requested injunction would reach all forms of non-revenue service, including NextGen Acela commissioning runs and equipment repositioning. Metro-North's concerns over track damage and service disruptions are therefore not irrelevant to this dispute.

Amtrak's burden is ultimately a modest and relatively uncertain one and does not decisively outweigh the burden to Metro-North of granting the preliminary injunction that Amtrak seeks. For that reason, Amtrak has not shown that it meets the standard for the issuance of preliminary relief.

## III.    Conclusion

For the foregoing reasons, the Court reconfirms its bottom-line order denying Amtrak's petition for a preliminary injunction in aid of arbitration.

The Clerk of Court is respectfully directed to enter final judgment dismissing the petition and to close the case.

SO ORDERED.

New York, NY
June 1, 2026

JED S. RAKOFF, U.S.D.J.